IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF CAMDEN

SOUTH CAMDEN CITIZENS IN          :
ACTION, BARBARA PFEIFER,
PHYLLIS HOLMES, LULA              :
WILLIAMS, AND SHARON
CHRISTIE PORTER,                  :          HONORABLE FREDA L. WOLFSON

        Plaintiffs,        :          Civil Action No. 01-CV-702(FLW)

    v.                            :

THE NEW JERSEY DEPARTMENT         :
OF ENVIRONMENTAL PROTECTION
and BRADLEY CAMPBELL,             :
COMMISSIONER OF NEW JERSEY
DEPARTMENT OF ENVIRONMENTAL       :
PROTECTION IN HIS OFFICIAL
CAPACITY,                         :

        Defendants,        :

ST. LAWRENCE CEMENT CO.,          :
L.L.C.,
                 :
       Intervenor.

---

BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

                             PETER C. HARVEY
                             ATTORNEY GENERAL OF NEW JERSEY
                             R.J. Hughes Justice Complex
                             P.O. Box 093
                             Trenton, New Jersey 08625
                             (609) 633-1309
                             Attorney for Respondent, State of
                               New Jersey

GARY W. WOLF, II
JOHN R. RENELLA
Deputy Attorneys General
  On the Brief

STEFANIE A. BRAND
Assistant Attorney General
  of Counsel

**TABLE OF CONTENTS**

**PAGE**

FACTS AND PROCEDURAL HISTORY . . . . . . . . . . . . . . . 1

SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . 23

INTENTIONAL DISCRIMINATION STANDARD . . . . . . . . . . . . 25

    A.    Plaintiffs Failed to Present any Genuine
        Issues of Material Fact that the DEP
        Acted in an Intentionally Discriminatory
        Manner in its Review and Issuance of the
        SLC Permits. . . . . . . . . . . . . . . . . . 26

    B.    Even if it is Assumed Plaintiffs are Dis-
        proportionally Impacted by the DEP's Review
        and Issuance of the SLC Permits, Plaintiffs
        Have Failed to Present Any Genuine Issues of
        Material Fact that the Disparate Impact is
        "Unexplainable on Grounds Other Than Race." . . . 28

    C.    Even if it is Assumed Plaintiffs are Dis-
        proportionally Impacted by the Department's
        Review and Issuance of the SLC Permits, Plain-
        tiffs Have Failed to Present Any Genuine
        Issues of Material Fact that the Department's
        Decision Making Process was Motivated by an
        Intent or Purpose to Discriminate. . . . . . . . 37

CONCLUSION . . . . . . . . . . . . . . . . . . . . 46

**CASES CITED**

_Adickes v. S.H. Kress & Co._, 398 U.S. 144 (1970) . . . . . . 23

_Alexander v. Sandoval_, 532 U.S. 275, 121 S. Ct. 1511    25, 26, 30

_Anderson v. City of Boston_, 375 F.3d 71 (1st Cir. 2004)    30, 44

_Anderson v. Liberty Lobby, Inc._, 477 U.S. 242 (1986) . . 23, 24

_Loan Center, LLC v. Nischal_, 331 F. Supp. 2d 301
  (D.N.J. 2004) . . . . . . . . . . . . . . . . . . . 23

_Celotex Corp. v. Catrett_, 477 U.S. 317 (1986) . . . . . . . 23

City of Memphis v. Greene, 451 U.S. 100, 101 S. Ct. 1584,
  67 L. Ed. 2d 769 (1981) . . . . . . . . . . . . . . . . .   39

Gomillion v. Lightfoot, 364 U.S. 339, 81 S. Ct. 125,
  (1960) . . . . . . . . . . . . . . . . . . . . . .   30, 40

Hunter v. Underwood, 471 U.S. 222, 105 S. Ct. 1916,
  85 L. Ed. 2d 222 (1985) . . . . . . . . . . . . . . . . .   44

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
  475 U.S. 574, 586 (1986) . . . . . . . . . . . . . . . .   23

Oxford House-Evergreen v. City of Plainfield,
  769 F. Supp. 1329 (D.N.J. 1991) . . . . . . . . . . . . .   42

Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256 (1970) . . . . .   29

Project B.A.S.I.C. v. Kemp, 776 F. Supp. 637
  (D.R.I. 1991) . . . . . . . . . . . . . . . . . . . . .   39

Pryor v. Nat'l Collegiate Athletic Ass'n.,
  288 F.3d 548 (3d Cir. 2002) . . . . . . . . . . 25, 26, 29-35

Resident Advisory Bd. v. Rizzo, 564 F.2d 126
  (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . 42-44

Sylvia Dev. Corp. v. Calvert County, 48 F.3d 810
  (4th Cir. 1995) . . . . . . . . . . . . . . . 39, 42, 44, 45

Village of Arlington Heights v. Metro. Hous. Dev. Corp.,
  429 U.S. 259, 97 S.Ct. 555 (1997) . . . . 26, 29, 37-39, 42, 45

Washington v. Davis, 426 U.S. 229, 96 S. Ct. 2040
  (1976) . . . . . . . . . . . . . . . . . . . . . 25, 28, 29

Williams v. Hansen, 326 F.3d 569, 585 (4th Cir. 2003) . . . .   39

Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064,
  30 L. Ed. 220 (1886) . . . . . . . . . . . . . . . . . .   30

## STATUTES CITED

N.J.S.A. 26:2C-1 . . . . . . . . . . . . . . . . . . . 18, 41

N.J.S.A. 26:2C-9.2j . . . . . . . . . . . . . . . . . . 14-16

42 U.S.C. §2000d . . . . . . . . . . . . . . . . . . . .   25

42 U.S.C.A. 7410 . . . . . . . . . . . . . . . . . . . 33

### REGULATIONS CITED

N.J.A.C. 7:27A-1 . . . . . . . . . . . . . . . . 19, 41

N.J.A.C. 7:27B-4 . . . . . . . . . . . . . . . . . 16

N.J.A.C. 7:27-1 . . . . . . . . . . . . . . . 18-22, 41

N.J.A.C. 7:27-14 . . . . . . . . . . . . . . . . . 16

N.J.A.C. 7:27-15 . . . . . . . . . . . . . . . . . 16

N.J.A.C. 13:20 . . . . . . . . . . . . . . . . . 16-18

N.J.A.C. 26:3A2-21 . . . . . . . . . . . . . . . . 19

### FEDERAL RULES CITED

Fed. R. Civ. Pro. 25(d) . . . . . . . . . . 2, 4, 5, 8-10, 12-14

Fed. R. Civ. Pro. 56(c) . . . . . . . . . . . . . 23, 46

## FACTS AND PROCEDURAL HISTORY[1]

On or about April 30, 2001, South Camden Citizens in Action (hereinafter "SCCIA"), an unincorporated community organization composed of residents of the Camden neighborhood known as Waterfront South, filed a complaint on behalf of its members against the New Jersey Department of Environmental Protection (hereinafter "DEP" or "Department") and Robert C. Shinn, Jr., in his capacity as the Commissioner of the DEP. Plaintiffs' Second Amended Complaint ¶5.

The April 30, 2001 complaint also named as plaintiffs several individuals who are also members of SCCIA. Plaintiffs' Second Amended Complaint ¶s 6-16. Since the initial filing of the SCCIA complaint, several plaintiffs have withdrawn. Currently, only four individual named plaintiffs, in addition to SCCIA, remain. They are: Barbara Pfeiffer, residing at 1701 South Fourth Street, Camden, New Jersey; Phyllis Holmes, residing at 422 Viola Street, Camden, New Jersey; Lula Williams, residing at 1907 South Fourth Street, Camden, New Jersey; and, Sharon Christie-Potter, residing at 1727 South Fourth Street, Camden, New Jersey.

The complaint challenged DEP's issuance of permits to the St. Lawrence Cement Company (hereinafter "SLC") to operate a blast furnace slag grinding facility in the Waterfront South area of

---

1 Because the procedural and factual histories in this matter are inextricably intertwined, they have been combined in this brief to avoid repetition and for the convenience of the Court.

Camden.   Plaintiffs' Second Amended Complaint ¶1. The April 30,
2001, complaint sought:

> 1.  To have the permits issued by the DEP declared
>     invalid and rescinded.
>
> 2.  To have the DEP's policies and procedures for
>     evaluating the permit application declared unlawful;
>     and
>
> 3.  To require DEP to develop a protocol for reviewing
>     permit applications in compliance with Title VI
>     of the Civil Rights Act of 1964, and to apply that
>     protocol to the St. Lawrence Cement Facility.

Plaintiffs' Second Amended Complaint ¶2.

Defendant DEP, a principal Department within the
executive branch of State Government, was named because it
implements and enforces the environmental laws and regulations of
the State of New Jersey.  Plaintiffs' Second Amended Complaint ¶17.
Defendant Robert C. Shinn, Jr., was named in his capacity as the
then Commissioner of the DEP who oversaw the operations of the DEP.
Shinn Dep., pgs. 14-15, Exhibit A to Wolf Aff.  Commissioner Shinn
served in his official capacity from February 1994 until February
2002.  Id. at 13.

Plaintiffs' original complaint was amended twice, once on
May 2, 2001, and again on November 26, 2002 (the Second Amended
Complaint).  In Plaintiffs' Second Amended Complaint, by operation
of law, the current Commissioner, Bradley M. Campbell, was made a
defendant in his official capacity.  Fed. R. Civ. Pro. 25(d).  SLC

- 2 -

intervened in the instant action and is now a third party defendant.

On January 2, 2003, the Department filed a motion to dismiss Plaintiffs' Second Amended Complaint. On April 16, 2003, the Department's motion was granted, in part, by the Honorable Stephen M. Orlofsky. Judge Orlofsky's opinion dismissed all counts against the Department except for those which allege intentional discrimination in violation of Section 601 of Title VI of the Civil Rights Act of 1964 and the Fourteenth Amendment.

### A.    Waterfront South

The Waterfront South neighborhood is located within the City of Camden, New Jersey. The neighborhood contains approximately 2,130 residents. Plaintiffs' Second Amended Complaint ¶20. Much of the property located in Waterfront South is used for various industrial purposes. Bowen Dep., pg. 85, Exhibit B to Wolf Aff. The City of Camden makes up New Jersey census tract 6018 (hereinafter "CT 6018"). Plaintiffs' Second Amended Complaint ¶20.

Waterfront South and the SLC slag grinding facility (hereinafter "the facility") are located along the Delaware River in the "port area" of Camden, site of a "deep water" port capable of docking large ships for the loading and unloading of cargo. Davis Dep., pgs. 17-21, Exhibit C to Wolf Aff.

- 3 -

According to aerial photographs taken in 1940, 1951, 1970, 1979, and 2002, the largest land use within CT 6018 was consistently industrial related land use. Hickerson Report, pg. 4, Exhibit J to Wolf Aff.  These photographs also show that the property on which the SLC facility is presently located has been consistently used for industrial related purposes since at least 1940.  Ibid.  In addition, Sanborn  maps, which are large scale maps which periodically chart the development of American towns and cities, indicate that the site of the St. Lawrence Cement facility has been used for industrial related purposes since at least 1906. Ibid.

Between September 12, 1970 and June 25, 1979, the aerial extent of industrial related land use in CT 6018 only increased by approximately 1.1 percent.  Ibid.  Review of New Jersey census data from 1970 and 1980 shows that during this time the percentage of minority and/or persons residing within CT 6018 increased significantly, by 35.39 percentage points, from 39.3% in 1970 to 74.69% in 1980.  Ibid.  Similarly, between June 25, 1979 and February 19, 2002, the general extent of industrial related land use in CT 6018 only increased by approximately 4.1%.  Id. at 5.  A review of the New Jersey census data from 1980 and 2000 shows that during this time the percentage of minority and/or persons residing within CT 6018 increased significantly, by 10.81 percentage points, from 74.5% in 1980 to 85.5% in 2000.  Ibid.

- 4 -

**B.   DEP'S Environmental Equity Program**

In February of 1998 the United States Environmental Protection Agency (hereinafter "EPA") issued draft guidelines entitled "Title VI Interim Guidance on Environmental Justice" (hereinafter the "Interim Guidance"). Partially in response to the issuance of the Interim Guidance, a Federal Advisory Committee (hereinafter "FACA") was convened by the EPA. Shinn Dep., pgs. 71-73, Exhibit A to Wolf Aff. Only five states, including New Jersey, were chosen to participate on this FACA. Id. at 37-38. Commissioner Shinn was chosen to serve on the FACA as a representative for the State of New Jersey. Ibid. Commissioner Shinn stated with regard to his service on the FACA "[t]hat was quite an experience and certainly had an impact on my administration of dealing with permitting issues and environmental justice or environmental equity areas and just convinced me all the more that because of the density and the ethnic makeup of New Jersey we really needed to address that issue." Id. at 38.

The Interim Guidance did not place any affirmative duties on the DEP, and the DEP was not required by Federal Law to implement or even follow the interim guidelines. Id. at 71-73. Nonetheless, the DEP took many steps to see that environmental equity issues in general were addressed, including specifically the review and issuance of permits. William O'Sullivan, Director of the DEP's Division of Air Quality, testified during his deposition

on June 17, 2004, that "environmental equity and environmental justice were significant policy issues. It was a policy of the Department to try to address equity and to minimize impact, particularly in areas where there were already existing environmental issues." O'Sullivan Dep., pg. 30, Exhibit D to Wolf Aff. Similarly, Gary Sondermeyer, Chief of Staff to Commissioner Robert Shinn, testified on May 21, 2004, that "Commissioner Shinn was extremely interested in the issue of environmental justice," and "certainly [felt] that it was an issue that needed to be studied and reviewed and addressed minimally in terms of disclosure and expanded community outreach." Sondermeyer Dep., pgs. 27-28, Exhibit L to Wolf Aff.

In May of 1998 the Department instituted an Environmental Equity Task Force (hereinafter the "Task Force"). The Task Force consisted of approximately 30 members, representing a cross-section of the New Jersey local and business communities, and DEP employees. See, Administrative Order 1998-15, Exhibit M to Wolf Aff. The Task Force was developed to discuss issues related to environmental equity and to provide advice and counsel, and to make recommendations, to the Department. The Environmental Equity Task Force also was established to help integrate environmental equity concerns into the rule making process and permit review process of the Department. Sondermeyer Dep., pgs. 20, 30, Exhibit L to Wolf Aff.; Shinn Dep., pgs. 48-50, Exhibit A to Wolf Aff.

On November 22, 1998 the Department and Commissioner Shinn, by Administrative Order #1998-15, established the Advisory Council on Environmental Equity (hereinafter the "Advisory Council"). Administrative Order 1998-15, Exhibit M to Wolf Aff. This administrative order established and recognized the Environmental Equity Task Force in a formal capacity. The Advisory Council was charged with the tasks of providing advice and counsel to the Department in recognition of State and Federal concerns that minority and low income populations could experience a greater impact from pollution than other communities. Sondermeyer Dep., pgs. 20, 49-50, Exhibit L to Wolf Aff.; Shinn Dep., pgs. 48-50, Exhibit A to Wolf Aff.

The Advisory Council was the Commissioner's principal advisory resource for handling environmental equity concerns. Sondermeyer Dep., pg. 30, Exhibit L to Wolf Aff.; Shinn Dep., Plaintiffs' 48, Exhibit A to Wolf Aff. The Advisory Council played a key role in developing a draft rule aimed at handling environmental equity issues in the permit review process. Sondermeyer Dep., pgs. 30, 35, 60-87, Exhibit L to Wolf Aff.; Shinn Dep., pgs. 53-54, Exhibit A to Wolf Aff. High level members of the DEP staff, including Pamela Lyons, Director of the Office of Equal Opportunity, Contract Assistance and Environmental Equity, and Gary Sondermeyer, Chief of Staff, attended Advisory Council meetings on a regular basis and were intimately involved with the work of the

Advisory Council.  Sondermeyer Dep., pgs. 20, 31, 53-54, Exhibit L to Wolf Aff.; Shinn Dep., pg. 46, Exhibit A to Wolf Aff.  In fact, Gary Sondermeyer testified during his May 21, 2004 deposition that he had "a significantly higher level of involvement with this Advisory Council than any other that I've ever been involved with." Sondermeyer Dep., pg. 85, Exhibit L to Wolf Aff.

By Administrative Order 1999-05, issued on April 27, 1999, Commissioner Shinn created the Office of Equal Opportunity, Contract Assistance, and Environmental Equity.  Administrative Order 1999-05, Exhibit N to Wolf Aff.  This new office was charged with the Development and implementation of an Environmental Equity policy and procedures.  Pamela Lyons was appointed as the office Director.  Shinn Dep., pgs. 45-46, Exhibit A to Wolf Aff.  The position of Director of the Office of Equal Opportunity, Contract Assistance and Environmental Equity is a high level position within the DEP.  Ms. Lyons was a member of the Commissioner's management team.  Id. at 46.

By Administrative Order 2000-01, issued on February 8, 2000, Commissioner Shinn established the DEP's policy with respect to environmental equity.  Administrative Order 2001-01, Exhibit O to Wolf Aff.  The Administrative Order served as guidance to Department management and staff concerning environmental equity objectives and the implementation strategies that the Department

would undertake in order to incorporate environmental equity considerations into its decision making.

Administrative Order 2000-01 also specified specific responsibilities for the Advisory Council which included serving as the Department's principal source of advice and counsel on environmental equity issues and assisting with the Department's development of an Environmental Equity Policy and incorporating environmental equity considerations into its permitting process.[1] Ibid. Gary Sondermeyer testified during his deposition that consistent with this goal, the "policy was developed in cooperation with the Environmental Equity Task Force, that is why the body existed. Commissioner Shinn created that body, among other things, to develop a policy." Sondermeyer Dep., pg. 20, Exhibit L of Wolf Aff.

In addition, Administrative Order 2000-01 specified procedures by which, to the extent permitted by law, and following formal rulemaking in accordance with the Administrative Procedures Act, the DEP would incorporate environmental equity considerations

---

2   It is important to note that although it was formally charged by Administrative Order 2000-01 with the responsibility of providing advice and comment to the Department in developing the environmental equity process as a rule for formal proposal in accordance with the Administrative Procedure Act, the Advisory Council and its predecessor, the Task Force, began working towards this goal as of the Task Force's inception in May of 1998.   Sondermeyer Dep., pgs. 59-60, Exhibit L to Wolf Aff.; Shinn Dep., pgs. 48-49, Exhibit A of Wolf Aff.

into its decision making process.  Administrative Order 2001-01, Exhibit O to Wolf Aff.

During the development of the Environmental Equity Policy, as set forth above, in November, 1998, the DEP was given a $100,000 grant by the EPA to implement a model program promoting environmental equity.  Sondermeyer Dep., pg. 37, Exhibit L of Wolf Aff.; Leon Dep., pg. 44-46, Exhibit H of Wolf Aff.  New Jersey was one of only five states to receive such an EPA grant.  Sondermeyer Dep., pg. 37, Exhibit L of Wolf Aff.

The EPA grant money was used primarily to develop a screening model to help the DEP identify potential areas of application for its future environmental equity process.  Id. at 39-40, 41-43.  Commissioner Shinn testified during his deposition that he believed the EPA was "enthusiastic about the work we have done on the issue and our commitment to try to build something into our rule that would respond to the issue.  I think that's why they gave us the grant."  Shinn Dep. pg. 45, Exhibit A to Wolf Aff.  The screening model was developed and tested, but never formally applied or used by the Department because, as set forth below, the proposed rule was never adopted.  Sondermeyer Dep., pg. 42, Exhibit L to Wolf Aff.; Shinn Dep., pg. 59, Exhibit A to Wolf Aff.  The screening model was intended to identify areas where an applicant proposing a new facility would be strongly encouraged by the DEP to voluntarily enter into a process to address potential environmental

equity concerns.  Shinn Dep., pgs. 43, 56-57, 59-62, 98-100, Exhibit A to Wolf Aff.; Sondermeyer Dep., pgs. 95-96, Exhibit L to Wolf Aff.

The process developed by the Department involved, among other things, community outreach and discussions, public meetings, and possible alternative dispute resolution.  DEP presented this process to the FACA in 1999.  Sondermeyer Dep., pgs. 40-41, 89-90, Exhibit L to Wolf Aff.; Shinn Dep., pgs. 66-67, 198-200, , Exhibit A to Wolf Aff.

The process was formalized as a proposed rule on or about January 4, 2002.  Shinn Dep., pg. 68, Exhibit A to Wolf Aff.  Gary Sondermeyer testified that "Commissioner Shinn want[ed] us to move as quickly as possible to the rule making..." because "[h]e was very committed to the issue of environmental equity, and he wanted to see something substantive done that was more than just an internal agency policy statement.  He wanted to see rules proposed and adopted so we could start to address the issue."  Sondermeyer Dep., pgs. 97-98, Exhibit L to Wolf Aff.  The DEP's goal was to have the EPA recognize the proposed state environmental equity program and rule as a viable alternative to the EPA interim guidance process.  Shinn Dep., pgs. 88-89, Exhibit A to Wolf Aff.  In fact, Commissioner Shinn envisioned a performance partnership agreement with the EPA, specifically, he testified "we were providing an alternative and seeking endorsement for EPA to support

a state initiative." Id. at 73-74.  The proposed rule, however, was never formally adopted by the New Jersey Department of Environmental Protection because Commissioner Campbell, who took office shortly thereafter, envisioned an interagency approach toward addressing issues of environmental equity.  Id. at 66; Sondermeyer Dep., pg. 106, Exhibit L to Wolf Aff.  Commissioner Campbell's approach was eventually formalized in an Executive Order issued by Governor James McGreevy in February, 2004.  Exhibit P, pg. 106.


### C.   SLC Facility

The St. Lawrence Cement Company, LLC is a multinational company which manufactures cement and concrete materials.  SLC leased 11.7 acres of land at Broadway terminal, 2500 Broadway, Camden, New Jersey, located within Waterfront South (hereinafter the "facility").  Plaintiffs' Second Amended Complaint ¶38.  This location was selected by SLC because the facility receives its raw material, granulated blast furnace slag (hereinafter "GBFS"), by cargo ships which dock at the Camden Port.  Davis Dep., pgs. 17-21, Exhibit C to Wolf Aff.  The GBFS is brought from the Camden Port to the SLC facility by truck.  O'Sullivan Dep., pg. 71, Exhibit D to Wolf Aff.  The current site of the facility is one of only three potential sites in the area that met SLC's siting needs, and the only site that was located in New Jersey.  Davis Dep., pgs. 17-22,

Exhibit C to Wolf Aff.  In addition, Waterfront South and the SLC facility are located in close proximity to, and have easy access to, many major roadways.  Bowen Report, pg. 4, Exhibit K to Wolf Aff.  This strategic location also places the SLC facility in the heart of the marketplace targeted by SLC for the sale of the product it produces at the facility.  Ibid.

SLC unilaterally chose to site the SLC facility in Waterfront South.  The Department had no input into and was not involved in any way with the siting of the SLC facility at its present location.  Shinn Dep., pgs. 234-235, Exhibit A to Wolf Aff.; Davis Dep., pgs. 17-18, Exhibit C to Wolf Aff.

In August 1999 SLC submitted an application to the Department for Air Pollution Control permits to construct and certificates to operate stationary emission sources for purposes of operating the facility.  Plaintiffs' Second Amended Complaint ¶s 40, 64.

A permit applicant may request a pre-application meeting prior to submitting the permit application for review.  O'Sullivan Dep., pgs. 15-16, Exhibit D to Wolf Aff.  SLC did request a pre-application meeting and the DEP did meet with SLC for a pre-application meeting.  Id. at 23.

On November 1, 1999, the Department informed SLC by letter that its permit application for the facility was administratively complete.  Leon Dep., pg. 207, Exhibit H to Wolf

- 13 -

Aff.  The Department made this determination only after SLC had responded adequately to a deficiency letter dated September 7, 1999.  Id. at 58, 83.  The November 1, 1999 letter from the Department specifically informed SLC that the determination was made only for administrative completeness and did not imply a permit would actually be issued.  Ibid.  Following its determination of administrative completeness the Department began reviewing the SLC permit application.

Pursuant to N.J.S.A. 26:2C-9.2j, a facility is legally permitted to begin construction of a planned facility (i.e. one proposed by permit application) "at risk."  A permit applicant must submit notice to the DEP of its intent to construct "at risk" at least seven days prior to commencement of construction "at risk."  Leon Dep., pgs. 97-98, Exhibit H to Wolf Aff.  SLC submitted such a notification to the DEP on November 17, 1999.  The Department does not recommend or advise applicants as to whether or not they may proceed with "at risk" construction and did not recommend or advise SLC as to whether it may or may not construct "at risk."  Leon Dep., pgs. 130-131, Exhibit H to Wolf Aff.; Shinn Dep., pgs. 30-31, Exhibit A to Wolf Aff.  SLC unilaterally choose to exercise its legal option to construct the facility "at risk" during the permit review process.

While the permit review was pending, the DEP scheduled a public hearing for August 23, 2000.  Plaintiffs' Second Amended

- 14 -

Complaint ¶35.  In addition to conducting a public hearing, the DEP, among other things, made itself accessible to the public, met with community representatives, responded to requests from the public and responded to letters.  O'Sullivan Dep., pgs. 125-126, Exhibit D to Wolf Aff.  William O'Sullivan testified that "[i]t was our intention to be as responsible and open as possible with [the SLC] application."  Id. at 126.  About one month prior to this hearing the DEP published and distributed to the public, a notice, fact sheet, and five draft air quality permits to construct and certificates to operate, with proposed regulatory conditions, regarding the proposed SLC facility.  Plaintiffs' Second Amended Complaint ¶72.  At the public hearing, and in subsequent written submissions, both the future plaintiffs and their counsel commented regarding the SLC facility.  Hearing Officer's Report, Exhibit Q to Wolf Aff.; Public Hearing Transcript, Exhibit R to Wolf Aff.  Waterfront South community members commented as well.  Ibid.

During the period of the SLC permit review, the DEP also conducted a health risk study in Camden, even though this study was not required as part of the permit review process.  The results of the study showed the addition of the SLC facility did not elevate the health risk.  Shinn Dep., pg 141, Exhibit A to Wolf Aff.

Because the SLC facility would ship the GBFS from the port to the facility, the DEP discussed potential truck routes for trucks coming to and from the SLC facility with the Waterfront

South community during the SLC permit review process.  Id. at 220; Leon Dep., pg. 180, Exhibit H to Wolf Aff.  The DEP did not then, nor does it have now, the authority to consider truck routes and mobile sources in determining whether to issue permits for stationary sources.  Shinn Dep., pg. 220, Exhibit A to Wolf Aff.; Leon Dep., pgs. 155-156, 188, Exhibit H to Wolf Aff.  Truck exhaust system emissions and non-stationary diesel engine emissions are regulated by mobile source rules N.J.A.C. 7:27-14, the Control and Prohibition of Air Pollution from Diesel-fueled Motor Vehicles rules, N.J.A.C. 7:27-15, the Control and Prohibition of Air Pollution from Gasoline-Fueled Motor Vehicles rules, and N.J.A.C. 7:27B-4, Air Test Method 4: Testing procedures for Motor Vehicles rules.  The regulations are incorporated by reference in Title 39, the Motor Vehicle Code, enforced by state and local police, and in sections of N.J.A.C. 13:20, where on-road and periodic inspection authority is vested.  Defendant's Responses to Plaintiffs' First Set of Requests for Interrogatories, pg. 10., Exhibit S to Wolf Aff.  Despite these legal limitations, DEP raised with SLC the community's concerns regarding truck routes, and SLC agreed to utilize certain routes as a result.  Shinn Dep., pg. 220, Exhibit A to Wolf Aff.

The DEP, after considering the applicable air emission standards, as well as the comments submitted during and after the August 23, 2000 public hearing, issued five permits to construct

and certificates to operate stationary emission sources at the SLC facility on October 31, 2000.  Plaintiffs' Second Amended Complaint ¶82.  Even though no environmental equity based regulations existed to guide the DEP during the SLC permit review process, the DEP did follow the guidance of the previously formed Task Force, the Environmental Equity Advisory Counsel, and the various Administrative Orders executed during the review process. Sondermeyer Dep., pgs. 60, 93, Exhibit L to Wolf Aff.; Shinn Dep., pgs. 45-46, 52, 54, Exhibit A to Wolf Aff.; Leon Dep., pgs. 178, 181, 194, Exhibit H to Wolf Aff.

Consistent with its normal permit review procedures, the DEP relied heavily on modeling data in its review and issuance of the SLC permits.  Modeling data submitted in conjunction with the SLC permit application and reviewed by the DEP indicated the proposed SLC facility would not emit particulates in excess of the applicable state and federal regulatory standards.  O'Sullivan Dep., pgs. 26-29, 46, 78, Exhibit D to Wolf Aff.  This modeling was not required by rule, however, the DEP used discretion to require it in the case of SLC, in part to ensure public involvement.  Id. at 26-29.  The Waterfront South area and South Camden were also shown to be in attainment with the National Ambient Air Quality Standards for PM-10 particulates with the SLC facility operating. Shinn Dep., pg. 212, Exhibit A of Wolf Aff.

While the EPA adopted standards for PM-2.5 in 1997, these standards were immediately challenged. As a result, when the Department issued permits for the facility to SLC in 2000, Camden was not designated as a non-attainment area for PM-2.5 by the EPA. Only after being designated a non-attainment area for PM-2.5 is New Jersey required to submit a State Implementation Plan to the EPA for approval. Shinn Dep., pgs. 212-214, Exhibit A of Wolf Aff. Therefore, there was no statutory or regulatory requirement in New Jersey for SLC to address PM-2.5 emissions before DEP could approve its application. Id. at 212-214; Leon Dep., pgs. 195-196, Exhibit H to Wolf Aff. Nonetheless, the DEP did discuss PM 2.5 issues regarding the SLC facility internally. O'Sullivan Dep., pgs. 50-51, Exhibit D to Wolf Aff.

The SLC permit application complied with all applicable regulations and standards. Thus, the DEP approved the permits to construct and certificates to operate on October 31, 2000. Atay Dep., pgs. 181-182, Exhibit E to Wolf Aff.

### D.   DEP's Enforcement Program

The DEP is charged with the implementation and enforcement of the Air Pollution Control Act, N.J.S.A. 26:2C-1 et seq., and its implementing regulations, N.J.A.C. 7:27-1 et seq. and does so evenly throughout the State of New Jersey.

The DEP is required by the EPA to inspect major facilities in New Jersey every two years, and synthetic minor[2] facilities in New Jersey every five years. Choromanski Dep., pg. 21, Exhibit F to Wolf Aff. At every inspection, DEP determines compliance with the applicable Air Pollution Control Regulations and the applicable permit or permits held by the facility. Id. at 22. The DEP endeavors to inspect major and synthetic minor facilities every two years and five years, respectively, and has been largely successful at doing so. Id. at 40-42. Major facilities are required to self-report violations of the air regulations to DEP. Id. at 75-76.

All complaints received by DEP are assigned to an inspector to investigate. Id. at 49. Some complaints are assigned to specific Counties to investigate pursuant to the delegation of authority under the County Environmental Health Act. Id. at 62; N.J.A.C. 26:3A2-21 et seq.

Penalties are assessed by the DEP for air violations according to specific, detailed regulations set forth at N.J.A.C. 7:27A-1 et seq. Choromanski Dep., pg. 81, Exhibit F to Wolf Aff. These penalty calculation regulations give the DEP limited discretion to determine the number of days over which a violation

---

3  A synthetic minor facility is a facility with the potential to emit more than 100 tons/year of certain 'criteria' pollutants, but that actually emit less that 100 tons/year of said pollutants because of the use of one or more control technologies.

occurred, for continuing violations.  However, the DEP does not have discretion as to the penalty amount assessed, per day, once it has been determined that a particular violation of <u>N.J.A.C</u>. 7:27-1 <u>et</u> <u>seq</u>. has occurred.  <u>Id</u>. at 80-81, 151-154.

During the duration of Commissioner Shinn's tenure as Commissioner of the DEP, the DEP was deeply involved with the development and improvement of the South Camden area.  Shinn Dep., pg. 117, Exhibit A to Wolf Aff.  According to the testimony of Commissioner Shinn, "we were probably more active in a proactive way in Camden than in any city in the state." <u>Id</u>. at pgs. 232-233. Additionally, Gary Sondermeyer testified that "there was an awful lot of attention on the City of Camden in trying to address problem issues in the city to try to improve the quality of life." Sondermeyer Dep., pg. 120, Exhibit L to Wolf Aff.  "[C]ertainly, Camden has been a significant focus area for the department for many, many years." <u>Ibid</u>.  Specifically, the DEP played a significant role in bringing the South Camden neighborhood the following improvements and facilities which benefit the community;

    (a)   The Battleship New Jersey and associated port dredging, Shinn Dep., pgs. 115, 117, 119, Exhibit A to Wolf Aff;
    (b)   The Sony Amphitheater, <u>id</u>. at 225;
    (c)   The Knipper Building, <u>id</u>. at 119, 225;
    (d)   The South Camden Park adjacent to the Camden County Municipal Utilities Authority, <u>id</u>. at  117;
    (e)   The Baseball Stadium, <u>id</u>. at 117, 119; and,
    (f)   The Admiral Wilson Blvd. Corridor project, <u>id</u>. at 225.

In conjunction with many of the above stated improvements in Camden, the DEP waived the required permit fees to help facilitate the project's completion.  The DEP does not commonly waive permit fees for projects in New Jersey.  Id. at 116-119.

      E.    **Plaintiff's Expert Witness**

On behalf of Plaintiffs, Dr. Jeremy Mennis submitted an expert report entitled "Race and the Location and Regulation of Air Polluting Facilities in New Jersey," dated August 3, 2003.  Mennis Report, Exhibit I to Wolf Aff.  The goal of the study was to investigate racial equity in the spatial distribution and regulatory enforcement of air polluting facilities in New Jersey. Id. at 2.  Dr. Mennis was deposed on April 5, 2005.  During his deposition, Dr. Mennis testified that his review did not show intentional discrimination by the DEP in its review and issuance of the SLC permits.  Mennis Dep., pg. 104-105, 130, Exhibit G to Wolf Aff.  Specifically, Dr Mennis testified with respect to his expert report that, "[t]he  study by itself does not suggest intent by the DEP."  Id. at 130.  Moreover, during his deposition Dr. Mennis also testified that the statistical study he conducted to prepare his expert report could not pinpoint the causes of the racial inequity

in AFS[3] facility location and enforcement alleged by plaintiffs. Id. at 94.

Additionally, according to Dr. Mennis' data, census tracts located in New Jersey which contain AFS facilities actually have a lower minority population (33%) while New Jersey census tracts which do not contain AFS facilities have a higher minority population (35%).    Mennis Report, Pg. 4, Exhibit I to Wolf Aff.

In fact, Dr. Mennis did not even conclude in his report that Plaintiffs are subject to a significantly disproportionate impact.    The best Dr. Mennis, could do was conclude that his statistical study found "evidence of racial inequity in the location and enforcement of AFS facilities."   Id. at 7.

---

4  AFS facilities are permitted facilities in New Jersey that are classified as Major and Synthetic Minor sources of air contaminants and contained in the EPAs' Aerometric Information Retrieval System database.

## SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. Pro. 56(c), summary judgment is proper where the court finds that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). As the plaintiffs bear the burden of proof at trial, the Department as the moving party need only show that plaintiffs failed to offer sufficient evidence "to establish an essential element of [plaintiffs'] claim." Id. at 331. The moving party satisfies its burden by "affirmatively show[ing] the absence of evidence in the record." Id. at 332. The non-moving party must then point to evidence in the record to show the existence of a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986); See also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Although evidence must be viewed in the light most favorable to the non-moving party and the non-moving party granted all favorable inferences therefrom, Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970), to withstand a summary judgment motion plaintiffs must produce more than a scintilla of evidence and allege more than some factual dispute. Anderson, supra, 477 U.S. at 247-48, 252; Bus. Loan Center, LLC v. Nischal, 331 F. Supp. 2d 301, 305 (D.N.J. 2004). The threshold inquiry is whether "there are any genuine

factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, supra, 477 U.S. at 250. If no such genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law, the motion for summary judgment must be granted. Ibid.

## INTENTIONAL DISCRIMINATION STANDARD

Intent to discriminate is the crux of a private cause of action brought under Section 601 of Title VI of the Civil Rights Act.  See, Alexander v. Sandoval, 532 U.S. 275, 121 S. Ct. 1511, (2001).  Section 601 prohibits only intentional discrimination "on the ground of race, color, or national origin." 42 U.S.C. §2000d; Sandoval, supra, 532 U.S. at 280, 121 S. Ct. at 1516; Pryor v. Nat'l Collegiate Athletic Ass'n., 288 F.3d 548, 562 (3d Cir. 2002). While federal agencies are authorized to promulgate regulations that effectuate the provisions of §601, including regulations that prohibit actions that have a racially disparate impact, no private cause of action exists to enforce such regulations.  Sandoval, supra, 532 U.S. at 293, 121 S. Ct. at 1524; Pryor, supra 288 F.3d at 554.

A plaintiff asserting a Title VI violation must show that the decision maker intended to discriminate when the challenged act was undertaken.  Washington v. Davis, 426 U.S. 229, 241-42, 96 S. Ct. 2040, 2048-49 (1976).  Absent a prima facie showing that a discriminatory purpose motivated the challenged official act, even if the act disproportionately impacts particular racial groups, plaintiffs, as a matter of law, fail to state a Title VI cause of action and the claim must be dismissed.

In order for Plaintiffs to prevail on their remaining claims against the DEP. i.e., intentional discrimination, Plaintiffs must establish they meet the standards set froth in Washington, supra 426 U.S., Sandoval, supra 532 U.S., Pryor, supra 288 F.3d, or Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 259, 97 S.Ct. 555 (1997). As set forth below, Plaintiffs have failed to meet any of these standards.

**A.    Plaintiffs Failed to Present any Genuine Issues of Material Fact that the DEP Acted in an Intentionally Discriminatory Manner in its Review and Issuance of the SLC Permits.**

Plaintiffs have not presented any evidence that the Defendants engaged in intentional discrimination while reviewing and issuing the SLC permits. Furthermore, the decision making process the Defendants followed in their review and issuance of the SLC permits, and the underlying Department policies and regulations associated with their decision, were facially neutral with respect to race, color and national origin. In fact, Plaintiffs failed to even allege in their complaint that the Defendants had intentionally discriminated against Plaintiffs.

Moreover, Plaintiffs have had the opportunity to engage in meaningful discovery, have received thousands of documents from Defendants, have received detailed answers to Interrogatories, and have conducted depositions of 11 current and former DEP employees

including, but not limited to, the former Commissioner and former Defendant Robert C. Shinn, his Chief of Staff Gary Sondermeyer, the Director of the Office of Environmental Equity Pamela Lyons and the current Administrator of the DEP's Air Enforcement Program Edward Choromanski. Plaintiffs have deposed two DEP expert witnesses and four expert witnesses retained by SLC. With this vast amount of factual information at their disposal Plaintiffs still can not produce a single fact, statement or document showing the Department or any of its employees acted in an intentionally discriminatory manner in their review and issuance of the SLC permits.

Even Plaintiffs own expert, Dr. Jeremy Mennis, during his April 5, 2005 deposition testified that his review did not show intentional discrimination by the DEP in its review and issuance of the SLC permits. Mennis Dep., pg. 104-105, 130, Exhibit G to Wolf Aff. Specifically, Dr Mennis testified with respect to his expert report that, "[t]he study by itself does not suggest intent by the DEP." Id. at 130. Moreover, during his deposition Dr. Mennis also testified that the statistical study he conducted to prepare his expert report could not pinpoint the causes of the racial inequity in AFS facility location and enforcement alleged by plaintiffs. Id. at 94.

Additionally, Dr. Mennis' own data shows no evidence of statewide discrimination by the DEP. In fact, according to Dr.

Mennis' data, census tracts located in New Jersey which contain AFS facilities actually have a lower minority population (33%) while New Jersey census tracts which do not contain AFS facilities have a higher minority population (35%). This result contradicts Plaintiffs' claim that the DEP intentionally engaged in discriminatory behavior.

Therefore, because there is not a scintilla of evidence in the record to suggest that Defendants engaged in intentional racially discriminatory behavior while reviewing and issuing the SLC permits, the Defendants are entitled to judgment as a matter of law on this issue.

   **B.   Even if it is Assumed Plaintiffs are Disproportionally Impacted by the DEP's Review and Issuance of the SLC Permits, Plaintiffs Have Failed to Present Any Genuine Issues of Material Fact that the Disparate Impact is "Unexplainable on Grounds Other Than Race."**

To establish a Title VI violation, plaintiffs must show both a racially discriminatory purpose and disparate impact. Washington, supra 426 U.S. at 239. Plaintiffs bear the burden of showing that the Department acted with the intent to discriminate based on race or other impermissible classification. Id. at 241, 2048. Only after plaintiffs meet this threshold burden does the burden shift to the defendant to show racially neutral criteria and procedures. Ibid.

- 28 -

While "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another," a facially neutral law that serves a legitimate governmental purpose will not be invalidated simply because races are affected to varying degrees. Id. at 242, 2048-49.  The Supreme Court has stated unequivocally that disproportionate impact, while "not irrelevant,... is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution."  Ibid.; Arlington Heights, supra, 429 U.S. at 265.  Where a plaintiff is challenging a facially neutral policy, the plaintiff must show that the agency or other decision maker adopted the policy at issue "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  Pryor, supra, 288 F.3d at 562 (finding that plaintiffs' complaint, which alleged "the NCAA purposefully adopted a policy because that policy would reduce the number of black athletes" eligible for athletic scholarships, alleged insufficient "facts showing intentional, disparate treatment on account of race"); quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1970).  Awareness of or "deliberate indifference" to the consequences of the challenged policy do not equate to intent. Pryor, supra, 288 F.3d at 567-68.  On the contrary, to adopt a "deliberate indifference" standard would "eviscerate the Supreme Court's ruling in Sandoval."  Id. at 568.

Only when "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action" does a disproportionate impact on one race establish that racial discrimination was a motivating purpose for the state action. Id. at 266, 564. See, Anderson v. City of Boston, 375 F.3d 71, 88-90 (1st Cir. 2004) (finding no discriminatory effect where plaintiffs relied solely on the minimal impact of white students in three out of eighty-five schools under the plan, failed to establish that the plan would have a systemwide racial impact, and where the effect was explainable on grounds other than race). For example, in Gomillion v. Lightfoot, 364 U.S. 339, 340, 81 S. Ct. 125, 126, (1960), the Alabama Legislature passed an act that redefined the city boundaries of Tuskegee. The statute altered the shape of Tuskegee from a square to a twenty-eight-sided figure, and had the effect of removing from the city all but four or five black voters but not a single white voter. Id. at 341, 127 . The Court found that the obvious intent of such state action was to deprive black citizens from the benefits of city residence, including the right to vote. Id. at 342, 127 . See also, Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L. Ed. 220 (1886) (striking down ordinances that required board approval for persons to operate laundries in wood structures, where the board had unregulated discretion to give such consent and the board approved only non-Chinese petitioners).

Even if, for the sake of argument, it is assumed the Plaintiffs have alleged sufficient facts to show they are disproportionately impacted by the Department's review and issuance of the SLC permits, Plaintiffs have not satisfied the applicable test for determining intentional discrimination. Plaintiffs must still show "a clear pattern, unexplainable on grounds other than race" was present during the Defendants review and issuance of the SLC permits. Pryor, supra, 288 F.3d at 568. Only if such a pattern is clearly present would a disproportionate impact on the Waterfront South community establish that racial discrimination was a motivating purpose for the issuance of the SLC permits. Even more, the Plaintiffs must show the Defendants issued the SLC permits "'because of,' not merely 'in spite of,'" any adverse effects upon the Waterfront South community. In effect, the disparate impact must be of such a magnitude that it could only be a result of intentional discrimination.

Plaintiffs, however, have not shown the Defendants issued the SLC permits "'because of,' not merely 'in spite of,'" the alleged adverse effects upon the Waterfront South community. Plaintiffs have alleged in their complaint that Defendants were aware of or "knew" the following:

1) the racial makeup of the Waterfront South community;
2) the potential for the SLC facility to have an adverse impact upon the Waterfront South Community;
3) that the SLC facility would emit PM-2.5 particulate matter;

- 31 -

4)    that the region in which the SLC facility was located was not in compliance with the EPA's proposed (but not required) PM-2.5 standard;

5)    the potential health effects associated with PM-2.5 particulate emissions and failed to notify the public of such health effects;

6)    the region's non-compliance with the NAAQS for ozone and the impact diesel truck emissions from the SLC facility would have on the ozone level; and,

7)    the significant Hispanic segment of the Waterfront South community.

Plaintiffs' Second Amended Complaint ¶101.

Even if it were assumed that all of the above factual allegations by Plaintiffs were true, the fact that the Department purportedly "knew" about these alleged facts cannot be used to establish a discriminatory intent.[4]  As specified in Pryor, awareness of or even "deliberate indifference" to the consequences of a challenged state action or policy does not equate to intent. Supra, 288 F.3d at 568.  At best, and assuming that the factual allegations by Plaintiffs were true, the Department was only aware of the alleged facts.  Therefore, the alleged knowledge by the Defendants of the above-listed facts, even if true, does not amount to a showing by the Plaintiffs of the required intent to discriminate.

---

5 In fact, the allegations made by Plaintiffs are not entirely accurate and true.  Specifically, Plaintiffs have produced no proof that while SLC's permit application was pending the region in which the SLC facility was located was not in compliance with the EPA's proposed PM-2.5 standard. Furthermore, the PM-2.5 standard referred to was at the time only a proposed standard and, therefore, can not be "complied" with or enforced by the DEP.

Plaintiffs also contend that Defendants took other actions which, in addition to the above-listed allegations, indicate a pattern of racially motivated discrimination. Ibid. First, Plaintiffs contend that the DEP and Commissioner Shinn chose to use the Federal National Ambient Air Quality Standards (hereinafter "NAAQS") as the criteria for determining whether the SLC permits should be issued, knowing that such a limited analysis could not reveal that permitting the SLC facility would create a discriminatory impact on plaintiffs. Ibid. DEP's use of the Federally approved NAAQS[5] was mandated by Federal law, 42 U.S.C.A. 7410, and in fact, the required application of the NAAQS provides an explanation other than race for the issuance of the permits. Moreover, even if Plaintiff's allegation is assumed to be true, simply knowing the use of Federally approved standards could lead to a disparate impact does not amount to the requisite intent to discriminate. As stated above, Plaintiffs can not merely rely on a standard of awareness of or deliberate indifference. Plaintiffs must show the Defendants issued the SLC permits "'because of,' not merely 'in spite of,'" any adverse effects upon the Waterfront South community. Pryor, supra, 288 F.3d at 562. This they have not done. Further, as discussed earlier, the DEP conducted a

---

6 The NAAQS are applicable nationwide regulations which have gone through full notice and opportunity to comment. The States are required by Federal Law to conform to the NAAQS. 42 U.S.C.A. 7410.

health risk study in Camden in connection with the permit review process. This study was not required as part of the permit review process. The results of the study showed the addition of the SLC facility did not elevate the health risk. Shinn Dep., pg. 141, Exhibit A to Wolf Aff.

Second, Plaintiffs contend that "the DEP and Commissioner Shinn refused to conduct a disparate impact analysis because they contended that the operation of this facility would not have any negative impact upon the Waterfront South community." Plaintiffs' Second Amended Complaint ¶101. The DEP is not required by New Jersey law to conduct disparate impact analyses during its review and issuance of permits.[6] Thus, its failure to do so here is not evidence of an intent to discriminate.

Lastly, the Plaintiffs allege that the DEP and Commissioner Shinn failed to develop or implement a procedure to prevent discrimination in the permitting process or to provide meaningful public participation for local residents. Plaintiffs' second amended Complaint ¶101. To the contrary, the DEP, in response to the issuance of the EPA's draft Interim Guidance in May of 1998, promptly instituted the Task Force, which included both DEP and community members, and was charged with integrating

---

7 The DEP did submit an analysis of potential disparate impacts as directed by the Honorable Stephen M. Orlofsky on June 13, 2001. The analysis "[did] not demonstrate disproportionate adverse impacts." Analysis of Disparate Impacts, June 13, 2001, pg. 2. Exhibit T to Wolf Aff.

- 34 -

environmental equity concerns into the rule making and permit review process. On November 22, 1998, the Task Force was formalized by Administrative Order and became the Advisory Council. The Advisory Council played a key role in handling environmental equity issues in the permit review process. Later the DEP Office of Equal Opportunity, Contract Assistance and Environmental Equity was created. The Director of this office is a member of the Commissioner's management team. On January 25, 2000, the DEP, by Administrative Order, established its policy on environmental equity, aimed at incorporating environmental equity considerations into environmental decision making.

Moreover, throughout the SLC facility permit review process the DEP followed the advice and counsel of the Task Force and Advisory Council, and implemented its policies on environmental equity. While the permit was pending, the DEP held a public hearing on August 23, 2000, gave the community a chance to raise verbal and written grievances and arguments, and promptly responded to said grievances and arguments.

Furthermore, Plaintiffs have not shown a clear pattern of discriminatory action "unexplainable on grounds other than race." Pryor, supra, 288 F.3d at 568. There are many reasons, other than racial bias, which more rationally and realistically explain the DEP's legitimate and consistent actions during its review and issuance of the SLC facility's permits.

As a threshold issue, it is important to recognize that the DEP does not select sites for the location of facilities or other activities under its regulatory control, such as coastal wetland developments.  As such, DEP did not select the location of the SLC facility in Waterfront South.  SLC itself selected the facility's location with no input whatsoever from the DEP.  As the regulator or reviewer of applications for environmental regulatory approvals, the DEP simply reviewed, and eventually issued, permits to SLC to operate at the location selected by the applicant.[7]

Equally as important is the fact that, based purely on applicable law, there did not appear to be any statutory or regulatory reason for the DEP to deny the permits to SLC.  The SLC permit met the environmental regulations in place at the time.  Contrary to Plaintiffs' assertions, therefore, the DEP had valid grounds, "other than race," to legitimately approve SLC's permits with the facility in its present location.

In conclusion, the DEP's actions in reviewing and issuing the SLC permits are clearly explainable on grounds other than race

---

8   There were many non-discriminatory reasons for SLC to choose that location.  The SLC facility is sited in an area that had been used predominantly for industrial purposes since the early 1900's.  Hickerson Report, pg. 4, Exhibit J to Wolf Aff.  The property was previously used for an industrial purpose.  Ibid.  Furthermore, because the SLC facility would receive its raw material by cargo ship, SLC sought to locate its facility in a deep water port area.  Davis Dep., pgs. 17-21, Exhibit C to Wolf Aff.  In addition, the location is also close to many major roads which facilitate SLC's distribution of its finished product.  Bowen Report, pg. 4, Exhibit K to Wolf Aff.

and there is no clear pattern present which shows an intent to discriminate by the DEP.  Even if it is assumed that all of the Plaintiff's allegations are true, and that Plaintiffs have suffered a disparate impact, the alleged actions by the DEP do not amount to a showing of intent to discriminate.  Plaintiffs have failed to produce any evidence whatsoever showing that the DEP made any decisions during the review and issuance of the SLC permits "because of" the alleged adverse affects they would have on Plaintiffs.  As such, Plaintiffs have not met their burden of proving that the Department acted with the intent to discriminate based on race or other impermissible classification and Defendants are entitled to judgment as a matter of law on this issue.

> **C.  Even if it is Assumed Plaintiffs are Disproportionally Impacted by the Department's Review and Issuance of the SLC Permits, Plaintiffs Have Failed to Present Any Genuine Issues of Material Fact that the Department's Decision Making Process was Motivated by an Intent or Purpose to Discriminate.**

Absent a stark pattern that compels the court to reach no other conclusion but that race or other impermissible factors motivated the state action, establishing disparate impact alone is insufficient.  Arlington Heights, supra, 429 U.S. at 266, 97 S. Ct. at 564.  Apart from the impact, Plaintiffs must prove racially discriminatory purpose or intent.  Ibid.  Where the impact of an

- 37 -

official act is not so disproportionate to compel the conclusion that race was the motivating factor, other evidentiary sources must be examined.  The Supreme Court has explained that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  Arlington Heights, supra, 429 U.S. at 266, 97 S. Ct. at 564.

In Arlington Heights, the Supreme Court enumerated a non-exclusive set of relevant factors to consider.  The inquiry includes:

1) the disparate impact itself;

2) the historical background of the action;

3) the particular events that led to the challenged act or decision;

4) departures from the usual state course of action, either procedurally or substantively, i.e., "if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached;" and,

5) legislative or administrative history.

Arlington Heights, supra, 429 U.S. at 267-68, 97 S. Ct. at 564-65. City of Memphis v. Greene, 451 U.S. 100, 101 S. Ct. 1584, 67 L. Ed. 2d 769 (1981).

In the instant matter, Plaintiffs have not shown compelling proof that they are so disparately impacted by DEP's review and issuance of the SLC facility permits as to compel the conclusion that race was the motivating factor. As noted above, the Plaintiff's own expert, Dr. Mennis, did not even conclude in his report submitted on Plaintiffs behalf that Plaintiffs are subject to a significantly disproportionate impact. The best Dr. Mennis could do was conclude that his statistical study found "evidence of racial inequity in the location and enforcement of AFS facilities." Likewise, Plaintiffs can not satisfy the applicable test for determining the presence of intentional discrimination set forth in Arlington Heights. Supra, 429 U.S. at 266.

The "historical background" factor requires a review of any history of discrimination by the decision maker or the represented jurisdiction. Williams v. Hansen, 326 F.3d 569, 585 (4th Cir. 2003). See, e.g., Sylvia Dev. Corp. v. Calvert County, 48 F.3d 810 (4th Cir. 1995) (finding "no evidence of any history of actual discrimination against Czechs, Eastern Europeans, or immigrants in general" by any county entity); Project B.A.S.I.C. v. Kemp, 776 F. Supp. 637 (D.R.I. 1991) (denying defendant's motion for summary judgment as Plaintiffs' complaint detailed a history of discrimination in the handling of public housing). In applying this factor, the Supreme Court cautioned against utilizing

- 39 -

"generalizations", without regard to context. <u>Gomillion</u>, <u>supra</u>, 364 <u>U.S</u>. at 343-44, 81 <u>S. Ct</u>. at 125.

Plaintiffs here have failed to present any genuine material facts showing that the DEP has a history of discrimination. Neither have Plaintiffs presented any evidence that there is a history of actual discrimination by the DEP against them. At best, Plaintiff's expert witness, Dr. Mennis, suggested that "regulatory enforcement is pursued more vigorously at [AFS] facilities in non-minority neighborhoods than at [AFS] facilities in Minority neighborhoods." Dr. Mennis' suggestion is based on his statistical conclusion that "AFS facilities in areas with high percent minority [populations] are associated with higher rates of significant violation, lower rates of State administrative orders issued, and lower penalty amounts...."

Even if it is considered to be true, Dr. Mennis' statistical conclusion does not amount to evidence of prior discrimination. This conclusion by Dr. Mennis shows nothing more than the possible correlation of several variables used in his analysis. Even his report fell short of reaching the necessary conclusion of a history of discrimination. In fact, Plaintiffs' argument regarding any disparate enforcement by the Department is not only misplaced, but also irrelevant to their claim of discrimination in the review and issuance of the SLC permit.

In addition, Dr. Mennis' conclusion was made without consideration of several indisputable material facts that tend to negate any significance it may have had.  For instance, Dr. Mennis did not consider the fact that the DEP is required by the EPA to inspect Major and Synthetic Minor facilities (AFS facilities) at predetermined frequencies, and that the DEP has been largely successful in meeting such requirements.  In addition, all penalties assessed by the DEP for violations of the Air pollution Control Act, N.J.S.A. 26:2C-1 et seq., and its implementing regulations, N.J.A.C. 7:27-1 et seq., are done so according to specific and detailed regulations set forth at N.J.A.C. 7:27A-1 et seq.  These penalty calculation regulations give the DEP limited discretion to determine the number of days over which a violation occurred, for continuing violations.  However, the DEP does not have discretion as to the penalty amount assessed, per day, once it has been determined that a particular violation of N.J.A.C. 7:27-1 et seq. has occurred.  As such, the DEP has little discretion in determining when to issue administrative orders and in determining the amount of penalties assessed, contrary to Dr. Mennis' suggestion.

Therefore, even if it is assumed for the sake of argument that Plaintiffs allegations are correct, Plaintiffs have failed to present any genuine material facts demonstrating a history of discrimination by the DEP.

- 41 -

The purpose of the challenged action may also be revealed by the preceding sequence of events, for example, if a town suddenly re-zones land upon learning of plans to build integrated housing. <u>Vill. of Arlington</u>, <u>supra</u>, 429 <u>U.S</u>. at 267, 97 <u>S. Ct</u>. at 564.   <u>See also</u>, <u>Oxford House-Evergreen v. City of Plainfield</u>, 769 <u>F. Supp</u>. 1329, 1343 (D.N.J. 1991) (finding that the sequence of events, where the zoning officer first allowed the facility as a permitted use under the zoning ordinance, then reversed her decision after a city council meeting at which opposition was expressed, suggested that the city's proffered interests were a pretext for discrimination); <u>Resident Advisory Bd. v. Rizzo</u>, 564 <u>F.2d</u> 126 (3d Cir. 1977) (noting that the city became actively opposed to the housing project "only after the initiation of bias-tinged local demonstrations).

Similarly, departures from the usual procedure or an aberrant weighing of factors, such that a contrary result would have been reached if the factors usually deemed important were given their usual consideration, may be evidence of improper purposes behind the decision.  <u>Id</u>. at 267, 564-65.  <u>See</u>, <u>e.g</u>. <u>Sylvia Dev. Corp</u>., <u>supra</u>, 48 <u>F.3d</u> at 821 (finding no evidence that the board "in any way departed from its usual procedural sequence in processing [plaintiffs'] application and administering the public hearing") <u>Resident Advisory Bd</u>., <u>supra</u>, 564 <u>F.2d</u> at 144 (noting the many departures from the normal procedure in the city's

attempt to terminate the housing project and that the normal procedure would have required the city to publicly reveal its reasons for cancelling the project).

Here, Plaintiffs have failed to present any genuine material facts demonstrating that the DEP has departed from its usual procedures, or that intent to discriminate can be revealed by a preceding sequence of events. In reviewing and issuing the SLC permits the DEP followed its standard procedures to the letter. The addition, the factors considered by the DEP did not strongly weigh in favor of an opposite permitting decision. Plaintiffs have not alleged otherwise. Furthermore, while the Department did not have formal procedures in place at the time to guide it in considering issues of environmental equity,[8] the Department did follow informed policies aimed at increasing Plaintiffs' participation. If anything, DEP stretched its normal procedures in favor of Plaintiffs' participation.

Plaintiffs can not point to any, and have alleged no preceding sequence of events that they purport reveals an intent to discriminate by the DEP. Similarly, no actions by the DEP have been alleged that follow the discovery of information that prevents

_____

9  As indicated previously, the Department was in the process of creating a rule for handling environmental equity issues in the review and issuance of permits, but this rule was not proposed until January 4, 2002.

- 43 -

the otherwise expected course of events to the adverse effect of the Plaintiffs.

Finally, the legislative or administrative history may be relevant, "especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." Id. at 268, 265. See, e.g., Resident Advisory Bd., supra, 564 F.2d at 144 (noting the mayor's repeated objections to the housing project, the equation of public housing with "black housing," and statements that "public housing should not be placed in white neighborhoods"). Again, here, the evidence presented by Plaintiffs must be considered not in isolation, but in the context of the totality of the evidence. Anderson, supra, 375 F.3d at 86. See also, Hunter v. Underwood, 471 U.S. 222, 229, 105 S. Ct. 1916, 1920-21, 85 L. Ed. 2d 222 (1985) (noting that the Alabama legislature passed the law at issue during a constitutional convention at which "white supremacy ran rampant"); Sylvia Dev. Corp., supra, 48 F.3d at 821-22 (cautioning against reading discrete statements out of context).

Plaintiffs have failed to present any genuine material facts demonstrating that the legislative or administrative history of the DEP's permitting regulations reveals an intent to discriminate against the Plaintiffs by the DEP. In fact, the Plaintiffs failed to allege this in their complaint. Plaintiffs have identified no contemporary statements by Department employees,

minutes of DEP meetings or DEP reports which even suggest an intent to discriminate.  Therefore, Plaintiffs have failed to present any genuine material facts demonstrating that the legislative or administrative history of the DEP's permitting regulations reveals even the slightest intent to discriminate against the Plaintiffs by the DEP.

In conclusion, Plaintiffs have not shown compelling proof that they are disparately impacted by DEP's review and issuance of the SLC facility permits.  However, even if it is assumed the Plaintiffs have alleged sufficient facts to show they are disproportionately impacted by the DEP's review and issuance of the SLC permits, the disparate impact is not of the type which would, without more, rise to the level required to constitute intentional to discrimination.  Plaintiffs have not shown a clear pattern of discriminatory action unexplainable on grounds other than race and Plaintiffs have failed to satisfy any of the relevant factors identified in Arlington Heights for determining the presence of intentional discrimination.  Supra, 429 U.S. at 266.  As such, Plaintiffs have not met their burden of proving that the Department acted with the intent to discriminate based on race or other impermissible classification and Defendants are entitled to judgment as a matter of law on this issue.

- 45 -

## CONCLUSION

Pursuant to <u>Fed. R. Civ. Pro</u>. 56(c), Plaintiffs have identified no genuine issue as to any material fact and defendant DEP is entitled to judgment as a matter of law.

Respectfully submitted,

PETER C. HARVEY
ATTORNEY GENERAL OF NEW JERSEY

By: _Stefanie A. Brand_

Stefanie A. Brand
Assistant Attorney General

Dated: _5/27/05_

- 46 -