UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SOUTH CAMDEN CITIZENS IN ACTION, BARBARA PFEIFFER, PHYLLIS HOLMES, LULA WILLIAMS, AND SHARON CHRISTIE POTTER, | : : : | Hon. Freda L. Wolfson<br><br>Civil Action No.01-CV-702(FLW) |
| Plaintiffs, | : | |
| v. | : | |
| THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION and BRADLEY CAMPBELL, COMMISSIONER OF NEW JERSEY DEPT. ENVIRONMENTAL PROTECTION IN HIS OFFICIAL CAPACITY | : : : : | STATEMENT  OF MATERIAL FACTS |
| Defendants. | : | |
| ST. LAWRENCE CEMENT CO., L.L.C., | : : | |
| Intervenor. | | |

TO: ALL COUNSEL OF RECORD

## <u>STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT</u>

Pursuant to Federal Rule of Civil Procedure 56 and Civil Rule 56.1, Defendants New Jersey Department of Environmental Protection and  Bradley Campbell, Commissioner of New Jersey Department of Environmental Protection in his Official Capacity, hereby submit the following Statement of Material Facts in Support of Defendants' Motion for Summary Judgement.

(1)  Defendant New Jersey Department of Environmental Protection (hereinafter "DEP" or "Department") is a principal Department within the executive branch of State Government, which implements and enforces the environmental laws and regulations of the State of New Jersey.  The Department maintains its principal offices at 401 E. State Street, Trenton, Mercer County, New Jersey. Plaintiff's Second Amended Complaint ¶17.

(2)  Defendant Robert C. Shinn, Jr., previously named in his official capacity as the former Commissioner of the DEP, oversaw the operations of the DEP.  Deposition of Robert C. Shinn,[1] pgs. 14-15, attached to the May 27, 2005 Affidavit of Gary W. Wolf, II as Exhibit A.[2]  Commissioner Shinn served in his official capacity from February 1994 until February 2002. <u>Id</u>. at 13.

---

[1] Hereinafter referred to as "Shinn Dep."

[2] Hereinafter referred to as "Wolf Aff."

(3)  Plaintiffs' original complaint was amended twice, once on May 2, 2001 and again on November 26, 2002 (the Second Amended Complaint).  In Plaintiffs' Second Amended Complaint, by operation of law, the current Commissioner, Bradley M. Campbell was made a defendant in his official capacity.  <u>Fed. R. Civ. Pro</u>. 25(d).

(4)  On January 2, 2003, the Department filed a motion to dismiss Plaintiffs' Second Amended Complaint.  On April 16, 2003, the Department's motion was granted, in part, by the Honorable Stephen M. Orlofsky.  Judge Orlofsky's opinion dismissed all counts against the Department except for those which allege intentional discrimination in violation of Section 601 of Title VI of the Civil Rights Act of 1964 and the Fourteenth Amendment.

(5)  Plaintiff, South Camden Citizens in Action (hereinafter "SCCIA") is an unincorporated community organization composed of residents of the Camden neighborhood known as Waterfront South.  Plaintiffs' Second Amended Complaint ¶5. SCCIA is the same entity as South Camden Citizens in Action, Inc. SCCIA's principal address is 1636 Ferry Avenue, Camden, New Jersey 08104.  <u>Ibid</u>.

(6)  On or about April 30, 2001, SCCIA filed a complaint against the Department and Robert C. Shinn, Jr., in his capacity as the Commissioner of the DEP, on behalf of its members.  Plaintiffs' Second Amended Complaint ¶5.  The April 30, 2001 complaint also

named as plaintiffs several individuals who are also members of SCCIA. Plaintiff's Second Amended Complaint, ¶s 6-16. The complaint challenged DEP's issuance of permits to the St. Lawrence Cement Company (hereinafter "SLC") to operate a blast furnace slag grinding facility in the Waterfront South area of Camden. Id. at pg. 2.

(7)   The April 30, 2001 complaint sought:

1.   To have the permits issued by the DEP declared invalid and rescinded.

2.   To have the DEP's policies and procedures for evaluating the permit application declared unlawful; and

3.   To require DEP to develop a protocol for reviewing permit applications in compliance with Title VI of the Civil Rights Act of 1964, and to apply that protocol to the St. Lawrence Cement Facility.

(8)   Currently, only four individual named plaintiffs, in addition to SCCIA, remain. They are:

Plaintiff Barbara Pfeiffer, residing at 1701 South Fourth Street, Camden, New Jersey;

Plaintiff Phyllis Holmes, residing at 422 Viola Street, Camden, New Jersey;

Plaintiff Lula Williams, residing at 1907 South Fourth Street, Camden, New Jersey; and

Plaintiff Sharon Christie-Potter, residing at 1727 South Fourth Street, Camden, New Jersey.

(9)   The Waterfront South neighborhood is located within the City of Camden, New Jersey.   Plaintiff's Second Amended Complaint ¶20.   The neighborhood contains approximately 2,130 residents.   Ibid.

(10) Much of the property located in Waterfront South is used for various industrial purposes.   Deposition of Dr. William Bowen, April 18, 2005,[3] pg. 85, attached to Wolf Aff. as Exhibit B.

(11) The City of Camden, New Jersey, makes up New Jersey census tract 6018 (hereinafter "CT 6018").   Plaintiff's Second Amended Complaint ¶20.

(12) According to aerial photographs taken in 1940, 1951, 1970, 1979, and 2002, the largest land use within CT 6018 was consistently industrial related land use.   Report entitled "Aerial Photographic Analysis, Census Tract 6018, Camden, New Jersey" dated February 22, 2005, prepared by Glen Hickerson, Vice President of Environmental Research, Inc., for Kirkpatrick & Lockhart Nicholson Graham LLP,[4] pg. 4, attached to Wolf Aff. as Exhibit J.

(13) Aerial photographs taken in 1940, 1951, 1970, 1979, and 2002 show that the property on which the St. Lawrence Cement facility and South Jersey Port Corporation facility are presently located, has been consistently used for industrial related purposes since at least 1940.   Ibid.

---

[3] Hereinafter referred to as "Bowen Dep."

[4] Hereinafter referred to as "Hickerson Report."

(14) A review of Sanborn maps show that the St. Lawrence Cement facility has been used for industrial related purposes, since at least 1906.  Ibid.

(15) Between September 12, 1970 and June 25, 1979, the aerial extent of industrial related land use in CT 6018 only increased by approximately 1.1 percent.  Ibid.

(16) Based on the New Jersey census data from 1970 and 1980, the percentage of minority and/or persons residing within CT 6018 increased by 35.39 percentage points, from 39.3% in 1970 to 74.69% in 1980.  Ibid.

(17) Between June 25, 1979 and February 19, 2002, the general extent of industrial related land use in CT 6018 only increased by approximately 4.1%.  Id. at 5.

(18) Based on New Jersey's census data from 1980 and 2000, the percentage of minority and/or persons residing within CT 6018 increased by 10.81 percentage points, from 74.5% in 1980 to 85.5% in 2000.  Ibid.

(19) The St. Lawrence Cement Company, LLC is a multinational company which manufactures cement and concrete materials.  SLC leased 11.7 acres of land at Broadway terminal, 2500 Broadway, Camden, New Jersey, located within Waterfront South. SLC intervened and is now a third party defendant to the instant action.  Plaintiff's Second Amended Complaint ¶38.

(20) In August 1999 SLC submitted an application to the Department for Air Pollution Control permits to construct and

certificates to operate stationary emission sources for purposes of operating a slag grinding facility in Waterfront South (hereinafter "the facility").  Plaintiff's Second Amended Complaint ¶s 40, 64.

(21) Waterfront South and the SLC facility are located along the Delaware River in the "port area" of Camden, site of a "deep water" port capable of docking large ships for the loading and for unloading of cargo.  Deposition of Thomas M. Davis, August 26, 2004,[5] pgs. 17-21, attached to Wolf Aff. as Exhibit C.   The current site of the facility is one of only three potential sites in the area that met SLC's siting needs, and the only site that was located in New Jersey. Id. at 20-21.

(22) The location of the SLC facility was selected by SLC because the facility receives its raw material, granulated blast furnace slag (hereinafter "GBFS"), by cargo ships which dock at the Camden Port. Ibid.  The GBFS is brought from the Camden Port to the SLC facility by truck.  Deposition of William J. O'Sullivan, June 17, 2004,[6] pg. 71, attached to Wolf Aff. as Exhibit D.

(23) The Department had no input into and was not involved in any way with the siting of the SLC facility at its present location. Davis Dep., pgs. 17-18, attached to Wolf Aff. as Exhibit C; Shinn Dep., pgs. 234-235, attached to Wolf Aff. as Exhibit A.

---

[5] Hereinafter referred to as "Davis Dep."

[6] Hereinafter referred to as "O'Sullivan Dep."

(24) Waterfront South and the SLC facility are located in close proximity to, and have easy access to, many major roadways. Expert Report of Dr. William M. Bowen, dated February 2005, which was prepared for Kirkpatrick & Lockhart Nicholson Graham LLP,[7] pg. 4, attached to Wolf Aff. as Exhibit K.

(25) Waterfront South and the SLC facility are located in the heart of the marketplace targeted by SLC for the sale of the product it produces at the facility.  <u>Ibid</u>.

(26) On November 1, 1999, the Department informed SLC by letter that its permit application for the facility was administratively complete.  Deposition of Joel H. Leon, June 11, 2004[8], pg. 207, attached to Wolf Aff. as Exhibit H.

(27) The Department made an administrative completeness determination only after SLC had responded adequately to a deficiency letter dated September 7, 1999.  <u>Id</u>. at 58, 83.

(28) The November 1, 1999 letter from the Department specifically informed SLC that the determination was made only for administrative completeness and did not imply a permit would actually be issued.  <u>Ibid</u>.

(29) Pursuant to <u>N.J.S.A</u>. 26:2c-9.2j and <u>N.J.A.C</u>. 7:27-8.24, a facility is legally permitted to begin construction of a planned facility (<u>i.e</u>. one proposed by permit application) "at risk."

---

[7] Hereinafter referred to as "Bowen Report."

[8] Hereinafter referred to as "Leon Dep."

(30) SLC unilaterally choose to exercise its legal option to construct the facility "at risk" during the permit review process.  Davis Dep., pgs. 104-105, attached to Wolf Aff. as Exhibit C.

(31) The Department follows the regulations set forth at N.J.A.C. 7:27-8.24, which allow permitees to choose to construct "at-risk" and, therefore, does not recommend or advise applicants as to whether or not they may proceed with "at risk" construction. Leon Dep., pgs. 96-97 and pgs. 124-126, attached to Wolf Aff. as Exhibit H.

(32) The Department did not recommend or advise SLC as to whether it may or may not construct "at risk."  Leon Dep., pgs. 130-131, attached to Wolf Aff. as Exhibit H; Shinn Dep., pgs. 30-31, attached to Wolf Aff. as Exhibit A.

(33) If an applicant proceeds with construction at risk, the Department may, following review of the permit, not issue a permit.  Leon Dep., pg. 98, attached to Wolf Aff. as Exhibit H.

(34) A permit applicant may request a pre-application meeting prior to submitting the permit application for review. O'Sullivan Dep., pgs. 15-16, attached to Wolf Aff. as Exhibit D.

(35) The DEP did meet with SLC for a pre-application meeting.  Id. at 23.

(36) A permit applicant must submit notice to the DEP of its intent to construct "at risk" at least seven days prior to

commencement of construction "at risk." SLC submitted such a notification to the DEP on November 17, 1999. Leon Dep., pgs. 97-98, attached to Wolf Aff. as Exhibit H.

(37) In February of 1998 the United States Environmental Protection Agency (hereinafter "EPA") issued draft guidelines entitled "Title VI Interim Guidance on Environmental Justice" (hereinafter the "Interim Guidance").

(38) Partially in response to the issuance of the Interim Guidance, a Federal Advisory Committee (hereinafter "FACA") was convened by the EPA. Shinn Dep., pgs. 71-73, attached to Wolf Aff. as Exhibit A. Only five states, including New Jersey, were chosen to participate on this FACA. Id. at 37-38.

(39) Commissioner Shinn was chosen to serve on the FACA as a representative for the State of New Jersey. Ibid.

(40) Commissioner Shinn stated with regard to his service on the FACA "[t]hat was quite an experience and certainly had an impact on my administration of dealing with permitting issues and environmental justice or environmental equity areas and just convinced me all the more that because of the density and the ethnic makeup of New Jersey we really needed to address that issue." Id. at 38.

(41) The Interim Guidance did not place any affirmative duties on the DEP, and the DEP was not required by Federal Law to implement or even follow the interim guidelines. Id. at 71-73.

(42) The DEP took many steps to see that environmental equity issues in general were addressed, including specifically the review and issuance of permits. William O'Sullivan, Director of the DEP's Division of Air Quality, testified during his deposition on June 17, 2004, that "environmental equity and environmental justice were significant policy issues. It was a policy of the Department to try to address equity and to minimize impact, particularly in areas where there were already existing environmental issues." O'Sullivan Dep., pg. 30, attached to Wolf Aff. as Exhibit D.

(43) Gary Sondermeyer, Chief of Staff to Commissioner Robert Shinn, testified on May 21, 2004, that "Commissioner Shinn was extremely interested in the issue of environmental justice," and "certainly [felt] that it was an issue that needed to be studied and reviewed and addressed minimally in terms of disclosure and expanded community outreach." Sondermeyer Dep., pgs. 27-28, attached to Wolf Aff. as Exhibit L.

(44) In May of 1998 the Department instituted an Environmental Equity Task Force (hereinafter the "Task Force"). The Task Force consisted of approximately 30 members, representing a cross-section of the New Jersey local and business communities, and DEP employees. The Task Force was developed to discuss issues related to environmental equity and to provide advice and counsel, and to make recommendations, to the Department. The Environmental Equity Task Force also was established to help integrate

environmental equity concerns into the rule making process and permit review process of the Department. See, Administrative Order 1998-15 attached to Wolf Aff. as Exhibit M; Deposition of Gary Sondermeyer, May 21, 2004,[9] pg. 30, attached to Wolf Aff. as Exhibit L; Shinn Dep., pgs. 48-50, attached to Wolf Aff. as Exhibit A.

(45) On November 22, 1998 the Department and Commissioner Shinn, by Administrative Order #1998-15, established the Advisory Council on Environmental Equity (hereinafter the "Advisory Council"). Administrative Order 1998-15, attached to Wolf Aff. as Exhibit M. This administrative order established and recognized the Environmental Equity Task Force in a formal capacity. The Advisory Council was charged with the tasks of providing advice and counsel to the Department in recognition of State and Federal concerns that minority and low income populations could experience a greater impact from pollution than other communities. Sondermeyer Dep., pgs. 20, 49-50, attached to Wolf Aff. as Exhibit L; Shinn Dep., pgs. 48-50, attached to Wolf Aff. as Exhibit A.

(46) The Advisory Council was the Commissioner's principal advisory resource for handling environmental equity concerns. Sondermeyer Dep., pg. 30, attached to Wolf Aff. as Exhibit L; Shinn Dep., pg. 48, attached to Wolf Aff. as Exhibit A.

(47) The Advisory Council played a key role in developing a draft rule aimed at handling environmental equity issues in the

---

[9] Hereinafter referred to as "Sondermeyer Dep."

permit review process.   Sondermeyer Dep., pgs. 30, 35, 60-87, attached to Wolf Aff. as Exhibit L; Shinn Dep., pgs. 53-54, attached to Wolf Aff. as Exhibit A.

(48) High level members of the DEP staff, including Pamela Lyons, Director of the Office of Equal Opportunity, Contract Assistance and Environmental Equity, and Gary Sondermeyer, Chief of Staff, attended Advisory Council meetings on a regular basis and were intimately involved with the work of the Advisory Council. Sondermeyer Dep., pgs. 20, 31, 53-54, attached to Wolf Aff. as Exhibit L; Shinn Dep., pg. 46, attached to Wolf Aff. as Exhibit A.

(49) Gary Sondermeyer testified during his May 21, 2004 deposition that he had "a significantly higher level of involvement with this Advisory Council than any other that I've ever been involved with." Sondermeyer Dep., pg. 85, attached to Wolf Aff. as Exhibit L.

(50) By Administrative Order 1999-05, issued on April 27, 1999, Commissioner Shinn created the Department of Environmental Protection Office of Equal Opportunity, Contract Assistance, and Environmental Equity.   Administrative Order 1999-05, attached to Wolf Aff. as Exhibit N.   This new office was charged with the Development and implementation of an Environmental Equity policy and procedures.  Pamela Lyons was appointed as the office Director. Shinn Dep., pgs. 45-46, attached to Wolf Aff. as Exhibit A.

(51) The position of Director of the Office of Equal Opportunity, Contract Assistance and Environmental Equity is a high

level position within the DEP.  The office's Director was a member of the Commissioner's management team.  Id. at 46.

(52) By Administrative Order 2000-01, issued on February 8, 2000, Commissioner Shinn established the DEP's policy with respect to environmental equity.  Administrative Order 2000-01, attached to Wolf Aff. as Exhibit O.  The Administrative Order served a guidance to Department management and staff concerning environmental equity objectives and the implementation strategies that the Department would undertake in order to incorporate environmental equity considerations into its decision making. Sondermeyer Dep., pgs. 30, 55-56, attached to Wolf Aff. as Exhibit L; Leon Dep., pg. 117, attached to Wolf Aff. as Exhibit H.

(53) Administrative Order 2000-01 specified specific responsibilities for the Advisory Council on environmental equity which included serving as the Department's principal source of advice and counsel on environmental equity issues and assisting with the Department's development of an Environmental Equity Policy, and incorporating environmental equity considerations into its permitting process.  Administrative Order 2000-01, attached to Wolf Aff. as Exhibit O.

(54) Gary Sondermeyer testified during his deposition that consistent with this goal, the "policy was developed in cooperation with the Environmental Equity Task Force, that is why the body existed.  Commissioner Shinn created that body, among

-14-

other things, to develop a policy." Sondermeyer Dep., pg. 20, attached to Wolf Aff. as Exhibit L.

(55) Administrative Order 2000-01 specified procedures by which, to the extent permitted by law, and following formal rulemaking in accordance with the Administrative Procedures Act, the DEP would incorporate environmental equity considerations into its decision making process. Administrative Order 2000-01, attached to Wolf Aff. as Exhibit O.

(56) Although formally charged by Administrative Order 2000-01 with responsibility of providing advice and comment to the Department in developing the environmental equity process as a rule for formal proposal in accordance with the Administrative Procedure Act, the Advisory Council and its predecessor, the Task Force, began working towards this goal as of the Task Force's inception in May of 1998. Sondermeyer Dep., pgs. 59-60, attached to Wolf Aff. as Exhibit L; Shinn Dep., pgs. 48-49, attached to Wolf Aff. as Exhibit A.

(57) In November of 1998, the DEP was given a $100,000 grant by the EPA to implement a model program promoting environmental equity. Sondermeyer Dep., pgs. 37, 39, attached to Wolf Aff. as Exhibit L; Leon Dep., pgs. 44-46, attached to Wolf Aff. as Exhibit H.

(58) New Jersey was one of only five states to receive an EPA grant for the purpose indicated in paragraph 58 above. Sondermeyer Dep., pg. 37, attached to Wolf Aff. as Exhibit L.

(59) The EPA grant money was used primarily to develop a screening model to help the DEP identify potential areas of application for its future environmental equity process. Sondermeyer Dep., pgs. 39-40, 41-43, attached to Wolf Aff. as Exhibit L.

(60) Commissioner Shinn testified during his deposition that he believed the EPA was "enthusiastic about the work we have done on the issue and our commitment to try to build something into our rule that would respond to the issue. I think that's why they gave us the grant." Shinn Dep. pg. 45, attached to Wolf Aff. as Exhibit A.

(61) The screening model was developed and tested, but never formally applied or used by the Department because the proposed rule was never adopted. Shinn Dep., pg. 59, attached to Wolf Aff. as Exhibit A; Sondermeyer Dep., pg. 42, attached to Wolf Aff. as Exhibit L.

(62) The screening model was intended to identify areas where an applicant proposing a new facility would be strongly encouraged by the DEP to voluntarily enter into a process to address potential environmental equity concerns. Sondermeyer Dep., pgs. 95-96, attached to Wolf Aff. as Exhibit L; Shinn Dep., pgs. 43, 56-57, 59-62, 98-100, attached to Wolf Aff. as Exhibit A.

(63) The process developed by the Department involved, among other things, community outreach and discussions, public meetings, and possible alternative dispute resolution. Sondermeyer

Dep., pgs. 40-41, 89-90, attached to Wolf Aff. as Exhibit L; Shinn Dep., pgs. 66-67, 198-200, attached to Wolf Aff. as Exhibit A.

(64) DEP presented this process to the FACA in 1999. Sondermeyer Dep., pg. 30, attached to Wolf Aff. as Exhibit L; Shinn Dep., pgs. 69-70, attached to Wolf Aff. as Exhibit A.

(65) The process was formalized as a proposed rule on or about January 4, 2002. Shinn Dep., pg. 68, attached to Wolf Aff. as Exhibit A.

(66) Gary Sondermeyer testified that "Commissioner Shinn want[ed] us to move as quickly as possible to the rule making..." because "[h]e was very committed to the issue of environmental equity, and he wanted to see something substantive done that was more than just an internal agency policy statement. He wanted to see rules proposed and adopted so we could start to address the issue." Sondermeyer Dep., pgs. 97-98, attached to Wolf Aff. as Exhibit L.

(67) The DEP's goal was to have the EPA recognize the proposed state environmental equity program and rule as a viable alternative to the EPA interim guidance process. Shinn Dep., pgs. 88-89, attached to Wolf Aff. as Exhibit A.

(68) Commissioner Shinn envisioned a performance partnership agreement with the EPA, specifically, he testified "we were providing an alternative and seeking endorsement for EPA to support a state initiative." Id. at 73-74.

-17-

(69) The proposed rule, referred to in paragraph 69 above was never formally adopted by the New Jersey Department of Environmental Protection because Commissioner Campbell, who took office shortly thereafter, envisioned an interagency approach toward addressing issues of environmental equity. Id. at 66; Sondermeyer Dep., pg. 106, attached to Wolf Aff. as Exhibit L.

(70) Commissioner Campbell's approach was eventually formalized in an executive Order issued by Governor James McGreevy in February, 2004. Exhibit P to Wolf Aff., pg. 106.

(71) The St. Lawrence Cement Company, LLC is a multinational company which manufactures cement and concrete materials. SLC leased 11.7 acres of land at Broadway terminal, 2500 Broadway, Camden, New Jersey, located within Waterfront South (hereinafter the "facility"). Plaintiffs' Second Amended Complaint ¶38.

(72) The DEP, after considering the applicable air emission standards, as well as the comments submitted during and after the August 23, 2000 public hearing, issued five permits to construct and certificates to operate stationary emission sources at the SLC facility on October 31, 2000. Plaintiff's Second Amended Complaint ¶ 82.

(73) No environmental equity based regulations existed to guide the DEP during the SLC permit review process. Sondermeyer Dep., pg. 93, attached to Wolf Aff. as Exhibit L; Shinn Dep., pgs.

52, 54, attached to Wolf Aff. as Exhibit A; Leon Dep., pgs. 178-179, attached to Wolf Aff. as Exhibit H.

(74) Throughout the SLC permit review process, the DEP followed the guidance of the previously formed Task Force, the Environmental Equity Advisory Counsel, and the various Administrative Orders executed during the review process. Sondermeyer Dep., pgs. 60, 93, attached to Wolf Aff. as Exhibit L; Shinn Dep., pgs. 45-46, attached to Wolf Aff. as Exhibit A; Leon Dep., pgs. 179-181, 194, attached to Wolf Aff. as Exhibit H.

(75) While the permit review was pending, the DEP scheduled a public hearing for August 23, 2000. Plaintiff's Second Amended Complaint ¶ 75.

(76) William O'Sullivan testified that "[i]t was our intention to be as responsible and open as possible with [the SLC] application." Id. at 126.

(77) In addition to conducting a public hearing, the DEP made itself accessible to the public, met with community representatives, responded to requests from the public, and responded to letters. O'Sullivan Dep., pgs. 125-126, attached to Wolf Aff. as Exhibit D.

(78) About one month prior to the hearing on August 23, 2000, the DEP published and distributed to the public, a notice, fact sheet, and five draft air quality permits to construct and certificates to operate, with proposed regulatory conditions,

regarding the proposed SLC facility.  Plaintiff's Second Amended Complaint ¶ 72.

(79) At the public hearing, and in subsequent written submissions, both the future plaintiffs and their counsel commented regarding the SLC facility.  Hearing Officer's Report, attached to Wolf Aff. as Exhibit Q; Public Hearing Transcript attached to Wolf Aff. as Exhibit R.  Waterfront South community members commented. Ibid.

(80) During the period of the SLC permit review, the DEP conducted a health risk study in Camden even though this study was not required as part of the permit review process.  The results of the study showed the addition of the SLC facility did not elevate the health risk.  Shinn Dep., pg. 141, attached to Wolf Aff. as Exhibit A.

(81) DEP discussed potential truck routes for trucks coming to and from the SLC facility with the Waterfront South community during the SLC permit review process.  Leon Dep., pg. 188, attached to Wolf Aff. as Exhibit H; Shinn Dep., pg. 220, attached to Wolf Aff. as Exhibit A.

(82) The DEP did not then, nor does it now, have the authority to consider truck routes and mobile sources in determining whether to issue permits for stationary sources. Shinn Dep., pg. 220, attached to Wolf Aff. as Exhibit A; Leon Dep., pgs. 155-156, 188, attached to Wolf Aff. as Exhibit H.

(83) Truck exhaust system emissions and non-stationary diesel engine emissions are regulated by mobile source rules N.J.A.C. 7:27-14, the Control and Prohibition of Air Pollution from Diesel-fueled Motor Vehicles rules, N.J.A.C. 7:27-15, the Control and Prohibition of Air Pollution from Gasoline-Fueled Motor Vehicles rules, and N.J.A.C. 7:27B-4, Air Test Method 4: Testing procedures for Motor Vehicles. The regulations are incorporated by reference in Title 39, the Motor Vehicle Code, enforced by state and local police, and in sections of N.J.A.C. 13:20, where on-road and periodic inspection authority is vested. Defendant's Responses to Plaintiffs' First Set of Requests for Interrogatories, pg. 10. Exhibit S. Despite these legal limitations, DEP raised with SLC the community's concerns regarding truck routes, and SLC agreed to utilize certain routes as a result. Shinn Dep., pg. 220, attached to Wolf Aff. as Exhibit A.

(84) The SLC permit application complied with all applicable regulations and standards prior to the DEP's approval of the permits to construct and certificates to operate in October 31, 2000. Deposition of Iclal Atay, March 14, 2001[10], pgs. 181-182, attached to Wolf Aff. as Exhibit E.

(85) Consistent with its normal permit review procedures, the DEP relied heavily on modeling data in its review and issuance of the SLC permits. Modeling data submitted in conjunction with the SLC permit application and reviewed by the DEP indicated the

_____

[10]Hereinafter referred to as "Atay dep."

proposed SLC facility would not emit particulates in excess of the applicable regulatory standards.  This modeling was not required by rule, however, the DEP used discretion to require it in the case of SLC, in part to ensure public involvement.  O'Sullivan Dep., pgs. 46, 78, attached to Wolf Aff. as Exhibit D.

(86) The Waterfront South area and South Camden were shown to be in attainment with the National Ambient Air Quality Standards for PM-10 particulates with the SLC facility operating.

(87) While the EPA adopted standards for PM-2.5 in 1997, these standards were immediately challenged.  As a result, when the Department issued permits for the facility to SLC in 2000, Camden was not designated as a non-attainment area for PM-2.5 by the EPA. Only after being designated a non-attainment area for PM-2.5 is New Jersey required to submit a State Implementation Plan to the EPA for approval.  Shinn Dep., pgs. 212-214, attached to Wolf Aff. as Exhibit A.   Therefore, there was no statutory or regulatory requirement in New Jersey for SLC to address PM-2.5 emissions before DEP could approve its application.  Id. at 212-214; Leon Dep., pgs. 195-196, attached to Wolf Aff. as Exhibit H.

(88) Nonetheless, the DEP did discuss PM 2.5 issues regarding the SLC facility internally.  O'Sullivan Dep., pgs. 50-51, attached to Wolf Aff. as Exhibit D.

(89) During the duration of Commissioner Shinn's tenure as Commissioner of the DEP, the DEP was deeply involved with the development and improvement of the South Camden area.  Id. at 117.

-22-

(90) According to the testimony of Commissioner Shinn, "we were probably more active in a proactive way in Camden than in any city in the state." Id. at pgs. 232-233.

(91) Gary Sondermeyer testified that "there was an awful lot of attention on the City of Camden in trying to address problem issues in the city to try to improve the quality of life." Sondermeyer Dep., pg. 120, attached to Wolf Aff. as Exhibit L. "[C]ertainly, Camden has been a significant focus area for the department for many, many years." Ibid.

(92) The DEP played a significant role in bringing the South Camden neighborhood the following improvements and facilities which benefit the community;

    (a)   The Battleship New Jersey and associated port dredging, id. at 115, 117, 119;
    (b)   The Sony Amphitheater, id. at 225;
    (c)   The Knipper Building, id. at 119, 225;
    (d)   The South Camden Park adjacent to the Camden County Municipal Utilities Authority, id. at 117;
    (e)   The Baseball Stadium, id. at 117, 119; and
    (f)   The Admiral Wilson Blvd. Corridor project, id. at 225.

(93) In conjunction with many of the above stated improvements in Camden, the DEP waived the required permit fees to help facilitate the project's completion. The DEP does not commonly waive permit fees for project in New Jersey. Shinn Dep., pgs. 116-117, attached to Wolf Aff. as Exhibit A.

(94) DEP is required by the EPA to inspect major facilities in New Jersey every two years, and synthetic minor

facilities in New Jersey every five years. Deposition of Edward M. Choromanski, April 7, 2005,[11] pg. 21, attached to Wolf Aff. as Exhibit F.

(95) The DEP is charged with the implementation and enforcement of the Air Pollution Control Act, N.J.S.A. 26:2C-1 et seq. and its implementing regulations N.J.A.C. 7:29-1 et seq.

(96) At every inspection, DEP determines compliance with the applicable Air Pollution Control Regulations and the applicable permit or permits held by the facility.  Id. at 22.

(97) The DEP endeavors to inspect major and synthetic minor facilities every two years and five years, respectively, and has been largely successful at doing so.  Id. at 40-42.

(98) All complaints received by DEP are assigned to an inspector to investigate.  Id. at 49.

(99) Some complaints are delegated to specific Counties to investigate pursuant to the delegation of authority under the County Environmental Health Act.  N.J.A.C. 26:3A-21 et seq.; Choromanski Dep., pg. 62, attached to Wolf Aff. as Exhibit F.

(100) Penalties assessed by the DEP for air violations are done so according to specific, detailed regulations set forth at N.J.A.C. 7:27A-1 et seq.; Id. at 81.

(101) These penalty calculation regulations give the DEP limited discretion to determine the number of days over which a violation occurred, for continuing violations.  The DEP does not

---

[11] Hereinafter referred to as "Choromanski Dep."

have discretion as to the penalty amount assessed, per day, once it has been determined that a particular violation of <u>N.J.A.C</u>. 7:27-1 <u>et</u> <u>seq</u>. has occurred.  <u>Id</u>. at 80-81, 151-154.

(102) Facilities are required to self-report violations of the air regulations to DEP.  <u>Id</u>. at 75-76.

(103) The majority of penalties assessed to major facilities in New Jersey for violation of the air regulations are for self-reported violations.

(104)  On behalf of Plaintiffs, Dr. Jeremy Mennis submitted an expert report entitled "Race and the Location and Regulation of Air Polluting Facilities in New Jersey," dated August 3, 2003.  Mennis Report, attached to Wolf Aff. as Exhibit I.

(105)  The goal of Dr. Mennis' study was to investigate racial equity in the spatial distribution and regulatory enforcement of air polluting facilities in New Jersey.  <u>Id</u>. at 2.

(106)  Dr. Mennis was deposed on April 5, 2005.  During his deposition, Dr. Mennis testified that his review did not show intentional discrimination by the DEP in its review and issuance of the SLC permits.  Mennis Dep., pg. 104-105, 130, attached to Wolf Aff. as Exhibit G.

(107) Dr. Mennis testified with respect to his expert report that, "[t]he study by itself does not suggest intent by the DEP."  <u>Id</u>. at 130.

(108) During his deposition Dr. Mennis also testified that the statistical study he conducted to prepare his expert

report could not pinpoint the causes of the racial inequity in AFS facility location and enforcement alleged by plaintiffs.  <u>Id</u>. at 94.

(109)  According to Dr. Mennis' data, census tracts located in New Jersey which contain AFS facilities actually have a lower minority population (33%) while New Jersey census tracts which do not contain AFS facilities have a higher minority population (35%).  Mennis Report, Pg. 4, attached to Wolf Aff. as Exhibit I.

(110)  Dr. Mennis concluded that his statistical study found "evidence of racial inequity in the location and enforcement of AFS facilities."  <u>Id</u>. at 7.

(111)  The DEP submitted an analysis of potential disparate impacts as directed by the Honorable Stephen M. Orlofsky on June 13, 2001.  The analysis "[did] not demonstrate disproportionate adverse impacts."  Analysis of Disparate Impacts, pg. 2, attached to Wolf Aff. as Exhibit T.

PETER C. HARVEY
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Defendants, State
of New Jersey, Department of
Environmental Protection

By:  Stefanie A. Brand
Stefanie A. Brand
Assistant Attorney General

Dated:  5/27/05