<u>NOT FOR PUBLICATION</u>                                    [306, 315]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | |
| SOUTH CAMDEN CITIZENS IN | : | Civil Action No. 01-702 (FLW) |
| ACTION, BARBARA PFEIFFER, | : | |
| PHYLLIS HOLMES, LULA WILLIAMS, | : | |
| and SHARON CHRISTIE POTTER, | : | |
| | : | |
| PLAINTIFFS,_____ | : | **OPINION** |
| | : | |
| v. | : | |
| | : | |
| THE NEW JERSEY DEPARTMENT OF | : | |
| ENVIRONMENTAL PROTECTION, | : | |
| BRADLEY CAMPBELL, Commissioner | : | |
| of the New Jersey Department of | : | |
| Environmental Protection, in his official | : | |
| capacity, | : | |
| | : | |
| DEFENDANTS, | : | |
| | : | |
| & | : | |
| | : | |
| ST. LAWRENCE CEMENT CO., L.L.C., | : | |
| | : | |
| INTERVENOR DEFENDANT. | : | |
| _____ | : | |

APPEARANCES:

For Plaintiffs:
OLGA D. POMAR
SOUTH JERSEY LEGAL SERVICES, INC.
745 MARKET STREET
CAMDEN, NJ 08102
    &
LUKE W. COLE
CENTER ON RACE, POVERTY AND THE ENVIRONMENT
450 GEARY ST., SUITE 500
SAN FRANCISCO, CA 94102

For Defendants New Jersey Department of Environmental Protection and Bradley Campbell,
Commissioner of the New Jersey Department of Environmental Protection:
GARY W. WOLF & STEFANIE A. BRAND
OFFICE OF THE NJ ATTORNEY GENERAL
25 W. MARKET STREET
PO BOX 112
TRENTON, NJ 08625-0093

For Intervenor Defendant St. Lawrence Cement Co.:
BRIAN MONTAG, DONALD KIEL & CATHERINE TRINKLE
KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
ONE NEWARK CENTER
10TH FLOOR
NEWARK, NJ 07102

**WOLFSON**, United States District Judge:

Plaintiffs South Camden Citizens in Action ("SCCIA"), Barbara Pfeiffer, Phyllis Holmes,

Lula Williams and Sharon Christie Potter (collectively "Plaintiffs") allege that the Defendant New

Jersey Department of Environmental Protection ("NJDEP" or "DEP"), and its former

Commissioner, Robert Shinn, violated Section 601 of Title VI of the Civil Rights Act of 1964 by

granting permits to Intervenor-Defendant St. Lawrence Cement Co. ("SLC") to construct and

operate a granulated blast furnace slag grinding facility in the Waterfront South neighborhood in

Camden, New Jersey.  Plaintiffs also assert that SLC's operation of the Facility constitutes a

private nuisance.  All Defendants have moved for summary judgment on all claims.  The issues

before the Court are whether there are genuine issues of fact as to 1) whether SLC's facility

unreasonably interferes with Plaintiffs' enjoyment and use of their homes and whether Plaintiffs

can demonstrate that SLC, as opposed to other area industries, caused Plaintiffs' harm or

nuisance, and 2) whether an invidious discriminatory purpose was a motiving factor in NJDEP's

issuance of permits to SLC to operate its facility.  This Court has jurisdiction pursuant to 28

U.S.C. §§ 1331, 1343, 1367.  For the reasons stated below, SLC's motion for summary judgment

is granted and the motion for summary judgment filed by NJDEP and former Commissioner

Bradley Campbell is granted.

## I.  BACKGROUND[1]

### A.  The Parties

NJDEP is the department of the executive branch of state government that implements and

enforces the environmental laws and regulations of the State of New Jersey.  Second Am. Compl.

¶ 17.  NJDEP receives financial assistance from the United States Environmental Protection

Agency ("EPA") and operates an air quality permitting program to enforce the Clean Air Act, 42

U.S.C. § 7401 et seq.  Id. ¶¶ 1-2.  NJDEP's air quality permitting program is subject to Title VI of

the Civil Rights Act of 1964.  Id. ¶ 1. From 1994 to 2002, Robert C. Shinn, Jr. was the NJDEP

Commissioner; Defendant Bradley Campbell became NJDEP Commissioner in 2002 and

remained in that position until recently. Id. ¶ 18; NJDEP, Office of the Commissioner, available at

http://www.state.nj.us/dep/commissioner (visited March 30, 2006).

SLC is a manufacturer of portland cement and cement products for use in concrete and

other construction materials.  Meadows Decl. at ¶ 2  As part of its business, SLC processes

granulated blast furnace slag ("GBFS"), which is a sand-like byproduct of the steel-making

industry that is added to cement. Id.

SCCIA is a community organization composed of and representing the interests of the

_____

[1]This Court is aware that it may not rely solely on the parties' statements of undisputed
facts, see Doeblers' Pennsylvania Hybrids, Inc. v. Doebler, No. 04-3848, 2006 WL 722156 at n.8
(3d Cir. Mar 23, 2006) (quoting Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d
241, 244 (2d Cir. 2004)), and, as a result, does so rarely and only when the underlying fact is
undisputed.

residents of the Camden, New Jersey neighborhood known as Waterfront South. SCCIA's Second

Am. Compl. ¶¶ 8-16.  The individually named Plaintiffs, Lula Williams, Phyllis Holmes, Barbara

Pfeiffer and Sharon Christie Potter, all live in the Waterfront South area, which constitutes U.S.

Census Tract 6018.  Id. ¶¶ 8-12, 20.

Based on 2000 U.S. Census data, Census Tract 6018 has 1,700 residents, 85.4% of whom

are non-white minorities.  U.S. Census Data.  In 2000, the median household income of

Waterfront South's residents was $22,147 and 33.8% of its residents lived below the poverty line.

U.S. Census Data.  By comparison, the state of New Jersey was 27.4% non-white, the median

household income of its residents was $55,136, and 8.5% of New Jerseyans lived below the

poverty line.  Id.

At the time this lawsuit was filed, the Honorable Stephen Orlofsky of the United States

District Court for the District of New Jersey, found that municipal or county facilities in or nearby

the Waterfront South area included: (1) the Camden County Municipal Utilities Authority

("CCMUA") sewage treatment plant, which treated sewage for approximately 35 municipalities in

Camden County; (2) the Camden County Resource Recovery facility, a trash-to-steam incinerator;

and (3) the Camden Cogen Power Plant, a cogeneration facility, which was an industrial facility

that converts waste energy to produce heat or electricity. South Camden Citizens in Action v. New

Jersey Dept. of Environmental Protection, 145 F. Supp.2d 446, 459 (D.N.J. 2001).

Judge Orlofsky also found that: 1) industrial facilities located in or near Waterfront South

included the Pneumo Abex Corporation, the G-P Gypsum Corporation, United Parcel Service, and

the Coastal Eagle Point Oil Company Refinery; 2) there are two Superfund sites located in

Waterfront South, including the Welsbach/General Gas Mantle site, which consisted of two

4

abandoned factories and neighboring residential lots on Arlington Street and is contaminated with

thorium and was discovered to be radioactive in 1981, and the Martin Aaron Drum Company site,

which is located on Broadway. Id.

According to Judge Orlofsky's findings, NJDEP identified numerous known contaminated

sites in the Waterfront South neighborhood, including: (1) Camden Iron & Metal, located at the

intersection of Front and Atlantic Streets; (2) Conrail, located on Chelten Ave.; (3) Lectronic

Research Laboratories, at 1423 Ferry St.; (4) Consolidated Chemx Corp., located at 4th and

Jefferson Streets; (5) Camden Lime, located at the intersection of South Front and Atlantic Ave.;

(6) Atlantic Industrial Tank, at 212 Mechanic Street. Fourteen of these sites are currently active in

the NJDEP's site remediation program. Id. at 459-60.  Judge Orlofsky found that NJDEP was

aware of the concentration of contaminated sites in this area and that it dedicated a staff member

to work directly with the City of Camden to facilitate clean-up and redevelopment, and found that

there were numerous other industrial facilities in the Waterfront South area, including: (1) four

scrap yards on or near Ferry Avenue; (2) Jen Cyn Industries: (3) Lambertsky Poultry; and (4) four

automotive shops. Id. at 460.  Later on in the litigation, SLC identified over thirty industrial

facilities in the Camden area.  See Background, § I (D) infra.

**B. The Facility**

On March 8, 1999, SLC entered into a lease with South Jersey Port Corporation

("SJPC"),[2] to lease 11.7 acres of land at Broadway Terminal, 2500 Broadway, Camden, NJ 08104,

---

[2]The SJPC is a quasi-state agency of the State of New Jersey. N.J.S.A. § 12:11A-1. Upon
its creation, the Legislature decided that the SJPC "should be vested with powers and
responsibilities sufficient to fulfill not only its port development purposes but its financial
obligations to the government and people of the State of New Jersey." Id.  Since it was created in
1968, the SJPC has sought to develop, rehabilitate, and promote economic growth for the port

located within the Waterfront South neighborhood. Meadows Dep. Tr. at 71:10-73:12; Lease Agreement.  SLC proposed to construct and operate a GBFS grinding facility at the Broadway Terminal site and intended to market the ground GBFS under the trade name GranCem®, which is used as an additive to strengthen portland cement. Meadows Decl. ¶ 3; Meadows Dep. Tr. at 23:13-26:25.   SLC planned to import, by barge, and process approximately 850,000 tons of GBFS and 16,500 tons of gypsum annually. SCCIA, 145 F. Supp.2d at 453. Because the on-site Broadway port cannot accommodate the import barges, barges were to arrive and be offloaded at the Beckett Street Terminal. Id. Trucks would then transport the GBFS and gypsum three miles to the SLC facility, where they would be offloaded into large, open piles. Id. Front-end loaders would transfer the GBFS to a feed hopper. Id. From the feed hopper, the GBFS would be transported by conveyor belt to a vibrating screen, which sifts out oversize materials. Id. The remaining material would proceed via conveyor belt to the roller mill, where it would be heat dried and then ground into smaller particles.  Id.  The GGBFS would be stored in storage silos until it is transported out of the facility by truck. Id. Before processing, GBFS particles are the size and texture of beach sand. After processing, the ground GBFS ("GGBFS") material is the size and texture of powdered sugar. Id.

The primary pollutants to be produced by the SLC facility were to be emitted into the air. Id.  These pollutants include particulate matter (dust), mercury, lead, manganese, nitrogen oxides, carbon monoxide, sulfur oxides, and volatile organic compounds. Id. at 453-54.  The focus of SLC's application, and of the NJDEP's review, was on SLC's air permit applications because the

---

districts in Camden and Salem New Jersey, and create jobs therein. Balzano Dep. Tr. at 11:14-25, 105:2-106:1.

most significant source of pollutants produced by the SLC facility was to be airborne emissions

from stationary sources. Id. at 454. Air contaminant emissions would be generated at the

following stages of GBFS processing: (1) fugitive dust emissions would be generated from the

handling and movement of GBFS when it is offloaded from trucks, piled, and then placed in the

hopper; (2) GBFS particles may be blown into the ambient air once on the conveyor belt; (3)

various air pollutants would be produced during the heating and grinding processes; and (4)

GGBFS emission may occur when the GGBFS is stored and offloaded for delivery off-site. Id.

SLC sought to manage and minimize the air pollution by: (1) keeping the GBFS wet by spraying it

with water while being offloaded, transported by truck, and piled, thereby minimizing fugitive

emissions; (2) watering and sweeping the roads at the facility; (3) covering the vibrating screen

and conveyor belts, thereby protecting the GBFS from the wind; (4) utilizing baghouse controls,

which function like vacuum cleaners, to siphon off particles before discharging the exhaust stream

from the roller mill into the atmosphere; (5) monitoring visible dust emissions pursuant to a dust

management plan; and (6) monitoring the radioactivity levels of the raw materials. Id.

Trucks would be used to deliver the GBFS from the Beckett Street Port to the SLC facility,

which is approximately three miles away. Id. Annually, there would be approximately 35,000

inbound delivery trucks arriving at the SLC facility and approximately 42,000 outbound delivery

trucks departing from the SLC facility. Id.  Inbound truck deliveries to the facility would occur

about 80 days per year, with approximately 500 truck deliveries per day; outbound truck

departures would occur approximately 225 days per year, with approximately 200 trucks departing

per day. Id.  The contemplated truck route would pass through residential areas of the Waterfront

South community. Id. In response to community input, SLC modified the original truck delivery

route to minimize the number of residential streets used by SLC-contracted delivery trucks. Id.

After executing the lease with the SJPC, SLC initiated the process of applying for the necessary construction and operating permits from the NJDEP.   Meadows Decl. ¶¶ 11-12.  SLC retained the services of environmental engineers and consultants to assist with the permitting process.  Id.  SLC's primary focus in the permitting process was to obtain air permits.  Id.  Air permits were necessary because the grinding process used by SLC creates, among other things, dust and particulate emissions, which are regulated by the state. Id.   SLC began "pre-application" discussions with the NJDEP in March, 1999. Id.  These discussions continued for five months and culminated in the formal submission of SLC's air permit applications to the NJDEP on August 5, 1999. Id.

According to the AIRnow website[3], particle pollution (also known as "particulate matter") in the air includes a mixture of solids and liquid droplets. Office of Air and Radiation, Particle Pollution and Your Health, (Sept. 2003), available at http://www.airnow.gov/index.cfm?action=particle.airborne (visited March 22, 2006). Some particles are emitted directly; others are formed in the atmosphere.  Id.  PM10 is defined as inhalable particulate matter with a diameter of 10 micrometers or less.  They are referred to as "coarse dust particles" and can be found in wind-blown dust. Ten micrometers is smaller than the width of a single human hair.  PM2.5 is fine particulate matter with a diameter of 2.5 micrometers or less, which is 40 times smaller than the average grain of table salt.  They are referred to as "fine

---

[3]The U.S. EPA, National Oceanic & Atmospheric Organization, National Park Service, tribal, state, and local agencies developed the AIRNow website to provide the public with easy access to national air quality information. AIRnow, About AIRnow, available at http://www.airnow.gov/index.cfm?action=static.background (visited March 22, 2006).

particles" and can be found in smoke and haze. PM10 particles and smaller particles, such as PM2.5, pose great health problems because they are so small that they can get deep into people's lungs, and some may even get into people's bloodstreams. Id. Exposure to such particles can detrimentally affect both the lungs and heart. Id.

The Clean Air Act which was last amended in 1990, requires the United States Environmental Protection Agency ("EPA") to set National Ambient Air Quality Standards ("NAAQS") for pollutants considered harmful to public health and the environment. EPA, National Ambient Air Quality Standards, (Mar. 2006), available at http://www.epa.gov/air/criteria.html (visited March 23, 2006).  The Clean Air Act established two types of national air quality standards.  Id.  Primary standards set limits to protect public health, including the health of "sensitive" populations such as asthmatics, children, and the elderly.  Id. Secondary standards set limits to protect public welfare, including protection against decreased visibility, damage to animals, crops, vegetation, and buildings.  Id.  Presently, the EPA has NAAQS in place for six principal pollutants, which are called "criteria" pollutants: Carbon Monoxide, Lead, Nitrogen Dioxide, Ozone, Sulfur Oxides, PM10 and PM2.5.  Id.

While the EPA is responsible for establishing the NAAQS, states are charged under the Clean Air Act  with the primary responsibility for implementing the NAAQS within their borders and monitoring compliance. 42 U.S.C. § 7407(a)("Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State."). States are required to develop state implementation plans  which

explain how they plan to measure and monitor pollutants, and to submit their SIPS to the EPA for approval. 42 U.S.C. § 7410.

### C. Permit Applications

Based on its projected activities, SLC applied to various NJDEP offices for several different types of permits after executing the lease with the SJPC. Meadows Decl. ¶ 10; SCCIA, 145 F. Supp.2d at 454.   SLC retained the services of environmental engineers and consultants to assist with the permitting process. Meadows Decl. ¶ 10.   From SLC's perspective, the primary focus of the permitting process was to obtain air permits. Id.  Air permits were necessary because the grinding process used by SLC creates, inter alia, dust and particulate emissions, which are regulated by the state. SCCIA, 145 F. Supp.2d at 454; Meadows Decl. at ¶¶ 10-12.  SLC applied for: (1) a Waterfront Development Permit from the NJDEP Office of Sediment and Dredging Technology; (2) a Pollutant Discharge Elimination Permit from the NJDEP Water Quality Division; (3) several "general permits" governing handling and storage of materials; and (4) air quality permits for each of the five stationary emission sources SLC planned to operate, from the NJDEP Air Quality Permitting Program.  SCCIA, 145 F. Supp.2d at 458.

The NJDEP Air Quality Permit Program Office is responsible for reviewing and approving permits for stationary sources of air pollutants.  NJDEP, Air Quality Permitting Program, (Mar. 2006), available at  http://www.nj.gov/dep/aqpp (visited March 30 2006). The requirements and the application process for air permits are set forth at N.J.A.C. tit. 7, § 7:27-8.1.  SLC submitted its air permit applications to the NJDEP Air Quality Permit Program Office on August 5, 1999. The permit applications were several hundred pages long, and included narrative text, a site plan, diagrams of various parts of the facility, facility emission estimates for each of the emission

10

stacks, and a list of applicable state and federal regulations.

SLC's permit application proposed that the facility could emit almost 60 tons per year of PM10.   SCCIA Statement of Material Facts ¶ 103 (citing DEP Notice and Fact Sheet).  SLC planned to operate the facility twenty four hours a day, 365 days a year, processing up to 848,771 tons of GBFS annually. Id. ¶ 104 (citing DEP Notice and Fact Sheet).  The SLC operations would require 77,116 diesel truck trips per year to make deliveries or distributions of the facility's products. Id. ¶ 105 (citing DEP Notice and Fact Sheet).

With its application, SLC was required to submit an air dispersion modeling protocol. SCCIA, 145 F. Supp.2d at 458. The SLC air dispersion modeling proposal was based on an EPA-approved model which is capable of handling multiple layers of information. Id. Modeling is used to predict the environmental impact of a pollutant emission source, such as the proposed SLC facility, by estimating emission flow based on air patterns and other meteorological data. The results of the modeling are then compared to the NAAQS to determine whether a particular facility will cause or significantly contribute to a violation of the NAAQS. Id.  NJDEP approved the modeling protocol selected by SLC. Id.

The NJDEP is required by law to apply the NAAQS established by the EPA in evaluating permit applications for facilities which, like the SLC's proposed facility, will emit air pollutants. See 42 U.S.C. §§ 7407(a), 7410, 7411.  Therefore, when NJDEP evaluates a permit request it assesses whether the operation of a facility will cause or significantly contribute to a violation of the NAAQS.  The EPA has also established Prevention of Significant Deterioration ("PSD") levels for some pollutants, including PM10.  40 C.F.R. 50.21. A PSD increment is the maximum increase in a pollutant's concentration that is allowed to occur above an earlier established

baseline value as long as air concentrations stay below the standard.  Id. The purpose of analyzing

PSD increments is, among other things, to make sure that no particular facility can "consume" the

entire concentration of a pollutant allowed from all sources, in combination, under the NAAQS.

42 U.S.C. §§ 7470, 7473.  According to SLC, it demonstrated to NJDEP's satisfaction that it was

within the twenty four hour and annual PSD increments for PM10. Air Dispersion Modeling

Report.

    The air dispersion modeling done by SLC primarily focused on its PM10 emissions. Id.

The results of the modeling revealed that the PM10 emissions generated by the proposed SLC

facility would not exceed the NAAQS for PM10 established by the EPA that were then in place.

DEP did not investigate or analyze SLC's PM 2.5 emissions during the permit review. Id.

According to SLC, it was unable to compare the facility's PM2.5 emissions with the NAAQS

during the permitting process since "SLC could not have modeled for PM2.5 in compliance with

EPA guidance because in 2000," neither the requisite "three years of PM2.5 monitoring data,"

"nor a PM2.5 source inventory was available for Camden."  SLC's Statement of Material Facts ¶¶

137-38 (citing Batterman Dep. Tr. at 105:13-105:19, 138:1-140:17, and Flaherty Report at 8-9).

    In the course of its permit evaluation, SLC submitted to DEP an analysis of whether it was

meeting state-of-the-art requirements, which included a cost analysis.  SLC's Statement of

Material Facts ¶ 157 (citing Trinkle Ex. 28-29; O'Sullivan Dep. Tr. at 52:25-53:17).  SLC

determined that it was too costly to cover its slag piles and fully enclose its operations; DEP

accepted SLC's cost analysis.  SCCIA's Statement of Material Facts  ¶¶ 115-116 (citing Daly

Dep. Tr. 76:14-78:10).

In a letter dated November 1, 1999, the NJDEP informed SLC that its application was "administratively complete." Letter from Iclal Atay to Denise Brubaker (Nov. 1, 1999), Trinkle Ex. 27.  An application is designated as "administratively complete" when the applicant has submitted all of the information the NJDEP needs to review and evaluate the proposal and decide whether to permit the facility. Id.  According to N.J.A.C. tit. 7, § 27-8.24, when an application is deemed "administratively complete" by the NJDEP, the applicant may commence construction on the proposed facility.  The letter also set forth NJDEP's policy that if an applicant proceeds with construction of a proposed facility while awaiting review of its permit application, it does so at its own peril because the DEP could still deny the permit. Letter from Iclal Atay to Denise Brubaker (Nov. 1, 1999), Trinkle Ex. 27; Meadows Decl. ¶¶ 12-13.  Upon receipt of NJDEP's letter indicating that its application was "administratively complete," SLC began construction of the proposed facility towards the end of 1999.  Id. ¶ 14.

### D. The Permit Process and Environmental Equity

In February 1998, the EPA published draft guidelines entitled "Title VI Interim Guidance on Environmental Justice" ("Interim Guidance").  Shinn Dep. Tr. 68:14-17.  The Interim Guidance was "intended to provide a framework for the processing by EPA's Office of Civil Rights (OCR) of complaints filed under Title VI ... alleging discriminatory effects resulting from the issuance of pollution control permits by state and local governmental agencies that receive EPA funding." EPA, Interim Guidance for Investigating Title VI Administrative Complaints Challenging Permits, (Feb. 5, 1998) at 1, available at http://www.epa.gov/civilrights/docs/interim.pdf (visited March 14, 2006).  As such, the Guidance outlined the specific steps that the OCR is to follow when processing Title VI complaints. Id. at 3.

As a result of the issuance of the Interim Guidance, a Federal Advisory Committee ("FACA") was convened by the EPA in which five states, including New Jersey, were chosen to participate. Shinn Dep. Tr. at 37:5-38:19. Commissioner Shinn served on FACA as New Jersey's representative, id., and stated that serving on the FACA "was quite an experience and certainly had an impact on my administration of dealing with permitting issues and environmental justice or environmental equity areas and just convinced me all the more that because of the density and the ethnic makeup of New Jersey we really needed to address that issue," id. at 38:11-19.

According to Commissioner Shinn, the Interim Guidance did not place any affirmative duties on NJDEP, and NJDEP was not required by Federal Law to implement or even follow the interim guidelines. Id. at 72:21-73:11. Nonetheless, in May 1998, NJDEP created an Environmental Equity Task Force ("Task Force"), Sondermeyer Dep. Tr. at 30:15-18, 110:4-6, "for the purpose of developing recommendations for an environmental equity policy and process," NJDEP Administrative Order 1998-15; Sondermeyer Dep. Tr. at 20:5-6. The Task Force produced a "Draft Environmental Policy" that Commissioner Shinn submitted to the EPA. Sondermeyer Dep. Tr. at 30:19-24.

On November 22, 1998, NJDEP and Commissioner Shinn, by Administrative Order #1998-15, created the Advisory Council on Environmental Equity ("Advisory Council") in order "to establish a permanent source of advice and counsel in recognition of state and federal concerns that minority and low-income populations may be experiencing a greater impact from pollution than other communities." NJDEP Administrative Order 1998-15. The Advisory Council consisted of thirty (30) individuals, including "[NJDEP] representatives, members of grass roots community-based organizations, academic and medical community groups, environmental groups,

14

business representatives, and local officials." Id.  Additionally, the Advisory Council was charged with "making recommendations to the Commissioner for strategies to promote environmental equity in New Jersey and for building partnerships and trust with [the] many diverse communities within [New Jersey]." Id.  Furthermore, the Advisory Council was "to provide assistance during the implementation of [the] Environmental Equity policy and thereafter serve as [NJDEP's] principal advisory resource" for handling environmental equity concerns. Id.

By Administrative Order 1999-05, issued on April 27, 1999, Commissioner Shinn created the Office of Equal Opportunity, Contract Assistance, and Environmental Equity.  NJDEP Administrative Order 1999-05.  This new office was charged with the development and implementation of an environmental equity policy and procedures.  Id.  By Administrative Order 2000-01, issued on February 8, 2000, Commissioner Shinn established the DEP's environmental equity policy.  NJDEP Administrative Order 2001-01.  The Administrative Order served as a guide to NJDEP management and staff concerning environmental equity objectives and the implementation strategies that NJDEP would undertake in order to incorporate environmental equity considerations into its decisionmaking.  Id.  Administrative Order 2000-01 also directed the Advisory Council to serve as the Department's principal source of advice and counsel on environmental equity issues, assist with the Department's development of an Environmental Equity Policy, and incorporate environmental equity considerations into its permitting process. Id. Pursuant to these strategies, the NJDEP committed to: (1) work with the Advisory Council and permit applicants to identify mechanisms for community notification regarding application for new, modified, or renewal permits, as early as possible in the permit review process; (2) develop guidance for permit applicants for the administration of an effective environmental equity

community outreach process; (3) establish a mechanism for community outreach at the earliest possible stage of the permit application process; (4) utilize technical screening tools such as the GIS and TRI to identify potential environmental equity issues at the earliest feasible stage of the permitting process; (5) participate in discussions among permit applicants and local community stakeholders and attempt, when possible, to include in permits conditions that the permit applicants and community stakeholders have agreed upon; (6) facilitate ADR between permit applicants and stakeholders in the case of disputes; (7) work with permit applicants to facilitate accessibility, understanding, and transfer of technical and scientific data to local communities; and (8) provide ongoing environmental equity training to appropriate NJDEP managers and staff. Id.

During the development of the Environmental Equity Policy, in November, 1998, the DEP was given a $100,000 grant by the EPA to implement a model program promoting environmental equity. Sondermeyer Dep. Tr. at 37:21-24; Leon Dep. Tr. at 44:21-46:22. New Jersey was one of only five states to receive such a grant from the EPA. Sondermeyer Dep. Tr. at 37:21-24. The EPA grant money was used primarily to develop a screening model to help the DEP identify potential areas of application for its future environmental equity process. Id. at 39:4-43:22.

Dr. Robert E. Hazen, one of NJDEP's scientists, was assigned by NJDEP to create the screening model and test the hypothesis that there was a difference in level of exposures to environmental hazards and air pollutants among different ethnic groups in New Jersey. Hazen Dep. Tr. at 30:1-20. As such, Dr. Hazen created the "screening element that could be incorporated into the DEP equity policy, which would show geographic sensitivity to equity issues." Id. at 56:16-19. According to Dr. Hazen, the NJDEP screening model is a combination of "ethnicity, geographical location and exposure to environmental agents, and it involves the

16

combination of those three elements to determine if exposure to the agents is different by ethnicity," or, in other words, "whether there is a higher or lower exposure based on ethnicity." Id. at 29:4-16.  Furthermore, the model "shows ... that census tracts with different portions in homogeneity of ethnic populations and different pollution burdens regionally can show differences."  Id. at 108:5-9.  In simpler terms, the model "show[s] that there is a difference in level of exposures among different ethnic and income groups."  Id. at 108:15-20.

Dr. Hazen testified that statewide "African-Americans and Hispanic Americans ... had more than average exposure to air toxics." Id. at 47:22-24.  Dr. Hazen also identified areas in the state where exposure to one ethnicity was at least three to four times as high as was exposure to another ethnicity, an area roughly two percent of the area of the state. Id. at 60:12-17, 61:14-16. Dr. Hazen also testified that as a result of the Court's Order that NJDEP "compile environmental exposures in Camden," he "analyzed, through a multiple source [model], air affect in Camden." Id. at 13:2-21. Using the screening model to determine where risk borne by people of color was above that borne by whites, Dr. Hazen found that roughly one-third of the state, including Camden, fit that pattern Id. at 63:5-16.

The screening model was intended to identify areas where an applicant proposing a new facility would be strongly encouraged by the DEP to voluntarily enter into a process to address potential environmental equity concerns. Sondermeyer Dep. Tr. at 95:2-96:22; Shinn Dep. Tr. at 59:7-62:17.  The process developed by the DEP involved, among other things, community outreach and discussions, public meetings, and possible alternative dispute resolution. Sondermeyer Dep. Tr. at 89:3-90:5; Shinn Dep. Tr. at 198:22-200:13.   DEP presented this process to the FACA in 1999.  Sondermeyer Dep. Tr. at 30:19-24; Shinn Dep. Tr. at 69:4-70:11.

Although Dr. Hazen's screening model was developed and tested, it was never formally applied or used by NJDEP because the proposed rule was never adopted.   Sondermeyer Dep. Tr. at 45:14-18; Shinn Dep. Tr. at 59:1-4; 66:13, 68:2-8.[4]

In a letter dated September 7, 1999, DEP informed SLC: "Due to the fact that St. Lawrence will be operating in an economically depressed area which has a substantial minority population, the Department will evaluate the need to conduct an environmental justice analysis." Letter from Ann Ryan to Denise Brubaker (Sept. 7, 1999), Pomar Ex. AA. Even before receiving that letter, however, in July 1999, shortly before it submitted its final air permit applications to NJDEP, SLC began to solicit support for the facility from the public and, specifically, residents of Waterfront South.  Smith Decl. ¶¶ 2-4.  SLC hired a local consultant, Morris Smith, Esq. ("Smith"), to manage its outreach and community involvement initiative. Id. ¶ 1.  Smith arranged meetings between SLC representatives and residents, municipal officials, local business leaders

_____

[4]The process was formalized as a proposed rule on or about January 4, 2002. NJDEP's Statement of Material Facts (citing Shinn Dep. Tr. at 68:2-8).  Gary Sondermeyer testified that "Commissioner Shinn want[ed] us to move as quickly as possible to the rule making" because "[h]e was very committed to the issue of environmental justice, and he wanted to see something substantive done that was more than just an internal agency policy statement.  He wanted to see rules proposed and adopted so we could start to address the issue."  Sondermeyer Dep. Tr. at 97:14-98:7. NJDEP's sought to have the EPA recognize the proposed state environmental equity program and rule as a viable alternative to the EPA interim guidance process.  Shinn Dep. Tr. at 89:1-22. In fact, Commissioner Shinn envisioned a performance partnership agreement with the EPA, id. at 73:2-74:24.; specifically, he testified "we were [providing] an alternative and seeking endorsement for EPA to support a state initiative," id. at 73:10-11. The proposed rule, however, was never formally adopted by the New Jersey Department of Environmental Protection because Commissioner Campbell, who took office shortly thereafter, envisioned an interagency approach toward addressing issues of environmental equity.  Id. at 66:4-13; Sondermeyer Dep. Tr. at 104:4-106:1.  Commissioner Campbell's approach was eventually formalized in an Executive Order issued by Governor James McGreevy in February, 2004.  N.J.A.C. Executive Order No. 96 (2004).

and community organizations in order for SLC to share information about the facility and obtain input from the community.  Id. ¶¶ 2-4.  SLC representatives held a "community support meeting" with members of SCCIA, in August, 1999, at the home of Rose Townsend, SCCIA's then-president, in order to obtain a letter of support for the SLC facility from SCCIA. Id. ¶¶ 5-6.  Those who attended the meeting discussed the operation of the facility, the prospective employment of Waterfront South residents by SLC, and environmental issues relating to the facility. Id. ¶ 6. SCCIA convened a community meeting on September 22, 1999, at the Camden Fellowship House, to discuss the impact of the facility on the Waterfront South neighborhood. Id. ¶ 7. SCCIA scheduled no further meetings, and, as such, SLC created a community advisory committee. SCCIA, 145 F. Supp.2d at 456.

The "Community Advisory Panel" ("CAP") began meeting in January, 2000 at the SLC office. Id. This group met eighteen times between January, 2000 and October 31, 2000, when the final NJDEP permit was issued.  Smith Decl. ¶ 10.  The CAP created a "Technical Advisory Group" ("TAG") in order to provide CAP members and other interested parties with an "independent assessment of the environmental issues implicated by the Facility's operations." Id. ¶ 12.  Members of the CAP nominated and selected technical experts to evaluate the impact of the proposed facility on traffic, air quality, storm water management, and health. Id. ¶ 13.  SLC provided funding to contract technical experts selected by the CAP to perform independent evaluations. SCCIA, 145 F. Supp.2d at 456.  The CAP selected: (1) Horner & Canter Associates ("Horner & Canter"), to study traffic issues; (2) Professor Ronald A. Chatterton ("Dr.Chatterton") of Villanova University to study water impact issues; and (3) Dr. Irwin Berlin  ("Dr.Berlin") of Trinitas Hospital, to study health issues. Smith Decl. ¶ 15.  In January, 2000, SCCIA decided not

to participate in the CAP sponsored by SLC. Id. ¶ 9. Olga Pomar, Esq., attorney for Plaintiffs,

however, attended several of the CAP meetings and participated in the nomination and final

selection of Dr. Berlin, to perform the TAG health analysis, and Dr. Chatterton, to perform the

TAG water impact analysis. Id. ¶ 16.  At some point, though, SCCIA instructed Ms. Pomar to

discontinue her participation in the CAP.  Id. ¶ 16.

Dr. Berlin was concerned about SLC's potential for emitting PM 10 and PM 2.5. See, e.g.,

Meeting Minutes (Aug. 3, 2000), Trinkle Ex. 23.  He also sought information from SLC about its

anticipated percentage of PM 2.5 emissions, which had not been included in the permit

application. Letter from Irwin Berlin to Morris Smith (June 20, 2000), Trinkle Ex. 25.  SLC

provided a memo to its CAP members, which states that the majority of the emissions from the

plant are of ground product, and that the percentage of PM 2.5 within the PM 10 portion is

approximately 50%. Response to CAP Questions, Pomar Ex. I.  In a letter dated July 7, 2000,

from Michael Davis, SLC's Camden Facility Manager, to Dr. Berlin, SLC addressed the facilities

PM2.5 emissions:

> The NJDEP recommended that we use data from the Camden Lab PM10
> monitoring station (located about 1 ½ miles from our facility) in support of the air
> permit compliance demonstration.  In addition to the PM10 monitor, the station
> also has a monitor that reports 24 hour PM2.5 monitoring information.
>
> We had Malcolm Pirnie conduct a preliminary analysis of the PM2.5 emissions.
> The analysis indicated that the facility emissions, as estimated from on site sources,
> will be well within the USEPA proposed 24 hour PM2.5 standard.  The analysis
> then looked at the impact of the facility combined with the background reading and
> nearby facilities contained in New Jersey and Pennsylvania emissions inventories.
> Since the inventory of nearby sources only provides information on their PM10
> emissions, it was assumed that their PM10 emissions were equivalent to PM2.5
> emission rates (a conservative, or health protective, assumption).  Adding PM10
> impacts from nearby sources, along with the monitored PM2.5 background
> concentration from the NJDEP Camden Lab Station, resulted in total impacts that

were slightly above the proposed 65 [ug/meters cubed] standard.  We believe that
if actual PM2.5 emission rates were available for the offsite sources, the total
emissions would be within the proposed PM2.5 standard.

Letter from Michael Davis to Irwin Berlin (July 7, 2000), Pomar Ex. G.

On July 25, 2000, the DEP published and distributed to the public, a notice, fact sheet, and

five draft air quality permits to construct and certificates to operate, with proposed regulatory

conditions, the proposed SLC facility. NJDEP's Statement of Facts  ¶ 78 (citing Second Am.

Compl.).  NJDEP held the first public hearing regarding the draft permits on August 23, 2000. Id.

¶ 75 (citing Second Am. Compl.).  At that time, the SLC plant was already largely constructed.

SCCIA's Statement of Facts  ¶ 128.  Over 120 people attended the public hearing, at which

residents of Waterfront South spoke, including Plaintiffs, Phyllis Holmes, Sharon Christie Potter,

and Barbara Pfeiffer, and their counsel.  Id. ¶ 129 (citing Public Hrg. Tr., Trinkle Ex. 32).

According to Commissioner Shinn, during the period of NJDEP's review of SLC's permit,

NJDEP conducted a health risk study of Camden which showed that the addition of the SLC

facility did not elevate the area's health risk.  Shinn Dep. Tr. at 141:1-20.  NJDEP discussed

potential routes for trucks coming to and from the SLC facility with the Waterfront South

community during the SLC permit review process, DEP Statement of Material Facts ¶  81, but

maintains that it never had the authority to consider truck routes and mobile sources in

determining whether to issue permits for stationary sources, id.  ¶ 82.

On October 4, 2000, Plaintiff SCCIA and other Waterfront South residents filed a request

for a grievance hearing with DEP pursuant to 40 C.F.R. §7.90, alleging violations of the Title VI

regulations with respect to DEP's evaluation of the SLC permits. SCCIA's Statement of Facts ¶

133 (citing Compl.).  NJDEP did not respond to the request or provide a hearing or other forum to

address these concerns.  Id. ¶ 134 (citing Lyons Dep. Tr.).   On October 4, 2000, Plaintiff SCCIA

and other individual complainants filed a complaint with the EPA alleging that DEP's permit

process violated the EPA's Title VI regulations because the SLC facility would have a disparate

adverse impact on the basis of race, color, and national origin. Id. ¶ 135 (citing EPA

Administrative Compl., Pomar Ex. MM).   On October 31, 2000, DEP released a response to the

public comments, SLC Statement of Material Facts  ¶¶ 169-70 (citing Hearing Officer's Report

Responses to Public Comments on the Draft Air Permit, Trinkle Ex. 37),  and issued five permits

to construct and certificates to operate stationary emission sources at the SLC facility.  DEP

Statement of Material Facts  ¶ 72 (citing Second Am. Compl. ¶ 82).

### D.  Procedural History

On February 13, 2001, the SCCIA Plaintiffs moved for a preliminary injunction and

declaratory relief against the NJDEP Defendants.  In their original verified Complaint, the SCCIA

Plaintiffs alleged that the method the NJDEP used to evaluate and grant SLC's air emissions

permits violated Title VI of the Civil Rights Act of 1964. Original Verified Compl.  On February

22, 2001, Judge Orlofsky signed a consent order which permitted SLC to intervene as a defendant

in this action. See Consent Order (Feb. 22, 2001).  On April 19, 2001, Judge Orlofsky granted the

SCCIA Plaintiffs' motion for a preliminary injunction and declaratory relief.

Five days later, on April 24, 2001, however, the United States Supreme Court decided the

case of Alexander v. Sandoval, 532 U.S. 275 (2001), which effectively overruled Judge

Orlofsky's decision.  However, the SCCIA Plaintiffs argued that Judge Orlofksy's decision of

April 19, 2001, which granted preliminary injunctive relief, could stand on alternative legal

grounds. On April 26, 2001, Judge Orlofsky granted the SCCIA Plaintiffs' motion for leave to amend the complaint.  On May 10, 2001, after considering the supplemental briefs filed by the parties, he issued a Supplemental Opinion and Order granting the SCCIA Plaintiffs preliminary injunctive and declaratory relief.

SLC appealed to the United States Court of Appeals for the Third Circuit, and on May 15, 2001, filed a motion to suspend or, in the alternative, to modify the preliminary injunction pending appeal, as well as a request for expedited review of the appeal. On May 29, 2001, NJDEP requested a stay of the remand process from the district court, but on June 4, 2001, the district court denied that request. NJDEP then made the same application to the Third Circuit on June 6, 2001, but the court denied its motion on June 11, 2001. On June 12, 2001, however, the Third Circuit granted SLC's request for expedited review, and on June 15, 2001, granted SLC's request to suspend the preliminary injunction pending appeal and SLC began operating the facility.

On December 17, 2001, in a divided two to one decision, the Third Circuit disagreed with the district court, and reversed the Court's Opinion and Order of May 10, 2001 that granted preliminary injunctive relief, and remanded the case for further proceedings. See South Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot., 274 F.3d 771 (3d Cir.2001), cert. denied, 536 U.S. 939 (2002). The Supreme Court denied certiorari on June 24, 2002, see South Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot., 536 U.S. 939 (2002).

Following the remand to the district court, the SCCIA Plaintiffs filed a motion for leave to file a Second Amended Complaint. In an Order dated November 19, 2002, Judge Orlofsky granted the SCCIA Plaintiffs' motion, and on November 26, 2002, the SCCIA Plaintiffs filed a Second Amended Complaint, which added Lula Williams and Sharon Christie Potter as plaintiffs,

23

substituted as a defendant the then NJDEP Commissioner Bradley M. Campbell ("Commissioner Campbell"), for former NJDEP Commissioner Shinn, and added Counts Five and Six, which asserted claims of Private and Public Nuisance against SLC only.  Accordingly, the SCCIA Plaintiffs asked the district court to grant declaratory relief in the form of rescinding the air permits and certificates which NJDEP issued to SLC, enjoining the NJDEP from taking further action which would facilitate the operation of SLC's cement grinding facility, and ordering the NJDEP to develop and adopt comprehensive protocols for reviewing permit applications that will prevent the granting of permits that have the effect of discriminating against persons on the basis of color, race, or national origin.

On January 31, 2001, both the NJDEP and SLC filed motions to dismiss the SCCIA Plaintiffs' Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  By way of an Opinion dated April 16, 2003, the district court: (1) denied the NJDEP Defendants' motion to dismiss the First and Third Counts of the Second Amended Complaint, to the extent that they alleged that the NJDEP Defendants intentionally discriminated against the SCCIA Plaintiffs in violation of § 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, as well as 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment; (2) granted the NJDEP Defendants' motion to dismiss the Second Count of the Second Amended Complaint, as well as that portion of the Third Count of the Second Amended Complaint which alleged a violation of § 602 of Title VI; (3) granted the NJDEP Defendants' motion to dismiss the Fourth Count of the Second Amended Complaint, which alleged that the NJDEP Defendants violated the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 et seq.; (4) denied SLC's motion to dismiss the Fifth Count of the Second Amended Complaint, which alleged a

24

claim of private nuisance; and (5) granted SLC's motion to dismiss the Sixth Count of the Second Amended Complaint, which alleged a claim of public nuisance.

On May 29, 2003, this case was reassigned from Judge Orlofsky to me.  On July 23, 2003, SLC filed a Third Party Complaint seeking contribution from facilities in and around Waterfront South on Plaintiffs' private nuisance claim as a result of these facilities' alleged contribution to any nuisance that exists in the Waterfront South area.  The parties named were: American Minerals, Astro Holdings, Inc., Camden Cogen, L.P., Camden County Energy Recovery Associates, L.P., Camden County Board of Chosen Freeholders, Camden County Municipal Utilities Authority, Camden International Commodities Terminal, L.L.C., Camden Iron and Metal, Inc., Central Medals, Inc., Colonial Processing, Inc., Comarco Quality Pork Products, Inc., Container Recyclers of Camden, Inc., Cresmont L.P., CSX Corporation, Express Equipment Rental, Co., Gloucester Refrigerated Warehouse, Inc., G-P Gypsum Corp., Harris-Camden Terminal Co., Holt Marine Terminals, Inc., Holt Oversight & Logical Techs., Inc., Jack Lambersky Poultry Co., Jen Cyn Enterprises, Inc., Joseph Oat & Sons, Inc., Mafco Worldwide Corp., Pneumo Abex Corp., R. Fanelle & Sons, Inc., Sanco Steel & Mfg., Inc., South Jersey Port Corporation, State Metals, Inc., Sunoco, Inc., Trans Ocean Maritime Services, Inc., Valero Refining Co.-New Jersey, ABC Corporations, and John Does.

Following motion practice on the Third Party Complaint, on December 19, 2003, Plaintiffs and SLC entered into a Stipulation and Consent Order which, inter alia provided:

> To the extent that the Plaintiffs seek relief, legal or equitable, against SLC based on the private nuisance claim set forth in the Fifth Count of their Second Amended Verified Complaint for Declaratory Judgment and Injunctive Relief (the "Second Amended Complaint"), such relief, legal or equitable, is only with regard to SLC's activities and the effect that SLC's activities have on the Plaintiffs.  SLC is not

responsible, and the Plaintiffs are not seeking to hold SLC responsible, for the activities or effects of other past or present operations in or about the Waterfront South neighborhood.  Any liability on the part of SLC in this matter is therefore several rather than joint and several.  This Stipulation and Consent Order applies solely to the claims currently pled against SLC.

Although the Plaintiffs are seeking relief against SLC only with regard to SLC's activities and the effect that SLC's activities have on the Plaintiffs, the Plaintiffs acknowledge that they believe that there are other operations and entities that they believe contribute to the alleged environmental conditions in Waterfront South.

SLC shall have the right to assert as a defense and to submit proofs and evidence at trial or any other further proceedings in this matter that the private nuisance and related damages alleged by the Plaintiffs in the Fifth Count of the Second Amended Complaint are a result of or caused by, in whole or in part, other operations or entities unrelated to SLC. Stipulation and Consent Order (Dec. 19, 2003)

On January 12, 2004, as a  result of the Stipulation and Consent Order, this Court entered an

Order providing, inter alia, that  SLC's Third Party Complaint was dismissed without prejudice,

and that all counter and cross-claims filed by entities named as third party defendants in SLC's

Third Party Complaint were dismissed without prejudice.[5]

Discovery in this case was completed in May, 2005.[6]  On May 27, 2005, after a number of

_____

[5]On May 6, 2004, Third Party Defendant CSX Corporation was dismissed from the case with prejudice.

[6]The parties have engaged in extensive fact discovery and have retained a number experts. The experts include:
1) Plaintiffs' expert, Dr. Stuart Batterman ("Dr. Batterman"), Associate Chair of the Department of Health Sciences of the School of Public Health at the University of Michigan, authored a report for Plaintiffs entitled "Analysis of Particulate Matter Concentrations and Health Impacts from a Granulated Blast Furnace Slag Grinding Facility and Associated Operations Located in Camden, New Jersey."  According to Dr. Batterman, the purpose of his analysis was to "obtain an understanding [of] the major pollutants of concern emitted by the [SLC] facility and its operations, namely, PM10 and PM2.5, the attendant human health risks, and the characteristics of the potentially affected population."  Batterman Report at 5.
2) Dr. Jeremy Mennis of the University of Colorado's Department of Geology is another one of

discovery motions had been filed and ruled upon by the Honorable Ann Marie Donio, U.S.M.J.,

SLC and NJDEP each filed a motion for summary judgment. By way of an Order dated June 3,

2005, this Court administratively terminated the motions and set forth a revised briefing schedule.

SLC and NJDEP then re-filed their motions.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp.

v. Catrett, 477 U.S. 317, 323 (1986).   To avoid summary judgment the non-moving party must

"go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

issue for trial.'"  Celotex Corp., 477 U.S. at 324.   A genuine issue of material fact is one that will

permit a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby,

---

Plaintiffs' experts.  He issued a report entitled "Race and Location and Regulation of Air
Polluting Facilities in New Jersey," the purpose of which was to "investigate racial equity in the
spatial distribution and regulatory enforcement of air polluting facilities in New Jersey."  Mennis
Report at 1.  In his report, Dr. Mennis concluded that there is evidence "of racial inequality in the
location and regulatory enforcement of [AIRS Facility Subsystem ("AFS") Facilities]." Id. at 7.
3) Dr. William Bowen prepared an expert report for SLC, the purpose of which was to provide
his opinions concerning 1) the data and methodology employed by Dr. Mennis as set forth in his
report and 2) "the extent to which, if at all, there is a substantial pattern of racial inequity in the
environmental air permitting of facilities by NJDEP, and in NJDEP's regulatory enforcement of
such facilities."  Bowen Report at 1.
4) Glenn Hickerson of Environmental Research, Inc.,  prepared an "Aerial Photographic Analysis
of Census Tract 6018" for SLC.
5) Paul Flaherty was retained by SLC to evaluate Dr. Batterman's work.  Flaherty Report at 1-2.
6) Malcolm Pirnie prepared an "Air Dispersion Modeling Reprort" for SLC in December, 1999,
before the initiation of any litigation.

Inc., 477 U.S. 242, 248 (1986).  In evaluating the evidence, the Court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [nonmoving] party."  Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002) (quoting Bartnicki v. Vopper, 200 F.3d 109, 114 (3d Cir. 1999)).  Conclusory allegations do not meet the non-moving party's duty to set forth specific facts showing that a genuine issue of material fact exists and a reasonable factfinder could rule in its favor.  Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999).

**B.  Private Nuisance**

In their Second Amended Complaint, the Plaintiffs assert a private nuisance claim against SLC, alleging that "dust, soot, vapors and fumes," as well as "noise" and "vibration" from the Facility and diesel truck traffic associated with the Facility have "unreasonably interfered with the [P]laintiffs' use and enjoyment of their property." Second Am. Compl. ¶¶ 120-134.  They allege that SLC's operations "intentionally and unreasonably interfere with plaintiffs' use and enjoyment of their property," "endanger the health and safety of plaintiffs, their children and their families," "loss of enjoyment of their homes, and diminution of value of their property." Id. ¶¶ 126-132.

On March 4, 2005, however, Plaintiffs and SLC entered into a limiting Stipulation and Consent Order, which, inter alia, provided:

> None of the Plaintiffs has asserted or will assert in this litigation a claim for any illness, disease, or condition that was allegedly caused or exacerbated in any way by SLC or SLC's operations.
>
> The Allegations of Increased Health Risk ... are made solely by Plaintiffs Barbara Pfeiffer, Sharon Potter, and Lula Williams. ... Plaintiffs Pfeiffer, Potter, and Williams each contends only that she is at greater risk of injury to health as a result of SLC or SLC's operations; she makes no claims for any illness, disease, or condition that was allegedly caused or exacerbated in any way by SLC or SLC's operations.  Stipulation and Consent Order (Mar. 4, 2005).

28

Thus, in connection with Plaintiffs' private nuisance claim against SLC, no plaintiff is asserting a physical injury claim and only three individual plaintiffs are asserting claims of increased health risk.

"The essence of a private nuisance is an unreasonable interference with the use and enjoyment of land." Ruiz ex rel. Ruiz v. Kaprelian, 322 N.J. Super. 460, 472 (App. Div. 1999) (quoting Sans v. Ramsey Golf & Country Club, Inc., 29 N.J. 438, 448 (1959); accord Restatement (Second) Torts § 822 (1979)).   Litigation of this type usually deals with the conflicting interests of property owners and the question of the reasonableness of the defendant's mode of use of his land. Sans, 29 N.J. at 448.  The process of adjudication requires recognition of the reciprocal rights of each owner to reasonable use, and a balancing of the conflicting interests. Id. The utility of the defendant's conduct must be weighed against the quantum of harm to the plaintiffs. Id. The question is not simply whether a person is annoyed or disturbed, but whether the annoyance or disturbance arises from an unreasonable use of the neighbor's land or operation of his business. Id.

According to the Restatement of Torts, one is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either intentional and unreasonable, or unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.  Restatement (Second) Torts § 822 (1979).  The conduct necessary to make the actor liable for a private nuisance may consist of an act or a failure to act under circumstances in which the actor is under a duty to take positive action to prevent or

abate an interference. Id. § 824.  An invasion is intentional if the actor purposely causes it or

knows that the invasion is substantially certain to result from his conduct. Id. § 825. An

intentional invasion of another's use is unreasonable if (a) the gravity of the harm outweighs the

utility of the actor's conduct, or (b) the harm caused by the conduct is serious and the financial

burden of compensating for this and similar harm to others would not make the continuation of

the conduct not feasible. Id. § 826.  Nuisances occasionally proceed from a malicious desire to do

harm for its own sake, but more often they are intentional only in the sense that the defendant has

created or continued the condition causing the nuisance with full knowledge that the harm to the

plaintiff's interests is substantially certain to follow. Krauth v. Geller, 54 N.J. Super. 442, 452

(App. Div. 1959).  Moreover, New Jersey courts, starting with Justice Nathan Jacobs' opinion in

Hartman v. Brigantine, 23 N.J. 530, 534-35 (1957) have recognized that where a defendant's

conduct gives rise to a continual invasion of neighboring property by way of dust, fumes and

noise, such conduct may be tortious within the concept of nuisance.

        Plaintiffs must establish that SLC's conduct is a legal cause of the harm allegedly caused.

Proximate or legal causation is that combination of 'logic, common sense, justice, policy and

precedent' that fixes a point in a chain of events, some foreseeable and some unforeseeable,

beyond which the law will bar recovery." People Express Airlines, Inc. v. Consol. Rail Corp., 100

N.J. 246, 264 (1985) (citation and internal quotation omitted).  Proximate cause has been defined

as any cause which in the natural and continuous sequence, unbroken by an efficient intervening

cause, produces the result complained of and without which the result would not have occurred.

Kasper v. Board of Trustees of Teachers' Pension and Annuity Fund, 164 N.J. 564, 591

(2000)(internal quotations omitted).  The issue of proximate cause "entails a consideration of

public policy and fairness." Williamson v. Waldman, 150 N.J. 232, 245 (1997).

Ordinarily, issues of proximate cause are considered jury questions. Perez v. Wyeth Labs., Inc., 161 N.J. 1, 27 (1999). On occasion, however, a court may resolve that issue itself. Id. The Restatement (Second) of Torts states that courts may resolve for themselves the question of legal or proximate causation if they believe that a reasonable jury could not find such causation on the facts presented. Restatement (Second) of Torts § 435(2) (1965). Moreover, there is ample precedent in New Jersey authorizing courts to resolve the issue of proximate cause in any case in which reasonable minds could not differ on whether that element of the plaintiff's case has been established. Miller v. Estate of Sperling, 166 N.J. 370, 386 (2001)(citing Vega by Muniz v. Piedilato, 154 N.J. 496 (1998)).

Plaintiffs primarily rely upon their own statements and the work of their air modeling expert, Dr. Batterman, to establish their nuisance claim here. In that regard, the individual Plaintiffs have testified about the conditions at their homes before the SLC facility began operating and subsequent thereto. At her June 16, 2004 deposition, Plaintiff Lula Williams, a resident of Waterfront South, testified that there had been dust on her porch before SLC began operating its facility, but "[a]fter St. Lawrence came and set up, then we began to have the sand, the white on the porch," and that she "never had ... sand on [her] porch before St. Lawrence came." Williams Dep. Tr. (June 16, 2004) at 64:14-65:5. She also testified that there was sand inside her home, id. at 65:14-24, and, as a result, she had to "clean," "sweep" and "scrub" and "keep the windows closed," id. at 89:8-16. She also testified that SLC's trucks stopped coming by her house in April, 2004, id. at 59:2-5, 66:3-16, even though she later admitted that she did not know what SLC trucks looked like and her knowledge and understanding of which trucks were

SLC trucks was based solely on what someone from a SCCCIA meeting had told her.  Id. at 82:1-84:17.  When she was specifically asked about the basis of her belief that the sand in her house and on her porch was coming from SLC, Williams stated that she "believe[d] it's coming from St. Lawrence" "because we didn't have it before."  Id. at 66:21-67:2.  When she was asked if she was prepared to swear that the sand is coming from SLC, she answered, "You know what? Yes.... [because] the wind blow[s]" the sand from "that pile [that] is not covered up there."  Id. at 70:18-71:11.  She stated that she even gave a jar of the sand to someone with the Camden Alliance of Justice to get tested and analyzed, but had no documentation regarding the test and did not know when she would get the test results.[7]  Id. at 68:4-70:2.  Williams also testified that she bought her home for $14,000 in 1982 or 1983 and believed that she could sell it in June, 2004 for $35,000-$40,000.  Id. at 139:3-19.

On July 5, 2004, Williams took a number of photographs. See Pls.' Ex. EE.  At her July 7, 2004 deposition, Williams testified that the "photographs are showing the sand and dust on my porch," "the sand that is at [the] St. Lawrence cement place where the cement is not covered," and "where cement [is] on the ground and different areas ... where they say the cement doesn't blow."  Williams Dep. Tr. (July 7, 2004) at 176:10-21. "I'm trying to show that it does."  Id. at 176:21-22.  Williams testified that sand on her porch came from SLC because "the trucks go right past there."  Id. at 179:2-11.  However, she readily admitted that she did not see sand actually fall off a truck and land on her porch, and explained that it "could be blown off [from the pile of sand] and fell down there too."  Id. at 179:23-180:2.

_____

[7]Plaintiffs never provided the results of any such test during the discovery period or during the pendency of these motions.

Plaintiff Sharon Christie Potter, also a resident of Waterfront South, testified at her deposition that as a result of SLC, there is "dust everywhere you go because of the big trucks that come through, but [she thought] it got worse as ... the plants ... like [SLC] came in and trucks started moving more..., [there] was more dust accumulation in the homes than ... before."  Potter Dep. Tr. at 37:17-24.  She stated that she and her family paint the inside of their house "every year because ... it seems like the house gets so dusty," id. at 51:19-21, 52:11-14, and has "gotten more dusty since [the SLC] plant" began operating, id. at 55:20-24.  When she was asked if she blamed SLC for her need to paint, she answered "I blame it for some of the dirt. Some of the dirt is natural dirt, some of the dirt is from different plants....I know that it has gotten more dusty since that [SLC] plant has gotten there, but it's always been kind of like dusty."  Id. at 55:11-24 (emphasis added).  The dust that she attributes to "industry," as opposed to "normal dirt," comes from trucks driving on Fourth Street, and nothing else, according to Potter.  Id. at 74:23-17.  She made clear that she was "not saying that it's [only] St. Lawrence trucks" that cause the industry dust because "there are other companies back there that move on that road as well."  Id. at 74:17-22.  She could not swear that the trucks that drove by and created dust were SLC trucks or were headed to the SLC facility because she never followed one of the trucks. Id. at 120:8-130:1. She also testified that her children have "breathing problems," id. at 38:15-39:10, and that as a result of the dust coming from the SLC facility and her efforts "to keep the dust in moderation," she does not open her windows downstairs, id. at 73:23-74:12.  However, the truck noise and vibration does not cause her to use her property differently.  Id. at 73:9-22.

When Plaintiff Phyllis Holmes was asked at her deposition if SLC's operations have interfered with her enjoyment of her property, she explained that "sand [and] dust flying around"

33

cause her eyes to "burn" and "scratch[]" when she is outside gardening or barbecuing, and might be making her cough, as well. Holmes Dep. Tr. at 70:21-73:16.  She testified that because she does not have her windows open, she does not "get dust like a lot of people." Id. at  77:13-19.  When she was asked if, other than her eyes, "how else if at all, does dust and sand from [SLC] interfere with the enjoyment of [her] land or [her] property," she answered, "[t]he only thing I can testify to is the fact that my eyes never bothered me before St. Lawrence moved into the community.  That's the only thing I can testify to." Id. at 78:15-23.  She also testified that she never saw sand flying from the SLC facility itself, although she had been on the property once and observed the property several times.  Id. at 78:24-80:6. Furthermore, she testified that she was "not sure" if there were other industries in the area that produced sand or dust that flew around the neighborhood, but that she "imagine[d]" that there were.  Id. at 85:17-24.

   Plaintiff Barbara Pfeiffer lives on Fourth Street in the Waterfront South neighborhood. Pfeiffer Dep. Tr. (June 14, 2004) at 259:11-18.    Pfeiffer testified on June 14, 2004 that when "big trucks" drive on Fourth Street she could hear them, feel their vibrations and smell their fumes while she was inside her home. Id. at 246:4-12.  Pfeiffer stated that she knew what SLC trucks looked like because "they have arches[,] ... they're large," and "[t]hey're slag," id. at 264:5-24, and "guess[ed]"  that she had seen them driving on Ferry Street near her home between twenty and thirty times,  id. at 266:2-269:19.  Pfeiffer also testified that she had dust in her house and that she "think[s] the St. Lawrence slag piles are a big source of dust."  Id. at 303:11-24.  However, she testified later that the dust she sees in her house was "soot," "city dust," and that it was not the color of SLC slag, and that, therefore, she did not believe that she had SLC's slag in her house. Id. at 307:5-12.  At her July 14, 2004 deposition, Pfeiffer stated that the Plaintiffs' nuisance claim

involved both visible and invisible dust, but that she "[could not] say that [she had] seen slag dust the way [her] friends see slag dust every single day." <u>Id.</u> at 329:13-18.  She also testified that she believed that her walls and windows had been damaged from truck traffic and resulting vibrations, although she admitted that she had never had a professional examine either.  <u>Id.</u> at 362:18-368:24.

Plaintiffs also utilize the expert report of Dr. Batterman in support of the increased health risk component of the nuisance claims of Plaintiffs Pfeiffer, Potter, and Williams.[8]  Specifically, Dr. Batterman found that annual and twenty-four hour PM10 levels increased as a result of the SLC facility's operations.  Batterman Report at 17-18.  In that regard, Dr. Batterman concluded that "<u>PM10 and PM2.5 emissions from the facility will increase risks of morbidity and mortality in the exposed population.  These risks are judged to be significant, especially given the likely high rates of susceptible individuals in the area (high rates of asthma and [cardiovascular disease] are expected, high numbers of young and old, etc.); the likely poor access to quality health care in this poor and largely minority community; and the other existing environmental exposures that burden the community (PM from other sources, ozone, etc).</u> " <u>Id.</u> at 18 (emphasis in original). He also made clear that "[g]iven the nature of air quality impacts, facility impacts are highest near the facility." <u>Id.</u>

SLC makes a number of arguments as to why it believes Plaintiffs' nuisance claims cannot survive summary judgment.  It contends that Plaintiffs have "failed to present" any evidence as to

---

[8]When there is an invasion of interests in the use and enjoyment of land constituting a private nuisance, the plaintiff may recover not only for harm arising from acts that affect the land itself and the comfortable enjoyment of it, but also for harm to members of her family and to her chattels.  Restatement (Second) Torts § 821D (1979).  However, in order for Plaintiffs to recover for health risk, they must first establish the underlying interference with the use and enjoyment of their land that gives rise to their alleged increased health risks.

"the amount of SLC's share of liability, if any, for the nuisance conditions allegedly affecting their properties."  SLC's Reply Br. at 4.  SLC also argues that by entering into the Stipulation and Consent Order of December 19, 2003, Plaintiffs "have assumed a very specific, additional burden with respect to the causation element of their nuisance claim." SLC's Moving Br. at 20.[9]  SLC argues that as a result of the Stipulation and Consent Order, Plaintiffs have  "obligated themselves to prove precisely that SLC's dust, soot, vapors, fumes, nose, and vibration are causing them damages and, if so, precisely what portion of those damages SLC is causing."  Id.  The issue here, however, is not whether Plaintiffs can prove "precisely" that SLC's activities are causing Plaintiffs damages and what portion of those damages SLC is causing, but indeed, whether Plaintiffs have any credible proof on these issues to create a triable issue.

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249.  Moreover, the Court must draw all justifiable inferences in favor of the non-moving party on summary judgment. Id. at 255.  However, to the extent that Plaintiffs allege in their Second Amended Complaint that SLC's facility and trucks each are responsible for noise, vibration, and dirt giving rise to a nuisance, see Second Am. Compl. ¶¶ 123-125,  at most, Plaintiffs have testified about sand, noise, vibrations, fumes and vapors coming from truck traffic and sand and dust coming from the Facility.  They have not pointed to any evidence of soot, vapors, fumes, noise or vibrations coming from the Facility.

---

[9]The Stipulation and Consent Order provides that Plaintiffs are seeking relief only "with regard to SLC's activities and the effect that SLC's activities have on the Plaintiffs.  SLC is not responsible, and the Plaintiffs are not seeking to hold SLC responsible, for the activities or effects of other past or present operations in or about the Waterfront South neighborhood." Stipulation and Consent Order (Dec. 19, 2003)

The issue here is causation, and Plaintiffs have made no effort to separate out the harm to their properties allegedly caused by SLC's operations from any nuisance caused by other industries in the area.  Indeed, Williams and Potter testified that there had always been dust in their homes, before SLC even began operating.  Potter and Pfeiffer testified that trucks other than SLC's drive through the area.   Pfeiffer testified that she had city dust in her home that was not from SLC.   Potter also testified that there exists natural dirt in her home, and that the industry dust and dirt in her home is a result of the trucks that drive in the area, of which some, but not all, are SLC's.  Holmes testified that she imagined other area industries produced sand or dust.  At best, Plaintiffs' testimony is that there is more dust, dirt, white sand and truck noise, vibrations and fumes since SLC began its operations but have not quantified or differentiated these alleged nuisances from other polluting sources.  That is insufficient to withstand summary judgment.  Moreover, even though discovery is complete, Plaintiffs have not submitted any expert reports, sampling, testing or monitoring that link an increase in dust, dirt, white sand and truck noise, vibrations and fumes to SLC's operations and/or trucking.

Furthermore, the individual Plaintiffs' testimony regarding the issue of causation is simply that SLC could be causing a nuisance, as evidenced by their testimony:

- Williams testified that she "believe[d] [the sand was] coming from St. Lawrence" "because we didn't have it before."  Williams Dep. Tr. at 66:21-67:2. Williams also testified that she knew that the sand on her porch came from SLC because "the trucks go right past" id. at 179:2-11, but admitted that she never saw sand actually fall off an SLC truck and land on her porch, and explained that it "could be blown off [from the pile of sand] and fell down there too,"  id. at 179:23-180:2.

- Potter admitted that she did not know which plants were generating the dirt but that she "kn[e]w that it ha[d] gotten more dusty since that [SLC] plant has gotten there, but it's always been kind of like dusty."  Potter Dep. Tr. at 55:11-24.  She attributed the increase in dust to SLC's truck traffic and not the facility itself, but admitted that SLC's trucks

37

were not the only trucks driving nearby, id. at 74:12-75:17, and could not swear that the trucks that drove by and created dust were SLC trucks or were headed to the SLC facility because she never followed one of the trucks, id. at 120:8-130:1.

•   Holmes testified that "[t]he only thing [she could] testify to is the fact that [her] eyes never bothered [her] before St. Lawrence moved into the community." Id. at 78:15-23. However, she also testified that she never saw sand flying from the SLC facility itself, although she had been on the property once and observed the property several times, id. at 78:24-80:6, and that she was "not sure" if there were other industries in the area that produced sand or dust that flew around the neighborhood, but that she "imagine[d]" that there were, id. at 85:17-24.

•   Pfeiffer testified that she believed that her walls and windows had been damaged from truck traffic and resulting vibrations, although she admitted that she had never had a professional examine either. Pfeiffer Dep. Tr. at 362:18-368:24.

It is clear, therefore, that Plaintiffs' testimony that SLC has legally or proximately caused an interference with their use and enjoyment of their property is conjectural and speculative; however, speculation and conjecture normally cannot create a material factual dispute. See Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir.1990); Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 76 (3d Cir.1996) (affirming a district court's order granting summary judgment where the plaintiff failed to present sufficient evidence on the element of causation).[10]

Similarly, Dr. Batterman's expert report suffers from the same fatal flaws. For the purposes of this motion, SLC has accepted Dr. Batterman's findings as true, as does this Court. SLC Reply Br. at 7, n. 3. Dr. Batterman, who is not a doctor, but whose report is being used by three Plaintiffs as evidence of the increased health risk component of their nuisance claim, looks at Waterfront South as a whole and does not tie SLC's operations to those particular Plaintiffs'

_____

[10] Plaintiffs' conjecture extends to the alleged diminution of their property values as a result of SLC's activities. They have submitted no evidence from any real estate expert in support of those contentions.

homes.  Indeed, Dr. Batterman performed no testing or monitoring of any kind at the properties of these three Plaintiffs.  Thus, Batterman does not attempt to quantify or opine on the levels of particulate matter at the three Plaintiffs' residences.  Furthermore, he is silent on the issue of the levels of particulate matter attributable to SLC, as opposed to that caused by the other industrial operations that Plaintiffs have acknowledged to exist and to cause such impacts.  Therefore, Dr. Batterman's report is of no aid in apportioning the share of liability allegedly attributable to SLC as opposed to other area industries, nor is his report helpful in ascertaining the increased health risks of the three Plaintiffs who have asserted such a claim.[11]

As such, the Court, and not a jury, will resolve the proximate cause issue here because I find that reasonable minds could not differ that the proximate cause element of the Plaintiffs' case has not been established. See, e.g., Vega by Muniz, 154 N.J. 496.  After extensive fact and expert discovery, Plaintiffs have produced no credible proofs of the harm or nuisance they suffered as a result of SLC's operations and they have failed to prove the causation element of their claim. Furthermore, they have made no effort to single out the nuisance at their properties allegedly caused by SLC as opposed to other area industries.  This is a burden Plaintiffs willingly accepted by virtue of the Stipulation and Consent Order into which they entered with SLC on December 19, 2003.  Accordingly, because Plaintiffs have failed to present facts sufficient to establish the existence of an element essential to their case on which they would bear the burden of proof at trial, the Court will grant summary judgment in favor of SLC. See Celotex Corp., 477 U.S. at 322-23 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and

---

[11]Dr. Batterman did no analysis of the three specific Plaintiffs and their individual health, age and background factors as impacted by particulate matter--even at the levels he extrapolates exist in the area, generally.

upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

### C. Discrimination

Plaintiffs maintain that NJDEP intentionally discriminated against them in violation of Title VI of the Civil Rights Act of 1964 when it issued the permits to SLC to operate its facility in the Waterfront South neighborhood of Camden, New Jersey.  Title VI of the Civil Rights Act of 1964 provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.  42 U.S.C. § 2000d.

The Supreme Court has held that Title VI "extends no further than the Fourteenth Amendment"[12] and prohibits only intentional discrimination.  Alexander v. Sandoval, 532 U.S. 275, 280 (2001).  Therefore, to recover under Title VI, Plaintiffs cannot assert only that NJDEP's issuance of the permit here has a disproportionate effect on certain minorities.[13]  See, e.g., Stehney v. Perry, 101 F.3d 925, 937 (3d Cir. 1996)( "[A] facially neutral policy does not violate equal protection solely because of disproportionate effects.").

"[A]n invidious discriminatory purpose may often be inferred from the totality of the

---

[12]The Fourteenth Amendment of the United States Constitution forbids states from denying any person within their jurisdiction "equal protection of the laws," with the aim of ensuring equal treatment for members of disadvantaged groups. U.S. Constitution, Amend. XIV; Strauder v. State of W. Va., 100 U.S. 303 (1879).

[13]A disproportionate or disparate impact exists when the defendants' racially neutral practice detrimentally affects persons of a particular race to a greater extent than other races. Powell v. Ridge, 189 F.3d 387, 394 (3d Cir. 1999).

relevant facts, including the fact, if it is true, that the [policy] bears more heavily on one race than another." Washington v. Davis, 426 U.S. 229, 242 (1976). Indeed, a disparate impact may "demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." Id. Nevertheless, the Supreme Court has "not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." Id.

To prove intentional discrimination by facially neutral conduct, a plaintiff must show that the relevant decisionmaker (e.g., a state legislature) adopted the policy at issue " 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979); accord Gen. Bldg. Contractors Assoc. v. Pennsylvania, 458 U.S. 375, 391 (1982).  A plaintiff may do this by showing that the policy was "applied in a discriminatory manner" or that its adoption or use was motivated by discriminatory animus. See Yick Wo v. Hopkins, 118 U.S. 356, 373-34 (1886); Hunter v. Underwood, 471 U.S. 222, 233 (1985).   A mere awareness of the consequences of an otherwise neutral action will not suffice. See Feeney, 442 U.S. at 277-78 (holding that state legislature did not intentionally discriminate against women by enacting laws that gave hiring preferences to veterans even though the legislature was undoubtedly aware that most veterans were men; the legislative history underlying these preferences showed that the legislature always intended to offer the veterans' preference for "any person").  Even deliberate indifference is not enough to justify relief under Title VI. Pryor v. National Collegiate Athletic Ass'n., 288 F.3d 548, 567-68 (3d Cir. 2002).

41

"Determining whether invidious discriminatory purpose was a motivating factor [in the adoption of a facially neutral policy] demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266 (1977); Hunt v. Cromartie, 526 U.S. 541, 546 (1999) (applying the Arlington Heights criteria to a voting district allegedly drawn along racial lines). Although considering evidence of impact would seem to contradict the principle that no claim for disparate impact lies under Title VI, the Supreme Court has more directly stated that the "important starting point" for assessing discriminatory purpose is the "impact of the official action" and "whether it bears more heavily on one race than another." Arlington Heights, 429 U.S. at 266; Reno v. Bossier Parish School Bd., 520 U.S. 471, 489 (1997). As the Court has explained, the "impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." Id. at 487.

Other considerations relevant to the purpose inquiry include the "historical background of the ...decision; [t]he specific sequence of events leading up to the challenged decision; [d]epartures from the normal procedural sequence; ... [t]he legislative or administrative history, especially ... [any] contemporary statements by members of the decisionmaking body"; and the forseeability of any disparate impact of the action. Id.; Arlington Heights, 429 U.S. at 267-68; Feeney, 442 U.S. at 279 n.25. If Plaintiffs meet this threshold burden of establishing a discriminatory purpose based on race, the burden then shifts to NJDEP to show that the same decision would have resulted in the absence of a discriminatory animus. Id. at 271 n.21.

SCCIA has made a number of arguments in support of its contention that NJDEP's issuance of the permits here caused a disparate impact that, along with NJDEP's actions,

establishes NJDEP's discriminatory intent.

1) <u>Disparate Impact</u>

The Supreme Court has made clear that the starting point for assessing discriminatory purpose is determining whether a disparate impact exists. <u>Arlington Heights</u>, 429 U.S. at 266. Here, according to Plaintiffs' expert, Dr. Batterman, the "<u>population near the facility is disproportionately minority, although the population in ... Camden [County] and in NJ is not</u>." Batterman Report at 9 (emphasis in original).   Specifically, he found that within a half mile radius of the SLC facility, "the total minority fraction is 81.7%." <u>Id.</u> at 9.  Dr. Jeremy Mennis, another one of Plaintiffs' experts, concluded that there is evidence "of racial inequality in the location and regulatory enforcement of [AIRS Facility Subsystem ("AFS") Facilities]." Mennis Report at 7.[14]  He also concluded that AFS Facilities, which are essentially air polluting facilities, "tend to concentrate in poor, high percent minority neighborhoods with low educational attainment."[15]  <u>Id.</u>  Further, he concluded that "AFS facilities in areas with high percent minority are associated with higher rates of significant violation, lower rates of state administrative orders issued, and lower penalty amounts as compared to those facilities in areas with low percent

---

[14]NJDEP emphasizes that an "inequity" falls short of a "disparate" or "disproportionate" impact.  NJDEP Reply Br. at 8.

[15] NJDEP also points out that, according to Dr. Mennis' report, census tracts located in New Jersey which contain AFS facilities are thirty three (33%) percent minority, while New Jersey census tracts which do not contain AFS facilities are thirty five  (35%) percent minority. Mennis Report at 4.  However, Plaintiffs maintain that the host tract analysis is the simplest and least accurate method for determining whether AFS facilities are located near areas with a higher minority population.  Pls.' Opp. Br. at 36.  Moreover, in Dr. Mennis' Certification, he explains, "[i]n plain terms, ... race is a significant predictor of the density of polluting facilities in New Jersey.  Air polluting facilities tend to concentrate near high percent minority tracts."  Mennis Cert. ¶ 8.

minority." Id.

Defendant NJDEP points out that at Dr. Mennis' deposition, when he was asked if it was his conclusion that "the DEP has intentionally discriminated," Dr. Mennis averred, "I don't have information about that." Mennis Dep. Tr. 105: 1-6. When Dr. Mennis was asked whether it was his "conclusion that the spatial distribution of AFS facilities was the result of intentional discrimination by [NJDEP]," he also conceded that he lacked information to answer the question. Id. at 105:7-13. When Dr. Mennis was asked if his "study does not allow one to draw any inferences of DEP['s] intent," he answered, "The study itself does not suggest intent by the DEP." Id. at 130:16-22. When Dr. Mennis was asked if "the study [he] did that led to [his] expert report in this case cannot pinpoint the causes of what [he] contend[s] is the racial inequity in AFS facility location and enforcement," he answered, "[n]ot by itself, no." Id. at 94:10-16.[16]

_____

[16]NJDEP has cited South Bronx Coalition for Clean Air, Inc. v. Conroy et al., 20 F. Supp.2d 565, 572 (S.D.N.Y. 1998) (quoting Leon v. Murphy, 988 F.2d 303, 311 (2d Cir. 1993)), for the proposition that "Plaintiffs [cannot] simply rely on population statistics and 'general' or 'conclusory' allegations of discrimination." NJDEP's Reply Br. at 10. In South Bronx, Environmental organizations sued state and federal authorities and private companies to enjoin, under, inter alia, Title VI the state transportation authority's sale of a bus depot and plans for solid waste facility. 20 F. Supp.2d at 567-70. Specifically, the plaintiffs' Title VI claims were based on the allegation that the transportation authority in its role as the Long Island Railroad entered into certain agreements restricting the handling and transportation of solid waste in Queens and on Long Island and that the combination of the expansion of the waste transfer facility and the transportation authority's agreements restricting the transfer of solid waste on Long Island would create a situation in which minority residents of the Bronx suffered the noxious effects of garbage to a greater degree than the mostly white residents of Long Island. Id. at 571-72. The plaintiffs alleged that these actions were "part of a policy of the defendants ... to site obnoxious environmental activity only in minority neighborhoods and to exclude such activities from neighborhoods occupied by white residents of the State." Id. at 572. They further alleged that these actions were "deliberate" and "specifically designed to protect white residents." Id. According to the district court, the plaintiffs offered no other allegations in support of their intentional discrimination claim, and did "not even identif[y] the dates, or the specific terms of, the alleged agreements which form the basis of this claim." Citing Leon v. Murphy, 988 F.2d 303, 311 (2d Cir. 1993), the court explained that "[i]t is well established that a complaint

44

Plaintiffs have also identified the screening model created by Dr. Robert E. Hazen, one of NJDEP's scientists, see Background § I(D), supra, as evidence of a disparate impact. Dr. Hazen testified that as a result of Judge Orlofsky's Order that NJDEP "compile environmental exposures in Camden," he "analyzed, through a multiple source [model], air affect in Camden." Hazen Dep. Tr. at 13:2-21.   Dr. Hazen found that in roughly one-third of the state, including Camden, the risk borne by people of color was above that borne by whites. Id. at 63:5-16.

In response, NJDEP points out that its environmental equity policy was merely "proposed," NJDEP's Reply Br. at 2, Hazen Dep. Tr. at 111:20, but never adopted or implemented by the DEP.  Id. at 111:20.  Furthermore, Dr. Hazen testified that when completed, the proposed screening model would act as a potential indicator or trigger in the environmental justice process, id. at 112:10-16, but was not intended to provide a conclusion as to whether an area was subject to environmental inequity.  Id.  Dr. Hazen conceded that the proposed model was only three-quarters complete when the DEP tested it on Camden, id. at 81:18-19, 106:11-17, and that  "with incomplete data sets, it would be impossible to draw any conclusions which would reflect what might be the conclusions reached when the model was to be employed," id. at 116:15-19.[17]

The Court finds that the works of Dr. Mennis and Dr. Hazen are evidential that the

_____

containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss," (internal quotations omitted), and found that the plaintiffs offered only "general" and "conclusory" allegations.  Thus, the district court dismissed their Title VI intentional discrimination claim.

[17]Plaintiffs also accuse NJDEP of burying Dr. Hazen's conclusions when it submitted the disparate impact study to the Court.  Pls.'s Br. at 42.  However, NJDEP maintains that its staff determined that because the model was not complete and was still being developed, that it would not be included in the study submitted.  NJDEP's Reply Br. at 3; Hazen Dep. Tr. at 97:17-98:1.

environmental effects of locating the SLC facility at its present site potentially bear more heavily upon minority groups than non-minorities.  However, since Plaintiffs' own expert, Dr. Mennis, testified that any disparate impact that exists does not, by itself, support a finding of a discriminatory purpose on the part of NJDEP, Mennis Dep. Tr. at 94:10-16, 130:16-22, Plaintiffs have, in effect, conceded that their case is not the rare case where "a clear pattern, unexplainable on grounds other than race" has emerged.  Arlington Heights, 429 U.S. at 266.  Therefore, this impact alone is not determinative, and the Court will proceed with the totality of circumstances approach outlined in Arlington Heights and look to other considerations relevant to the issue of whether NJDEP intentionally discriminated.

    2) Causation

NJDEP contends that the Court must look behind the disparate impact Plaintiffs have alleged because Plaintiffs cannot establish that NJDEP's issuance of the permits here caused the impact.  Indeed, Plaintiffs must establish that NJDEP issued the permits to SLC "because of, not merely in spite of its adverse effects upon" the minority population in Waterfront South."  Feeney, 442 U.S. at 279 (internal quotations omitted). Specifically, NJDEP contends, "it is important to recognize that the DEP does not select sites for the location of facilities or other activities under its regulatory control, such as coastal wetland developments.  As such, DEP did not select the location of the SLC facility in Waterfront South."  NJDEP's Moving Br. at 36.  NJDEP further explains: "SLC itself selected the facility's location with no input whatsoever from the DEP.  As the regulator or reviewer of applications for environmental regulatory approvals, the DEP simply reviewed, and eventually issued, permits to SLC to operate at the location selected by the applicant."  Id.  NJDEP also suggests that "there did not appear to be any statutory or regulatory

reason for the DEP to deny the permits to SLC.  The SLC permit met the environmental

regulations in place at the time." Id.  According to NJDEP, "[t]here were many non-

discriminatory reasons for SLC to choose that location." NJDEP's Moving Br. at 36, n.8.[18]

      Plaintiffs, on the other hand, contend that this argument is meritless.  In doing so, they

cite to Judge Orlofky's Opinion in which he addressed whether the NJDEP's permitting process is

causally linked to any resulting disparate impact:

> [A] review of the applicable regulations promulgated by the EPA clearly indicates
> that the EPA has determined that there is a causal connection between recipients'
> permitting practices and the distribution of polluting facilities, and enacted the
> implementing regulations to Title VI to ensure that recipients consider the potential
> disparate impact of their permitting decisions. See 40 C.F.R. § 7.10 et. seq. In other
> words, the EPA has acknowledged that because recipients are responsible for
> permitting, they are also responsible for considering the distribution of the facilities
> which they permit with respect to the classes protected by the Civil Rights Act of
> 1964. The regulations therefore support the conclusion that a recipient's permitting
> decisions are causally linked to the distribution of facilities as a matter of law.
> SLC ignores the fact that without receiving a permit from the NJDEP, none of the
> hundreds or thousands of business to which it refers may legally operate in the
> State of New Jersey. As I just explained, the EPA implicitly rejected SLC's
> contention that there is no causal connection between the distribution of facilities
> and the permitting process when it issued the implementing regulations to Title VI.
> I conclude that SLC's contention that the NJDEP's permitting practices are
> absolutely irrelevant to the siting of industrial facilities in New Jersey is illogical,
> and contradicted by the applicable Title VI regulations.
> SCCIA, F. Supp.2d at 494-95.

---

[18]Specifically, NJDEP explains:

  The SLC facility is sited in an area that had been used predominantly for
industrial purposes since the early 1900's.   The property was previously used for
an industrial purpose.  Furthermore, because the SLC facility would receive its
raw material by cargo ship, SLC sought to locate its facility in a deep water port
area.  In addition, the location is also close to many major roads which facilitate
SLC's distribution of its finished product.  NJDEP's Moving Br. at 36, n.8
(internal citations omitted).

I agree that even though NJDEP did not select Waterfront South as the location for the facility, that fact cannot alone cannot serve as a basis for granting summary judgment to NJDEP because of a lack of causation.  However, Plaintiffs must still show  that NJDEP issued the permits to SLC "because of, not merely in spite of its adverse effects upon" the minority population in Waterfront South,"  Feeney, 442 U.S. at 279 (internal quotations omitted).  Therefore, this Court's inquiry must proceed to the other evidence Plaintiffs have set forth as establishing intentional discrimination on the part of NJDEP.

   3) Historical Background

   In Arlington Heights, the Supreme Court explained that "[t]he historical background of the decision" is one potential source of evidence of intent to discriminate, "particularly if [the history] reveals a series of official actions taken for invidious purposes."  429 U.S. at 267.  Here, Plaintiffs argue that the work of Dr. Mennis shows that there exists a historical pattern of NJDEP's discriminatory granting of permits and discriminatory environmental enforcement.  Plaintiffs have cited to two cases in support of their contention that various alleged "historical patterns" can be properly considered under Arlington Heights' "historical background" factor.

   First, Plaintiffs have cited to the dissent in a Fourth Circuit case, Williams v. Hansen, 326 F.3d 569, 585 (4th Cir. 2003) (2-1 decision) (King, dissenting),[19] in support of the proposition that Arlington Heights'"historical background factor requires a review of any history of discrimination by the decision maker or the represented jurisdiction."  Pls.' Opp. Br. at 45 (emphasis in original); see Williams, 326 F.3d at 585 (King, dissenting) (the historical background factor "may take into account any history of discrimination by the decisionmaking body or the jurisdiction it

_____

   [19]Plaintiffs failed to identify in their brief that they were citing to a dissenting opinion.

represents")(citing to two other Fourth Circuit cases, <u>Sylvia Devel. Corp. v. Calvert County, MD.</u>,

48 F.3d 810, 819 (4th Cir. 1995) and <u>Talbert v. City of Richmond</u>, 648 F.2d 925, 929 (4th Cir.

1981) in support of that proposition). This Court has further reviewed <u>Sylvia Devel. Corp.</u> and

<u>Talbert</u>. In <u>Sylvia Devel. Corp.</u>, the Fourth Circuit added "evidence of a 'consistent pattern' of

actions by the decisionmaking body disparately impacting members of a particular class of

persons" to the <u>Arlington Heights</u> list and made clear that such evidence "is probative of whether

a decisionmaking body was motivated by a discriminatory intent"; the court cites <u>Talbert</u> for that

proposition. <u>Sylvia Devel. Corp.</u>, 48 F.3d at 819. <u>Talbert</u> involved a white police officer's

allegation that the City of Richmond, Virginia denied him a promotion on the basis of his race.

<u>Talbert</u>, 648 F.2d 925. <u>Talbert</u> was tried in the wake of <u>Richmond Black Police Officers' Ass'n v.</u>

<u>City of Richmond</u>, 74-0267-R (E.D.Va., July 3, 1975), which was terminated by a consent decree

reciting in part:

> The City of Richmond also denies that it has engaged in such racially
> discriminatory acts or practices, or pattern or practice, relating to employees of the
> Richmond Bureau of Police since the effective date of the 1972 Amendments to 42
> U.S.C. § 2000e et seq. But while denying liability to the named plaintiffs and the
> plaintiff class, the defendants realize that certain past practices within the Bureau
> may have given rise to an inference of discrimination against black persons. The
> individual defendants and the City have made good faith efforts to rectify and
> prevent racial discrimination in employment in the Richmond Bureau of Police and
> since June 11, 1974, the percentage of black employees has substantially increased.
> The defendants state that for the purpose of avoiding any further inference of
> discrimination, the City of Richmond has heretofore taken certain steps to
> eliminate policies, practices and procedures which were possibly discriminatory or
> potentially discriminatory against black persons. <u>Id.</u> at 929-30.

NJDEP argues that Judge King's dissenting opinion in <u>Williams</u> and the cases upon which

it relies have no bearing upon this case. Indeed, <u>Williams</u> is not binding upon this Court, and

Plaintiffs have not cited to a Third Circuit case standing for the same proposition. Furthermore, in Talbert,[20] the defendant City of Richmond conceded that prior discrimination had taken place. NJDEP has made no such concession, nor has the Court been made aware of any other court that has found that NJDEP has discriminated.  However, the Court need not rely upon Williams, Sylvia Devel. Corp. or Talbert to determine whether it may consider if there is evidence of a historical pattern of NJDEP's discriminatory granting of permits.  I need look no further than the Arlington Heights case.

In Arlington Heights, the plaintiff Metropolitan Housing Development Corp. ("MHDC"), a non-profit developer, contracted to purchase a tract within the Village of Arlington Heights (the "Village") in order to build racially integrated low and moderate income, multifamily housing. Arlington Heights, 429 U.S. 254-58.  The property at issue was zoned single-family and MHDC sought to have the property rezoned to multifamily, but the Village denied the request.  Id. at 258-59.  The Village's apartment policy called for multifamily zoned property to serve as a buffer between single-family development and other incompatible land uses, such as commercial or manufacturing districts.  However, the property at issue did not fit that requirement.  Thus, in seeking to determine whether an invidious purpose existed on the part of the Village in denying the applicant's re-zoning request, the Supreme Court, inter alia, considered the history of the buffer policy and how it had been applied in the past.  Id. at 270.  Therefore, according to the

---

[20]While Talbert is an employment case and Plaintiffs contend in broad brush fashion that NJDEP has discriminated on the basis of race in the employment context, Pls.' Opp. Br. at 45, n.19, discriminatory employment practices are not an issue here. Moreover, the basis for Plaintiffs' contention that NJDEP has engaged in discriminatory employment practices--Gary Sondermeyer's testimony that employment based civil rights complaints have been filed against the DEP--is hardly evidence of such discrimination.

process used by the Supreme Court in <u>Arlington Heights</u>, this Court may consider whether there is evidence that NJDEP has historically engaged in discriminatory permitting, which may bear on the issue of NJDEP's intent to discriminate in issuing the permit to SLC here.

Plaintiffs contend that their evidence of NJDEP's historical pattern of discriminatory permitting emanates from their expert, Dr. Mennis.  However, according to Dr. Mennis' report, "[t]he first component of the analysis of AFS facility distribution compares the percent minority tracts that are located nearby AFS facilities with those that are not. ...Table 1 shows that tracts that host AFS facilities and those that do not have approximately the same percent minority population (33% and 35%, respectively)."  Mennis Report at 2.  It also reveals that all tracts in New Jersey are 34 percent minority.  <u>Id.</u> at 4.  Moreover, Tables 2 and 3 of Dr. Mennis' report reflect that the percentage of land area used for industrial uses and population density, which is simply a measure of persons per kilometer, can provide a greater degree of explanation with respect to the locations of New Jersey's permitted AFS facilities, than does the percent of minority population.  <u>Id.</u> at 4-5.

Dr. Mennis' report is dated August 3, 2003, and he was deposed on April 13, 2005.  On July 8, 2005, and admittedly in opposition to Defendants' motions here, Dr. Mennis authored a certification that characterized as "misleading" his own finding that "the percent minority of host tracts (33%) as compared to the percent minority of non-host tracts (35%) is relatively close."  Mennis Cert. at 1-2, ¶¶ 5-6.  He certifies that "although minorities in urban areas are often concentrated near hazardous facilities, this pattern may not be captured by looking only at the host tract" because, for one, "tracts vary greatly in size, typically being much larger in rural areas and smaller in more densely populated areas."  <u>Id.</u>  As such, he contends that his methods represented in Tables 2 and 3 of his report, which measure a tract's proximity to an AFS facility and calculate

51

facility density, respectively, paint a better picture of hazardous facility location, id. at 1-3, ¶¶ 5-8, and reveal "that race is a significant predictor of the density of polluting facilities in New Jersey" because "[a]ir polluting facilities tend to concentrate near high percent minority tracts," id. at 2-3, ¶ 8.  Plaintiffs cite to these two latter quotations from paragraph eight of Dr. Mennis' certification in support of their contention that "race plays such a significant role in DEP's facility permitting, as part of the pattern is unexplainable on grounds other than race."  Pls.' Opp. Br. at 47.

In making such a contention, though, Plaintiffs have taken a significant conceptual leap.  First, when Plaintiffs use the language "unexplainable on grounds other than race," Pls.' Opp. Br. at 47, they are evoking the language the Arlington Heights Court used to describe the rare case of Yick Wo v. Hopkins, 118 U.S. 356 (1886), in which "a clear pattern, unexplainable on grounds other than race, emerge[d] from the effect of the state action even when the governing legislation appears neutral on its face." Arlington Heights, 492 U.S. at 564.  Yick Wo is a case growing out of the anti-Chinese crusade in San Francisco over one hundred years ago during which an ordinance had been passed by the city council requiring those who desired to engage in the laundry business to first obtain a permit from the board of supervisors of the city so to do. Yick Wo, 118 U.S. 356.  It was admitted that such permission had been refused to every Chinese applicant and granted to every white person seeking the same.  Id.  There is no such admission of discrimination here.  Dr. Mennis himself testified that any disparate impact that exists does not, by itself, support a finding of a discriminatory purpose on the part of NJDEP, and has said that other factors, such as, population density and industrial land use, can explain his results, as well.  Mennis Dep. Tr. at 94:10-16, 130:16-22.  Therefore, the "unexplainable on grounds other than race" language is inapplicable here.

52

Second, and more importantly, with regard to Dr. Mennis' data, there is no evidence presented by him or Plaintiffs as to when these facilities became located in these areas, what the racial composition was at the time of siting, and whether NJDEP permitting was involved.  SLC's expert, Dr. William Bowen, pointed out that "under Dr. Mennis' research design in the analyses described in his Tables 1, 2 and 3, the data do not include any time-related information on whether particular residents or permitted facilities came first."  Bowen Report at 5; SLC's Ex. 72. As such, Dr. Bowen concluded that "[i]t is therefore logically impossible to demonstrate on the basis of these data that the residents came before the facilities.  This design therefore cannot logically support any inferences about any putative causes of any observed relationships." Id.

Moreover, Glenn Hickerson, SLC's aerial photography expert, stated that there is aerial photographic evidence that the SLC property, "as well as many other properties within [census tract] 6018 has been consistently used for industrial related purposes since at least 1940." Hickerson Report at 4; SLC's Ex. 69.  He also stated that "Sanborn maps show that the [SLC] property has been used for industrial related purposes (large ship construction and major industrial transportation) since at least 1906."  Id.  Additionally, Joseph Balzano, who was "born and raised in the Waterfront South neighborhood" and has worked for the South Jersey Port Corporation and its predecessor since 1951, declared that the Waterfront South area was "historically developed to support the port's operations." Balzano Decl. ¶¶ 2, 7, SLC's Ex. 43.  The fact that 1970 census statistics reveal that tract 6018 had a population of 3,693 persons, of whom 2,201 were "white" and 1,452 were "negro," see Hickerson Report at 4, SLC's Ex. 69, further clouds Plaintiffs' contentions of historical discrimination at this site.

Furthermore, the New Jersey Legislature did not even create the DEP until 1966, see State

v. Kadelak, N.J.Super. 349, 357 (App. Div. 1995), and thus any allegedly historical evidence of discriminatory siting decisions must be of recent vintage only.  Yet, Plaintiffs have failed to parse out locations of polluting facilities pre-dating 1966.  As such, Dr. Mennis' case report, deposition, and recently authored certification reveal nothing about any actual permitting decisions made by the DEP and Plaintiffs have failed to provide any nexus between their evidence of the locations of the polluting facilities and what they suggest are the underlying discriminatory permitting decisions by NJDEP.  Plaintiffs are, in effect, asking the Court to assume that discriminatory permitting decisions occurred, which is something that the Court cannot do, especially in light of the undisputed evidence that 1) Tract 6018 has been used for industrial purposes for almost one hundred years; 2) the population of tract 6018 had more White residents than African-Americans in 1970; 3) the DEP began issuing permits like the one at issue here no earlier than 1966; 4) NJDEP has not conceded that it had discriminated in the past; and 5) there is no evidence of a finding of discrimination by any court or agency in the permitting context.  Thus, Plaintiffs' evidence regarding the locations of polluting facilities in New Jersey shows, at most, a disparate impact and nothing linking the locations of the facilities to NJDEP's permitting decisions. Disparate impact alone is not evidence of intent to discriminate, see Sandoval, 532 U.S. at 280, and thus, Plaintiffs have failed to produce any evidence of a historical pattern of discriminatory permitting decisions on the part of NJDEP.

Plaintiffs also contend, however, that there exists a historical record of discriminatory environmental enforcement on the part of NJDEP.  Plaintiffs have cited to Grosjean v. American Press Co., 297 U.S. 233, 245 (1936) for the proposition that "[d]iscriminatory purpose may be inferred when history reveals that the government uses a device that was traditionally used to

54

target an identifiable group for unfair treatment." Pls.' Opp. Br. at 47. In Grosjean, newspaper

publishers sued to enjoin the enforcement against them of a tax imposed upon newspapers with a

circulation of 20,000 copies per week in Louisiana. Grosjean, 297 U.S. at 240-41. The United

States Supreme Court invalidated the Louisiana tax as a result of the long recognized tradition of

using such taxes to suppress political opposition in the press. Id. at 243-51. NJDEP argues that

"Plaintiffs' argument that there is evidence of disparate enforcement by the Department is wholly

irrelevant to their claim of discrimination in the review and issuance of the SLC permit ... and

should not be considered during an Arlington Heights analysis."[21]   NJDEP's Reply Br. at 15.

According to Plaintiffs, Dr. Mennis found that in New Jersey "polluting facilities in high

percent minority areas are associated with significantly less enforcement actions and lower penalty

amounts compared to facilities in low percent minority areas. He also found that facilities with

significant violations are more likely to be in high percent minority areas." Pls.' Opp. Br. at 48

(internal citations omitted). Importantly, however, Plaintiffs have not alleged that NJDEP

engaged in discriminatory enforcement with regard to SLC's facility. Since the issue here is

whether the DEP's permitting decision regarding the SLC property was discriminatory, historical

discriminatory enforcement, even if true, is of limited relevance to the Court's inquiry. Yet, the

Court is not prepared to declare such evidence "wholly irrelevant," since it could be probative of a

---

[21]Grosjean, to which Plaintiffs have cited, involved a tax against the press that was a traditionally recognized forms of discrimination. As early as 1644, John Milton had argued against such taxes by the British Parliament. Grosjean, 297 U.S. at 245. Despite the persistent search for new subjects of taxation, the Court noted that it was "not without significance that, with the single exception of the Louisiana statute, so far as [it could] discover, no state during the one hundred fifty years of our national existence has undertaken to impose a tax like that" in Grosjean. Id. at 250-51. Plaintiffs are hard pressed to argue that the discrimination which they assert occurred here is as embedded in jurisprudence as the doctrine against taxes of the press.

discriminatory animus on the part of the DEP if other evidence exists of discrimination in the permitting context, and specifically with regard to the SLC site.  Here, the Court finds no such other evidence of discrimination in permitting.

Plaintiffs contend that another manner in which "to demonstrate a history of discriminatory intent is through evidence of actions taken by a decisionmaker to avoid or frustrate earlier efforts at non-discrimination."  Pls.' Opp. Br. at 50.  Specifically, Plaintiffs argue that NJDEP and its former Commissioner, Robert Shinn, undertook efforts "to avoid DEP's responsibilities under Title VI" by creating the Environmental Equity Policy in response to the EPA's Interim Guidance.  Pls.' Opp. Br. at 50. First, they have identified a letter written in September 1998 by Commissioner Shinn to Robert Lanz, a Coca-Cola vice president, wherein, Shinn explained that the FACA task force "has been struggling since May to come up with an alternative to the EPA guidance that allows states more control over the process and have flexibility so that the process works along with the permitting process."  Letter from Robert Shinn to Robert Lanz (Sept. 1998) at 1, Pls.' Ex. P.  He also stated that the DEP has "been involved in working with a group of stakeholders from across New Jersey to develop a state alternative to the EPA guidance that emphasizes community outreach and a proactive approach to environmental equity."  Id.  As such, Shinn indicated that the DEP wanted to test "whether [its] approach is a workable alternative" and asked Lanz if Coca-Cola would serve as a pilot company upon which the DEP could test its approach since Coca-Cola was "in the process of applying for manufacturing permits in [Newark, New Jersey], a minority community in the state."  Id. at 2.

Shinn's letter to Coca-Cola, as well as his deposition testimony, reveal that Shinn was concerned that the EPA's Title VI Interim Guidelines had "very negative implications ... upon

New Jersey," Letter from Robert Shinn to Robert Lanz (Sept. 1998) at 1, Pls.' Ex. P, because they had the potential to invalidate permits already issued by the DEP, which would cause "nightmar[ish]" "financial" and "legal" issues. Shinn Dep. Tr. at 77:22-78:6. Furthermore, he felt that the possibility of an EPA "override" of a permit would cause permitholders to lack confidence that they "really" possessed permits. Id. at 79:20-22. As such, he sought to create a "front end process," id. at 78:5-6, because "the sooner you start to talk about an issue of permit application[,] the sooner you are able to resolve it amicably. If you're at the tail end of the process, it's just a fight. So[,] [Shinn's] whole concept was driven by early participation, early discussion of the issues, some mitigation of some of the issues possible and rather than the permit invalidation at the end of the process," id. at 78: 14-25. Shinn hoped that pursuant to his policy, the EPA would "delegate" to NJDEP its authority to overturn an NJDEP permit and that NJDEP permits could not "be challenged" under "Title VI." Id. at 199:19-201:15. Shinn stated that his objective was not to "implement Title VI" but rather to create an "alternative" to the EPA policy and have the EPA "endorse[] and support" NJDEP's policy. Id. at 73:2-14.

Shinn also stated that he "felt [NJDEP] needed a policy because [there was] a high minority population throughout the state." Id. at 195:7-9. He made clear that he was "very aware of Camden," id. at 237:17, stated that the city had "had a tortured history," 114:16-17, and that it had been "through a tough[] economic cycle," id. at 114: 25-115:1. As such, Shinn thought of Camden as an area that was a "potential environmental justice site" and/or a "candidate for environmental equity confirmation" because of its low "per capita income," "unemployment," "substandard" housing, and "racial demographics." Id. at 124:25-126:20.

Plaintiffs have identified the testimony of Gary Sondermeyer, who managed the DEP

senior managers and all day to day activities of DEP under Commissioner Shinn, as allegedly

establishing Shinn's intent to evade Title VI obligations.  Specifically, Plaintiffs point to

Sondermeyer's statement that he "had been involved in the [Shinn] administration's efforts in the

area of environmental equity" and that when Commissioner Campbell took over, he "very

appropriately" "sought to move the issue in a different direction."  Id. at 24:17-23.  Indeed,

Shinn's policy was never implemented by NJDEP.  However, upon reviewing the entire transcript

of Sondermeyer's testimony,[22] it is evident that Plaintiffs have taken his comments out of context

and mischaracterized them.  Sondermeyer testified to his belief that "Commissioner Shinn was

extremely interested in the issue of environmental justice," id. at 27:5-6, and that he felt that

Commissioner Campbell went in a different direction because he "wanted different people

involved," id. at 24:22-23, and felt that Shinn's proposal was "overly procedural and not

particularly substantive," id. at 104:10-12.

> Plaintiffs have also characterized NJDEP's policy as:
>
> differ[ing] from coverage under Title VI in important respects and provid[ing]
> people of color with significantly fewer protections than the federal civil rights law
> as applied by EPA. First, it would have precluded a complaint at the end of the
> permit process. Second, unlike Title VI, the DEP process was voluntary for
> permit-seekers.  On this point, Shinn overruled his own Advisory Council, which
> wanted the process mandatory.  Third, under the program DEP had no ability to
> deny the permit, which Shinn knew Title VI had.  Pls.' Opp. Br. at 53 (internal
> citations omitted).

Even assuming Plaintiffs' comparisons are accurate, Plaintiffs must demonstrate that NJDEP was

attempting to evade civil rights protections and that its policies were grounded in discrimination.

Plaintiffs have cited to Griffin v. County School Board of Prince Edward County, 377 U.S.

---

[22]On March 20, 2006, the Court emailed the parties and requested complete transcripts of
Shinn and Sondermeyer's depositions.

218 (1964) in support of the proposition that "an attempt to weaken new and existing civil rights protections through seemingly neutral programs ... [is] evidence of invidious purpose." Pls.' Opp. Br. at 55.  In <u>Griffin</u>, the district court had enjoined discriminatory practices in Prince Edward County, Virginia schools, required the County School Board to take 'immediate steps' toward admitting students without regard to race to the white high school, and required the Board to make plans for admissions to elementary schools without regard to race.  <u>Griffin</u>, 377 U.S. at 222-23. As a result of the distict court's order, "Prince Edward's public schools were closed and private schools operated in their place with state and county assistance."  <u>Id.</u> at 231.  The Supreme Court ruled that "closing the Prince Edward schools and meanwhile contributing to the support of the private segregated white schools that took their place denied petitioners the equal protection of the laws." <u>Id.</u> at 232.  While Plaintiffs characterized the closing of the public schools and operation of a white private school in <u>Griffin</u> as "seemingly neutral," Justice Black, writing for the United States Supreme Court, thought otherwise, and concluded that the aforementioned events occurred "for one reason, and one reason only: to ensure, through measures taken by the county and the State, that white and colored children in Prince Edward County would not, under any circumstances, go to the same school."  <u>Id.</u> at 231.  In contrast, the actions taken by NJDEP in connection with its efforts to achieve environmental equity and satisfy the goals of the EPA's Interim Guidance are "seemingly neutral."

Moreover, even if the DEP's policy was less stringent than that suggested by the EPA Interim Guidance, that would not cause Plaintiffs to prevail since the Interim Guidance makes clear that it "is intended to provide a framework for the processing by EPA's Office of Civil Rights" of Title VI complaints "alleging discriminatory effects resulting from the issuance of

pollution control permits by state and local governmental agencies that receive EPA funding."

EPA, Interim Guidance for Investigating Title VI Administrative Complaints Challenging

Permits, (Feb. 5, 1998) at 1, available at http://www.epa.gov/civilrights/docs/interim.pdf (visited

March 14, 2006). As such, the Guidance outlines the specific steps that the OCR is to follow

when processing Title VI complaints. Id. at 3 (emphasis added). There is nothing within the

Interim Guidance to suggest that NJDEP was required to adopt or follow it. The fact that NJDEP

sought to create its own front end policy that would address environmental equity questions early

on in the process rather than later, which still left open the possibility that permits it already issued

could later be invalidated by the OCR or EPA, may be evidence that Shinn and the DEP sought to

approach environmental justice differently, but it is not that they sought to evade it.[23] Indeed, the

DEP policy would have addressed the issues of environmental equity before the lengthy

permitting process had been completed, rather than later, as Plaintiffs would obviously prefer.

Even when granting all inferences to Plaintiffs, there is no evidence of an effort on the part of

Commissioner Shinn to evade environmental equity. Therefore, the Court finds that the DEP's

work towards creating its own policy did not constitute avoidance or frustration of earlier efforts

at non-discrimination. Thus, the Court finds that Plaintiffs have not shown that the historical

background of the decision to issue the permits to SLC is evidence of NJDEP's intent to

discriminate.

    4) Sequence of Events Leading Up To the Issuance of the Permits and Departures From

---

[23]The Interim Guidelines also provide: "The statements in this document are intended solely as guidance. This document is not intended, nor can it be relied upon, to create any rights enforceable by any party in litigation with the United States." EPA, Interim Guidance for Investigating Title VI Administrative Complaints Challenging Permits, (Feb. 5, 1998) at 11, available at  http://www.epa.gov/civilrights/docs/interim.pdf (visited March 14, 2006).

the Normal Procedural Sequence

In <u>Arlington Heights</u>, the Supreme Court also explained that "[t]he specific sequence of

events leading up the challenged decision" and "[d]epartures from the normal procedural

sequence" "also may shed some light on the decisionmaker's purposes." 429 U.S. at 267.

Plaintiffs contend that the "DEP's attempts to evade its Title VI obligations are ... also part of the

sequence of events leading up to the SLC permitting decision that demonstrate discriminatory

intent by DEP." Pls.' Opp. Br. at 56. Since the Court has already determined that there is no

evidence that the DEP evaded any Title VI obligations, <u>see</u> Discussion <u>supra</u> § II(C)(3), this

argument fails.

Plaintiffs also argue that DEP's "selective enforcement of New Jersey environmental law,

in waiving of [N.J.A.C. § 7] permit fees to developments in Camden" is evidence of DEP's

discriminatory intent pursuant to <u>Arlington Heights</u>' "sequence of events" and "departures"

factors. Pls.' Opp. Br at 57-58, 63. However, Plaintiffs have not identified any evidence showing

that NJDEP waived SLC's permit application fees here, and, in fact, NJDEP and SLC contend

that NJDEP did not waive SLC's fees. SLC's Reply Br. at 21; NJDEP's Reply Br. at 17, n.10.

While Commissioner Shinn testified that NJDEP waived permit fees for other Camden projects,

such as the baseball stadium, aquarium, Admiral Wilson Boulevard improvements and the

Battleship New Jersey, Shinn Dep. Tr. at 115:12-116:14, Plaintiffs have submitted no evidence

that these projects caused any pollution.[24] Thus, these projects are not relevant to the inquiry here

_____

[24]Plaintiffs' contentions that fees were waived in connection with these projects because
of discrimination and not in order to improve economic conditions, and that the projects "caused
increased development and increased traffic in this already overburdened area," Pls.' Opp. Br. at
58-59, are conclusory and unsupported by the evidence. Moreover, if this case were to proceed
to the rebuttal stage, those contentions would surely be rebutted by evidence that NJDEP waived

and do not constitute evidence of discriminatory intent on the part of NJDEP.

Plaintiffs have also argued that DEP's "failure to conduct an environmental justice" or "environmental equity" analysis is indicative of discriminatory intent under <u>Arlington Heights</u>'s "specific sequence of events" and "departure from normal procedure" factors because "DEP was well aware that Camden was both a community of color and a community overburdened by pollution." Pls.' Opp. Br. at 60, 62, 63. They also quote Judge Orlofsky's first Opinion in this case and argue that "[t]he fact that the District Court found, at the preliminary injunction stage, that DEP had violated [the] EPA's Title VI regulations indicates the presence of a triable issue of fact on whether the specific sequence of events leading up to DEP's decision is indicative of discriminatory intent." <u>Id.</u> at 62-63. Indeed, Judge Orlofsky held that "NJDEP and Commissioner Shinn [had] violated Title VI of the Civil Rights Act by failing to consider the potential adverse, disparate impact of the SLC facility's operation on individuals based on their race, color, or national origin, as part of the NJDEP's decision to permit SLC's proposed facility." <u>South Camden Citizens in Action</u>, 145 F. Supp.2d at 481. However, since Judge Orlofsky issued that Opinion, the United States Supreme Court issued its decision in <u>Sandoval</u>, in which it ruled that § 601 of Title VI does not itself prohibit actions that disparately impact racial groups and that related regulations that proscribe disparate impacts do not simply apply § 601. <u>Sandoval</u>, 532 U.S. at 280-85. Therefore, the Court ruled, the private cause of action available for enforcing § 601 does not extend to disparate impact regulations. <u>Id.</u> Since Plaintiffs' only remaining claim against NJDEP is for intentional discrimination pursuant to § 601 of Title VI, it is clear at this

---

fees in those cases with the legitimate purpose of aiding in the revitalization of Camden and Camden's economy.

juncture that it no longer holds true that NJDEP and Commissioner Shinn violated Title VI of the Civil Rights Act solely by virtue of any failure to consider the potential adverse, disparate impact of the SLC facility's operation on minorities.  Plaintiffs have not cited any legal authority that imposed this duty upon NJDEP.

The fact that Judge Orlofsky authored a new opinion to address <u>Sandoval</u>'s effect on this case also belies Plaintiffs' contention that his finding at the preliminary injunction stage, which was made before <u>Sandoval</u>, creates a triable issue of fact at this time. Indeed, the Third Circuit has made clear that a grant of a preliminary injunction is irrelevant when the case reaches the summary judgment stage. <u>Doeblers' Pennsylvania Hybrids, Inc.</u>, No. 04-3848, 2006 WL 722156 at *6 ("The District Court's earlier grant of a preliminary injunction, and this Court's affirmance thereto, is irrelevant to our review of the grant of summary judgment.").  Moreover, the DEP points out that it conducted a health risk study which showed that the addition of the facility did not elevate the health risk, <u>see</u> Shinn Dep. Tr. at 141:1-20, and followed informal policies aimed at increasing Plaintiffs' participation in the environmental equity process including community outreach, public meetings and a formal public hearing, <u>see</u> O'Sullivan Dep. Tr. at 125:24-126:21. Therefore, the Court finds that DEP's failure to conduct an environmental justice or environmental equity analysis is not indicative of discriminatory intent on the part of NJDEP.

Additionally, Plaintiffs contend that "DEP did not require SLC to build its primary smokestack to [58.9 meters,] the height disclosed to the public and used in the air modeling by SLC and DEP."  Pls.' Opp. Br. at 63-64.  Rather, SLC built its stack 55.1 meters high.  <u>Id.</u> at 64. Plaintiffs assert that "[t]his lower stack height increases the air pollution impact on the surrounding neighborhood" and argue that SLC's building thereof "creates a triable issue of fact

63

as to whether or not its departure from such substantive requirements indicates intentional discrimination." Id. at 64. In response, NJDEP argues that while "SLC, due to an oversight, installed a stack smaller than that modeled, this fact does not constitute evidence of discrimination by the DEP or support a conclusion that race was a motivating factor in the DEP's decision to issue the SLC permits." NJDEP's Reply Br. at 17, n.9.

Paul Flaherty, SLC's air modeling expert, when asked if it is "generally true that the higher the stack, the less immediate local impact there is from emission source," answered that "[i]n a very general sense, yes...It depends on other factors beside the stack height, but stack height is significant." Flaherty Dep. Tr. at 93:20-25. Flaherty's testimony is less than convincing on the issue whether a 55.1 meter high stack causes more pollution in Waterfront South than a 58.9 meter high stack would have caused. Furthermore, Plaintiffs have not submitted any evidence as to what NJDEP has done in other situations or what it is supposed to do when a permit applicant has built a smokestack lower than it had disclosed to the public and used in air modeling. As such, since the Court is unaware what constitutes the usual and customary response in such situations, even when granting all inferences in favor of Plaintiff, I am unable to find that the fact that NJDEP did not require SLC to demolish its smokestack and build it 3.8 meters higher constitutes a departure from substantive requirements that is indicative of intentional discrimination.

5) Deliberate Indifference

While admitting that "deliberate indifference has been rejected as an independent theory of liability under Title VI," Plaintiffs argue that "it can be considered ... as evidence of discriminatory intent under the Arlington Heights administrative history proxy." Pls.' Opp. Br. at

64.  Plaintiffs contend that "the deliberate indifference inquiry focuses on the fact that the entity charged with discrimination is vested with the authority and indeed, the <u>obligation</u> to address and rectify the harm caused by the actions of third parties. While the other inquiries focus on the affirmative actions of the agency, the deliberate indifference standard focuses on the agency's inaction – its sins of omission." <u>Id.</u> at 64-65 (emphasis in original) (internal citations omitted). Plaintiffs have cited <u>Gebser v. Lago Vista Indep. School Dist.</u>, 524 U.S. 274, 290 (1998) in support of this proposition, as well as <u>Bryant v. Indep. School Dist. No I-38 of Garvin County,OK</u>, 334 F.3d 928, 933 (10th Cir. 2003)( "[t]he choice not to act – despite knowledge of harm and a duty to address the harm– implicates intent").  Yet, SLC contends that "deliberate indifference has no part in an intentional discrimination analysis under <u>Arlington Heights</u> and its progeny."  SLC's Reply Br. at 24.  This Court agrees.

        In <u>Pryor v. NCAA</u>, 288 F.3d 548 (3d Cir. 2002), the Third Circuit had to decide, <u>inter alia</u>, whether the plaintiffs stated a claim for purposeful, racial discrimination under Title VI by alleging that the National Collegiate Athletic Association adopted certain educational standards because of their adverse impact on black student athletes seeking college scholarships.   In <u>Pryor</u>, the plaintiffs argued "that the NCAA was not just indifferent to [the] alleged disparate impact on black athletes; it was extremely indifferent to that impact even if it did not intend to discriminate." <u>Id.</u> at 567.  In support of their argument, they cited several cases, including <u>Gebser v. Lago Vista Indep. School Dist.</u>,524 U.S. 274, 290 (1998) where "the Supreme Court held that a school or other entity covered by Title IX could incur liability under that civil rights law if an entity official 'with authority to take corrective action' (1) had 'actual notice' about another employee's sexual harassment of a student; and (2) after receiving actual notice, that official was still 'deliberately

indifferent' to the intentional wrongdoing committed by the employee." Id. at 568.  According to

the Third Circuit in Pryor,

> [t]he problem with applying Gebser's "deliberately indifferent" standard to a Title
> VI purposeful-discrimination case is that that standard applies to one who sat by
> passively while another committed an intentional Title IX violation. Stated another
> way, the school in Gebser faced liability under Title IX not because it did anything
> intentionally wrong; it just sat by and did nothing at all. And again, in Alexander v.
> Sandoval, the Supreme Court held that an entity cannot incur liability under Title
> VI for anything short of intentional discrimination. So, if we accepted Plaintiffs'
> theory here, we would also have to cast the NCAA in the role of the Gebser school
> that committed a sin of omission, not a sin of commission. In so doing, we would
> effectively turn [Sandoval] on its head, along with its prohibition against imposing
> liability for anything short of purposeful discrimination. We have no authority to
> do so.  Id.

Plaintiffs' citation to Bryant, in support of the proposition that the choice not to act –

despite knowledge of harm and a duty to address the harm– implicates intent, is equally inapposite

because it presupposes that an intentional act of wrongdoing occurred in the first instance.  See

Pryor, 288 F.3d at 568.  Here, at least to the extent that they advance this alternative theory of

relief, Plaintiffs do not claim that the DEP committed the purposeful discrimination required by

Title VI and Sandoval; rather, they contend that the DEP acted with such disregard for Plaintiffs'

civil rights that the disregard by itself is evidence of an intentional wrongdoing. If this Court

accepted this theory, it would eviscerate the Supreme Court's ruling in Sandoval.  Therefore,

Plaintiffs' argument that the Court should consider NJDEP's deliberate indifference to the fact

that new NAAQS[25] had been promulgated and to its "obligat[ion] to consider racially

---

[25]The operating permits that NJDEP issued to SLC in 2000 required SLC to comply with
the 1987 NAAQs.  The 1987 NAAQs were the standards in effect when the NJDEP issued the
permits.  Plaintiffs contend that because new, more stringent NAAQs were promulgated in 1999,
but not yet implemented in 2000 because they were challenged in litigation, NJDEP was on
notice that the 1987 standards "were not adequately protective of public health," Pls.' Opp. Br.
at 66, and that this notice is evidence of NJDEP's intent to discriminate.  Even if the Court

discriminatory impacts," Pls.' Opp. Br. at 66, as evidence of NJDEP's intent to discriminate, is

without merit.

    6) <u>Foreseeability and Totality of the Circumstances</u>

    Plaintiffs also contend that "foreseeability of and knowledge of discriminatory onus placed

upon the complainants" is a factor that the Court may consider when determining whether NJDEP

acted with discriminatory intent.  Pls.' Opp. Br. at 71.  In support of this proposition, Plaintiffs

cite to Judge Orlofsky's most recent Opinion in this case, which in turn cited to <u>Columbus Bd. of</u>

<u>Ed. v. Penick</u>, 443 U.S. 449 (1979).  In <u>Penick</u>, students in the Columbus, Ohio, school system

sued the Columbus Board of Education,  alleging that the Board intentionally segregated the

public schools based upon race.  <u>Penick</u>, 443 U.S. at 449.  The Court ruled in favor of the

students, and, in doing so, stated that "actions having foreseeable and anticipated disparate impact

are relevant evidence to prove the ultimate fact, forbidden purpose. Those cases do not forbid the

foreseeable effects standard from being utilized as one of the several kinds of proofs from which

an inference of segregative intent may be properly drawn."  <u>Id.</u> at 464-65.  The <u>Penick</u> court also

noted, though, that "disparate impact and foreseeable consequences, without more, do not

establish a constitutional violation."  <u>Id.</u> at 464.  As such, assuming, <u>arguendo</u>, that Plaintiffs are

correct that "[t]he disparate impact of the SLC was clearly [foreseeable]" to Commissioner Shinn

and NJDEP, Pls.' Opp. at 71, such a foreseeable impact is of no aid to Plaintiffs at this juncture

because it, alone, is insufficient to establish a constitutional violation, <u>Penick</u>, 443 U.S. at 465,

and this Court has found no other evidence of any intent to discriminate on the part of Shinn or

---

    accepted Plaintiffs' deliberate indifference theory, I would still be unable to conclude that the fact
that the DEP issued SLC's permits based upon the NAAQs that were in effect at that time is
somehow evidence of discriminatory intent.

the DEP.

Even if the Court adds to the totality of the circumstances equation Plaintiffs' evidence of DEP's alleged historical discriminatory enforcement, the result is the same, because that evidence is also disparate impact evidence.  Plaintiffs have no evidence of intent to discriminate specifically relating to NJDEP's issuance of SLC's permits.  When the Court grants all inferences in favor of Plaintiffs, including evidence of potentially discriminatory enforcement and of a foreseeable disparate impact, Plaintiffs still fail to establish that NJDEP issued permits to SLC because of, not merely in spite of, its adverse effects upon the minority community of Waterfront South.[26]  See Feeney, 442 U.S. at 279.  Therefore,  Plaintiffs' claim against NJDEP and its Commissioner pursuant to Section 601 of Title VI cannot survive summary judgment.

## III.  CONCLUSION

For the reasons set forth above, SLC's motion for summary judgment is granted and the motion for summary judgment filed by NJDEP and former Commissioner Bradley Campbell is granted..  An appropriate Order follows.

S/ Freda L. Wolfson
Honorable Freda L. Wolfson
United States District Judge

---

[26]I am constrained to note that the Plaintiffs in the Waterfront South area are unhappy, and deservedly so, with their continuing plight of being located in an area that is so historically suited to industrial facilities.  However, their assault on the SLC permitting decisions on a constitutional basis simply does not carry the day.  Instead, they should direct their efforts prospectively to the appropriate legislative and agency forums and work towards a sensible and meaningful environmental equity policy for the future.